**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CRANSTON SCHOOL DISTRICT** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **C.A. No. 06-538 ML** |
| **v.** | : | |
| | : | |
| **Q.D., through his parents and next friends, Mr. And Mrs. D.** | : | |
| | : | |
| | : | |
| **Defendant** | : | |

**PLAINTIFF, CRANSTON SCHOOL COMMITTEE'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, Plaintiff, Cranston School Committee, hereby moves for summary judgment, seeking a reversal of the decision of the hearing officer below, and denying Defendant tuition reimbursement and attorney's fees.

The reasons for said motion and objection are more fully set forth in the accompanying memorandum of law.

Plaintiff,
CRANSTON SCHOOL DISTRICT,
By its Attorney,

/s/ Gregory P. Piccirilli, Esq.
SCIACCA & PICCIRILLI
121 Phenix Avenue
Cranston, Rhode Island 02920
Phone: (401) 946-4900
Fax: (401) 944-3250
gregory@splawri.com

**CERTIFICATION**

I hereby certify that on April 16, 2007, I sent a true copy of the within by electronic filing to the following:

Mary Ann Carroll, Esq.
The Law Offices of Stephen M. Robinson
155 South Main St., Suite 402
Providence, RI 02903
macarroll@smrobinsonlaw.com

Vicki J. Bejma, Esq.
The Law Offices of Stephen M. Robinson
155 South Main St., Suite 402
Providence, RI 02903
vbejma@smrobinsonlaw.com

/s/ Gregory P. Piccirilli

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CRANSTON SCHOOL DISTRICT** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **C.A. No. 06-538 ML** |
| **v.** | : | |
| | : | |
| **Q.D., through his parents and next friends,** | : | |
| **Mr. And Mrs. D.** | : | |
| | : | |
| **Defendant** | : | |

**PLAINTIFF, CRANSTON SCHOOL COMMITTEE'S**
**MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION:

This case is an appeal by the Cranston School Department of a decision and order by a due process hearing officer involving a special education complaint under the Individuals With Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq*. In their initial complaint, the parents complained that the school department failed to provide their son with a Free Appropriate Public Education (FAPE) as required by the IDEA. As a result, the parents unilaterally placed their child at a private facility, the Wolf School, and sought tuition reimbursement from the school department. The hearing officer found that the school department had failed to provide QD with FAPE, and granted the parents' request for tuition reimbursement.

For the reasons set forth below, the parents have failed to meet the legal requirements for reimbursement, and the hearing officer's award of the tuition reimbursement should be reversed.

## II. PROCEDURAL HISTORY:

This case began when the parents of QD filed a request for an independent due process hearing on June 26, 2006. The school department filed a written response on July 7, 2006, and hearings on this matter were held on August 21, 22, 30, September 7, and 8, 2006.

Testifying at the hearing for the parents was their expert, Dr. Goldfischer, a pediatric neuropsychologist, who had conducted an evaluation of QD in the spring of 2006. Next, was QD's second grade teacher, Jacqueline Ingalls, who testified about the brief tutoring she provided QD during the summer of 2005, between his third and fourth grade.

The parents also presented the testimony of the Director of the Wolf School, Rosaline Granoff, who described the nature of that school's program, but who had no direct knowledge of QD or his Cranston program.

Jean Irving, QD's third and fourth grade public school teacher, testified extensively about QD's program and the progress he made, as did his counselor, the school psychologist, Sheree Koval.

For Cranston, its school psychiatrist, Dr. Gregory Steiner testified. Dr. Steiner was familiar with QD from both his private practice, and from working with him on behalf of the school district. Lastly, the mother testified briefly about her observations of her son's educational progress.

Thirty-one full exhibits were accepted into evidence. These included QD's IEPs from 2004 through 2006, as well as his report cards and progress reports. Also introduced were Dr. Goldfischer's 33-page report, replete with testing results, a diagnosis, and recommendations, as well as evaluations conducted by RI Hospital's Child Development Center, and Dr. Steiner. There

were also presented both educational and speech/language evaluations. Various correspondence and meeting notes were also introduced.

On November 17, 2006, the hearing officer issued her decision finding that the school district had denied QD FAPE, that the placement at the Wolf School was appropriate, and awarding tuition reimbursement to the parent.

First, the hearing officer found that the issue of QD's diagnosis was "irrelevant" to the case. (Dec. at p. 12) Conceding that Cranston was providing QD an individualized course of instruction with supporting aids and services, she focused on whether QD's IEP was affording him with "an opportunity that was reasonably calculated to achieve educational benefit." (Id.)

To support her decision, the hearing officer noted that the IEP for QD mentioned that he presents with serious social and emotional concerns, and yet that QD was placed in a classroom with students who are emotionally disturbed and behaviorally disordered. She added: "From a mere lay person's view, it is clear that placing this student with ED and BD children will not enhance his socialization, and more importantly, may adversely impact his socialization." (*Id*. at 13)

She accepted that QD has not made academic progress, based in part upon the comparison of Dr. Goldfischer's Woodcock-Johnson testing with the school district testing from a year earlier, and in part upon the school district's educational conference report of February 10, 2005, which noted a concern over a lack of academic progress. (Exh. 30) The hearing officer made no specific findings of fact with regard to whether QD was making progress in the area of social-emotional growth in the 2005-06 school year. She made no reference to the record of progress as reflected in QD's report card, progress reports, and in the testimony of the classroom special

education teacher and the school psychologist.

The hearing officer faulted the school district for not providing QD with individualized speech and language services, and for providing no more than .5 hour per week of counseling services by a certified school psychologist.

Finally, the hearing officer rejected the argument that the Wolf School is a more restrictive placement than a self-contained classroom in a public school, since "a private school placement that provides the student with appropriate supports and services cannot be rejected as more restrictive than a special education self-contained classroom simply because the school is located outside the district, particularly where there is no evidence of a comparable school setting within the district." (Dec. at 14)

## III. FACTUAL BACKGROUND:

QD was born on March 9, 1996, is currently eleven years old and is in the fifth grade at the Wolf School, having been placed there in September of 2006 by his parents. He was a student in Cranston since kindergarten, most recently at the George J. Peters Elementary School in a self-contained classroom. He had been in such an environment since the beginning of the third grade, after having attended the Orchard Farms Elementary School in a regular classroom. While the parents had signed an IEP for the 2004 (Exh. 23), they did not sign one for either 2005 or 2006. (Exhs. 24, and 25)

Until recently challenged by Dr. Goldfischer, the parents' neuropsychologist, QD's diagnosis has been Anxiety Disorder, ADHD, and a non-verbal learning disability. As will be explained further, there exists a question of whether QD' diagnosis should include Asperger's

Syndrome, an autism-spectrum disorder.

At the end of the fourth grade, QD's parents presented to the school department an evaluation by Dr. Goldfischer, which included the Asperger's diagnosis. (Exh. 5) In addition, the evaluation contained a litany of recommendations, none of which suggested a change in the nature of the educational program QD was receiving. Instead, the parents questioned the apparent lack of academic progress as measured by the Woodcock-Johnson-3rd Ed. Test of Achievement. In particular, the parents noted that the test, as administered by Dr. Goldfischer, showed little or no progress academically from one administered approximately one year earlier by the school's educational evaluator, Wendy Muscovitz. (Exh. 7).

The school department's special education director acknowledged the apparent lack of progress as measured by the two tests; however, she emphasized that QD was making good social and emotional progress, which would lead to more noticeable academic progress in the future. Based upon that determination, the school department felt that continuing along the academic path as set forth in its proposed IEP was appropriate for QD, and declined to consider any change in placement. (Exh. 8)

The parents presented testimony of Dr. Goldfischer to prove their case that QD was achieving little or no educational benefit from the Cranston Public School program, and to justify the private placement at the Wolf School. First, Dr. Goldfischer spent considerable time attempting to explain and validate his diagnosis of Asperger's Syndrome. (Vol. I, p. 9-33) Ultimately, he never testified what factors under the DSM-IV supported his diagnosis, instead relying primarily upon his own observations, and responses by the parent and teacher to Gilliam Asperger's Disorder Scale (GADS) and Social Responsiveness Scale (SRS), and a limited review

of the child's records. He never talked with any of the teachers or other staff members who have worked with QD, and did not review either the CDC psychological evaluation, (Exh. A), or Dr. Steiner's psychiatric evaluation (Exh. 14), both of which diagnosed QD with a primary Anxiety disorder, and not Asperger's. (Vol. I, p. 51-55)

In addition, Dr. Goldfischer testified about what program QD should receive. Based solely upon the lack of progress as based upon the two Woodcock-Johnson test scores, he testified that he did not believe that Cranston's program was affording QD FAPE. (Vol. I, p. 37-38) Although it is mentioned nowhere in his evaluation, Dr. Golfischer testified that QD would benefit from a so-called immersion model of education, with speech and language and occupational therapy in the classroom, and more than the proposed .5 counseling services as set forth in the IEP. (P. 43-46)

On cross-examination, Dr. Golfischer identified a few recommendations which he was unsure were being implemented in the Cranston program, such as sensory breaks, the assignment of a case manager, and avoiding sarcasm, figurative speech, idioms, slang, etc. Admittedly, he was unaware of whether these issues were already addressed by the school department. (P. 60-63)

He also mentioned the need for speech and language therapy, and more intensive occupational therapy, even though he devoted barely one paragraph to those recommendations in his 33 page report. (Exh. 5, p.23, "QD's school is encouraged to evaluate him to determine eligibility to receive school-based Occupational Therapy to assist him with his fine motor coordination difficulties, sensory sensitivities, and poor handwriting. Speech and Language Therapy might also be considered to help QD with aspects of nonverbal communications and improved social language.") (Vol. I, p. 73)

With regard to whether QD had made academic progress, Dr. Goldfischer conceded that he had never talked with the classroom teacher, never reviewed her progress notes, and never followed up on QD's progress subsequent to his February 2006 evaluation. (Vol. I, p. 47) As for QD's social and emotional progress, Dr. Goldfischer was unaware of QD's interactions with normative peers at school, or the progress as reported on the IEP. (P. 66-67) Instead, the doctor relied upon the scales as reported by the teacher, even though these scales reflect impairment and not progress. (P. 101)

The classroom teacher testified extensively about the progress she believed QD was making both academically and socially. For example, she testified that based upon her informal RIGBY testing, QD had improved from a 2nd grade reading level in September of 2004 to a late 4th grade level in May of 2006. On the Houghton Mifflin Assessment, QD scored at the 5th grade level with a 72 percent accuracy. (Vol. III, p. 74-79)

With regard to his IEP, Mrs. Irving testified that QD made progress in many areas. In reading, he responded to literary discussions using the WH questions; uses his index cards, story maps, and making personal connections to story characters. He participated in a reading circle. Written expression is an area of considerable weakness for QD, although he would write independently about topics such as a home activity or a friend without a prompt once he gets into a routine. Mrs. Irving disagreed with Dr. Goldfischer's recommendation that QD be punished with a denial of recess for failing to properly correct classwork. (Vol. III, p. 79-83)

In the area of math, QD had learned some math facts, was reducing his dependance on finger counting, could tell time, was working towards improving his calculation of coins, could read charts, graphs and maps, understood place and value, could do problem-solving patterns, and

many multiplication tables. (Vol. III, p. 84-86)

In the area of his social and emotional growth, QD had made more progress. He was better able to cooperate in a small group setting, and had improved his communication skills considerably. Remarkably, he participated more readily in recess activities with other peers, including playing football. He even made up a hockey game with sticks. (Vol. III, p. 87-89)

The makeup of QD's classroom reflected a typical self-contained classroom setting. While some students have behavior issues, Mrs. Irving testified that her classroom was not out of control as suggested by the parents. The classroom had one aide during QD's fourth grade year, it was to have two for the subsequent year. With the help of a social worker, psychologist, building principal, and guidance counselor, there was plenty of support to deal with the occasional disruption. (Vol. III, p. 91-95)

Mrs. Irving testified that she had prepared an extended school year IEP for QD for the summer of 2005, which would include a placement in a school setting. QD's parents did not avail themselves of this program, instead sending QD to camp, and having his 2nd grade regular education classroom teacher tutor him. This tutor chose not to follow any of the recommendations of Mrs. Irving, and taught QD in a one-on-one setting at home, rather than in a classroom setting. (Vol. III, p. 20-22) Not surprisingly, Mrs. Irving noted a regression in QD's ability to settle into a routine once he returned to school at the beginning of the fourth grade in the fall of 2005. (Vol. III, p. 95-98)

In the parents' case in chief, Mrs. Irving was asked about the rating scales. Mrs. Irving testified that, although these ratings were accurate at the time she filled them out, she did not think the scales reflected the progress QD had made in certain areas of his social and emotional

development. (Vol. III, p. 90).

Finally, the parent presented the testimony of Rosaline Granoff, who is the Director of Admissions at the Wolf School. The primary foundational basis of the school was to provide a model whereby students are provided speech and language and occupational therapy services in the classroom, instead of on a pull-out model which is common for public schools. (Vol. III, p. 9)

The school is not state certified as a special education school. (Vol. III, p. 10) The classroom to which QD was to be assigned has a regular education teacher, with no special education certification. (Vol. III, p. 39) The therapists are not certified teachers. (Vol. III., p. 41) There is no guidance counselor, (p. 36), or librarian (p. 44). While QD would have access to art and music, he would be taking those courses with only the other 7 disabled peers in his classroom. (P. 46)

While Ms. Granoff provided some critique of Cranston's program, she conceded that she never met with or talked to anyone in the Cranston School Department about QD, and did not have any observations of what QD did in school. (Vol. III, p. 48)

After some considerable confusion, Ms. Granoff noted that her school does not prepare IEPs as those documents are envisioned under the IDEA. Instead, when a child is placed by a school district, the Wolf School relies upon that district to prepare and revise the IEPs. If there is no public school involvement, the parents and staff meet informally in parent-teacher conferences. (Vol. III., p. 56-67)

With regard to counseling services, these services are provided through the classroom teacher and the therapists and aides. No dedicated time is allotted for QD to meet with a professional psychologist. (Vol. III, p. 72)

Next to testify was QD's school psychologist, Sheree Koval. According to the IEP, she counseled QD one time per week for approximately 30-45 minutes, as well as on other occasions as QD needed, and during the day in the school setting. (Vol. IV, p. 5) The primary area in which Ms. Koval assisted QD was dealing with anxiety issues. She testified to the strategies that she taught QD, and his success in implementing and internalizing those strategies. QD also had issues with accepting limitations and responsibilities. She dealt with the fact that the consequences at school were not often carried over at home. (p. 6-9)

With regard to QD's diagnosis, although Ms. Koval did not seek to directly contradict Dr. Goldfischer, she did note that many of the characteristics she has noticed and counseled in Asperger's children were absent from QD. (Vol IV, p. 10) Particularly, QD does not present with significantly impaired social interactions. He makes eye contact, understands gestures, enjoys interacting with other children. He has play dates. He can express empathy, and has demonstrated that to Ms. Koval in the classroom setting. He does not have repetitive or stereotypical behaviors; while QD can become fixated on a topic, that fixation seldom lasts long, and will change. He lacks rigidity; QD often deals with changes in schedules and routine without problem. While QD at times perseverates, this is more of a function of his anxiety. (p. 11-12)

With regard to Mrs. Irving's classroom, she found it well suited to QD. The classroom was well structured; Mrs. Irving was able to address the needs of all of her students. The interaction between the students and QD were positive. (Vol. IV, p. 13-14)

With regard to QD's mental age, Ms. Koval noted based upon the IQ scores, that it was 7 years 6 months, with a grade equivalency of 2.5. Vol. IV, p. 15) Based upon her experience and

understanding of the classroom, she felt that QD was receiving an educational benefit from the program in Cranston. She felt that the classroom setting was helping QD improve in all areas, both academically and social-emotionally. (P. 15-16)

Next, Dr. Steiner testified about his observations of QD. Although Dr. Steiner evaluated QD at the request of the school department, he had previously met QD and the parents in his private practice. (Vol. V, p. 7) First, Dr. Steiner disputes Dr. Goldfischer's diagnosis of Asperger's. Under the DSM, there are two major diagnostic criteria categories, one of which is social impairment, under which QD clearly qualifies. The second category is restrictive repetitive areas of interest, under which QD does not qualify. Unless both categories are met, the diagnosis of Aspergers' is not warranted. (p. 8-13) Specifically, QD is not cognitively fixated on specific topics. Nor does his perseveration focus on one topic; it is instead anxiety driven, and the topics on which QD obsesses will change often.

More troubling for Dr. Steiner in reviewing Dr. Goldfischer's report is his lack of reference to QD's anxiety issues. While agreeing that QD suffers from a non-verbal learning disability, Dr. Steiner believes that QD's primary diagnosis is related to his anxiety. (P. 14)

With regard to the rating scales so heavily relied upon by Dr. Goldfischer in support of his diagnosis of Asperger's, Dr. Steiner found them not very helpful. (Vol. V, p.42) In terms of the usefulness of these scales to measure progress, Dr. Steiner emphasized that they reflect a snapshot in time, and are only useful to measure progress if the scales are given to the same person to fill out over a period of time. (*Id.*)

While Dr. Steiner agreed with many of Dr. Goldfischer's recommendations, he found them too numerous to be of practical use, and often contradictory. As for Dr. Goldischer's testimony

about an immersion model for QD, Dr. Steiner noted nothing in Dr. Goldischer's report to support such a recommendation. (P. 14-17)

In the area of the standardized testing. Dr. Steiner found that such tests often do not accurately reflect the actual measure of a child's academic progress. Concerns over who performs the evaluation, and the conditions under which the test is performed, may reduce its reliability. Just as important an indicator are the observations of the student's teachers, as reflected in report cards and progress reports. (P. 18-22)

With regards to QD, Dr. Steiner felt that he was receiving an educational benefit from being in Mrs. Irving's classroom. He was impressed with the behavior plan she had developed for QD, particularly as it related to his anxiety issues. He also liked her ability to adapt her program to QD's needs as they changed over time. (p. 22-25)

Lastly, QD's report card and academic progress reports all show progress, both academically and in the area social and emotional growth. (Exh. 20)

## IV. STANDARD OF REVIEW:

The IDEA provides for an impartial due process hearing whenever a complaint is filed by a parent alleging a violation of the Act. 20 U.S.C.§ 1415(f). The decision of the due process hearing officer may then be appealed by way of a civil action in court, 20 U.S.C. § 1415(i)(2)(B). In reviewing these decisions, this Court "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Id.

As the First Circuit has noted, in reviewing the administrative record, the trial court's

"principal function is one of involved oversight." *Roland M. v. Concord School Committee*, 910 F.2d 983, 989 (1st Cir. 1990). The Court must be:

> "deferential, recognizing the expertise of the administrative agency, considering the agency's findings carefully and endeavoring to respond to the hearing officer's resolution of each material issue. Jurists are not trained educators. Thus, the statutory scheme binds the trial courts to give 'due weight' to the state agency's decision in order to prevent judges from imposing their view of preferable educational methods upon the States."

*Id.* (Citations and interior quotes omitted). The Court is not free to substitute its own views on the proper adjudication of a parent's complaint. "Rather, the law contemplates an intermediate standard of review on the trial-court level -- a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review." *Lenn v. Portland School Committee*, 998 F.2d 1083, 1086 (1st Cir. 1993). Otherwise, "the procedural protection provided by the administrative process would be rendered meaningless if courts could simply substitute their own preferences for the administrative officers' evaluations." *Kevin G. by Jo-Ann G. v. Cranston School Committee*, 965 F. Supp. 261, 264 (D.R.I. 1997).

It is against this backdrop that this Court should tackle its review of the matter below.

## V. BURDEN OF PROOF:

The United States Supreme Court has held that the same standard of proof applies is IDEA cases as in traditional cases. *Schaffer v. Weast*, 126 S.Ct. 528 (2005). Therefore, since the parents requested the due process hearing, they bore the burden of persuasion on all elements at the hearing.

## VI. ARGUMENT:

### A. The legal standard for tuition reimbursement.

The legal standard for tuition reimbursement under the IDEA emanated from the seminal case of *School Committee of Burlington v. Department of Education*, 471 U.S. 359 (1985). In that case, the court stated the following:

> [Parents who] "'unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials,' . . . are entitled to reimbursement only if . . . the public placement violated IDEA and [] the private school placement was proper under the Act."

*Id.* at 373-74 (1985), as quoted by *Florence County School District Four v. Carter*, 510 U.S. 7, 15 (1993).

This pronouncement of the Court is codified in the IDEA, and was most recently amended under the 2004 Reauthorization. The Act sets forth the standard by which tuition reimbursement cases are to be judged:

> "Payment for education of children enrolled in private schools without consent of or referral by the public agency.--
>
> (i) In general.--Subject to subparagraph (A), this part does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.
>
> (ii) Reimbursement for private school placement.--If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.
>
> (iii) Limitation on reimbursement.--The cost of reimbursement described in clause (ii) may be reduced or denied--
>
> (I) if-- (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform

> the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);
>
> (II) if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 615(b)(3), of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or
>
> (III) upon a judicial finding of unreasonableness with respect to actions taken by the parents.
>
> (iv) Exception.--Notwithstanding the notice requirement in clause (iii)(I), the cost of reimbursement--
>
> (I) shall not be reduced or denied for failure to provide such notice if-- (aa) the school prevented the parent from providing such notice; (bb) the parents had not received notice, pursuant to section 615, of the notice requirement in clause (iii)(I); or (cc) compliance with clause (iii)(I) would likely result in physical harm to the child; and
>
> (II) may, in the discretion of a court or a hearing officer, not be reduced or denied for failure to provide such notice if-- (aa) the parent is illiterate or cannot write in English; or (bb) compliance with clause (iii)(I) would likely result in serious emotional harm to the child."

20 U.S.C. § 1412 (a)(10)(C). The State of Rhode Island regulations interpreting this statute provide:

> "Reimbursement for private school placement. If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private preschool, elementary, or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate."

Board of Regents for Elementary and Secondary Education Regulations Governing the Education of Children with Disabilities, § 300.403.

In determining whether FAPE has been provided, the Courts have longed adhered to the

standard that the "IDEA does not require a public school to provide what is best for a special needs child, only that it provide an IEP that is 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law." *L.T. v. Warwick Sch. Comm.*, 361 F.3d 80, 83 (1st Cir. 2004), *citing Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 992-93 (1st Cir. 1990) (*quoting Board of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)).

Unlike certain other states, such as Massachusetts, which requires that an IEP assure that a special education child receive the "maximum possible development", Rhode Island has not required anything more than the federally mandated floor. *Scituate School Committee v. Robert B.*, 620 F. Supp. 1224, 1233 (D.R.I. 1985); *cf. G.D. v. Westmoreland School District*, 930 F.2d 942, 951 (1st Cir. 1991). As one Kansas court put it, the IDEA requires the equivalent of a "serviceable Chevrolet for all disabled children, not a Cadillac for the individual." *Logue v. Shawnee Mission Public Sch. Dist. No. 512*, 959 F. Supp. 1338, 1351 (D. Kan. 1997), *aff'd w/o opinion* 153 F.3d 727 (10th Cir. 1998). As long as the proposed IEP meets the minimal federal standard for appropriateness, "the Act does not require school districts to reimburse parents who choose a superior placement for their child." *Hampton School District v. Dobrowolski*, 976 F.2d 48, 52 (1st Cir. 1992).

In determining whether the IEP was appropriate, the Courts do not look simply as to whether and to what extent academic progress has been made in the past. As stated in *Roland M.*:

> "Among the related services which must be included as integral parts of an appropriate education are 'such development, corrective, and other supportive services (including . . . psychological services . . . and counseling services) as may be required to assist a handicapped child to benefit from special education.' . . . So long as the means for doing so fit within the statutory compendium, the Act 'requires that all of a child's special needs must be addressed in the educational plan.' . . . Thus, purely academic progress --

> maximizing academic potential -- is not the only indicia of educational benefit implicated either by the Act or by state law."

*Id.* at 991-2 (citations omitted). As stated in *Lenn v. Portland School Committee*, 998 F.2d 1083 (1st Cir. 1993), "an IEP is designed as a package. It must target all of a child's special need, whether they be academic, physical, emotional, or social." *Id.* at 1089 (citations omitted).

Another important factor to consider in determining the appropriateness of a program is the degree to which that program is offered in the least restrictive environment. "Mainstreaming may not be ignored, even to fulfill substantive educational criteria." *Rome School Comm., v. Mrs. B.*, 247 F.3d 29, 33 (1st Cir. 2001).

Even if a parent were to prove a denial of FAPE, reimbursement is not allowed unless the private placement is found to be appropriate. Thus, a placement that fails to provide for integration into a mainstream setting may not be considered appropriate for purposes of the Act, and tuition denied, regardless of whether FAPE was provided. *Rafferty v. Cranston School Comm.*, 315 F.3d 21, 26-7 (1st Cir. 2002).

Lastly, Courts have recognized that, as explained in *Rowley*, they "are ill-equipped to second guess reasonable choices that school districts have made among appropriate instructional methods." *L.T. v. Warwick Sch. Comm.*, 361 F.3d at 83. As recently noted by another hearing officer appointed in this state:

> "Autism is very difficult for parents, as well as teachers, to handle, and there are divergent theories as to the best treatment, *T.B. v. Warwick School Department*, 361 F.3d 80,83 (1st Cir. 2004). As the psychiatrist observed, there are various opinions concerning Asperger's Syndrome and the treatment thereof. Some experts believe that such children should be mainstreamed in classrooms with non-disabled peers so that they may benefit from the examples set by these students. Like other children, children with Asperger's Syndrome must often deal in a world outside the classroom. While providing appropriate supports, a LEA can provide a FAPE for these children."

*Mr. and Mrs. Doe v. School District*, Case No. 05-46 (January 13, 2006).

**B. The law as applied to the facts in this case**.

**1. Cranston had provided QD with FAPE.**

As an initial matter, it must be noted that the parents have no particular complaint with the IEP as developed for QD. They did not challenge the needs and strengths; the goals and objectives, the support services nor modifications and accommodations. They did challenge the amount of OT services, and the lack of speech and language, but not in the context of providing more pull-out services. Instead their complaint is with the public classroom model; i.e., they seek an immersion model for QD, where he will be educated with other disabled peers in a small class setting, with significant speech and language and occupational therapy services in the classroom, and not in a pull-out model. In essence, they want QD in a school with peers who suffer the same types of non-verbal learning disabilities, receiving a language based program, at the expense of the social and emotional growth he would achieve in the public school.

The sole person upon whom the parents rely for this argument is Dr. Goldfischer. Curiously, however, his report in no way supports their claim. Nowhere does he suggest in that report that QD is in need of an immersion model, or that there must be significant speech and language and occupational therapy services in the classroom. His only reference to such services is in passing in one small paragraph, and simply states that these services should be considered, without ever stating the manner in which the services should be provided.

The other complaints by Dr. Goldfischer with the IEP are not supported by the evidence. For example, he states that QD should have a case manager; QD does, it is his classroom teacher.

Dr. Goldfischer states that the staff should afford QD sensory breaks; QD has a quite extensive sensory diet, with many choices and opportunities to access it. Curiously, he states that the staff should avoid sarcasm and similar uses of language; there is no evidence that QD is subject to such remarks.

Also, Dr. Goldfischer faults the district for affording only a .5 counseling session; the Wolf School offers none, although they purport to provide it throughout the day in the classroom, with personnel not certified to provide such services. Conversely, the school department has professional guidance counselors, social workers and psychologists available to QD. It is disingenuous to suggest that a certified special education teacher is not as capable of affording QD informal counseling to any less degree that a regular classroom teacher, a speech and language therapist or an occupational therapist.

Ultimately, the case argued by the parents relies solely upon the alleged lack of academic progress made by QD, primarily evidenced by the comparative results of two Woodcock-Johnson Achievement Tests. As testified to by Dr. Steiner, since those tests were not given under similar circumstances, they are not a reliable indicator of whether QD has made academic progress.

One Federal Court has recently found that, even where no academic progress was noted based in comparing two Woodcock-Johnson tests performed four years apart, that the student was still receiving FAPE. *P.D. v. Franklin Township Bd. Of Ed.*, 2006 U.S. Dist. Lexis 16440 (D.N.J. 2006). There, the Court upheld a hearing officer's finding that, since the tests were not administered in a comparable way (the second was timed while the first was not), the tests were not an accurate indication of the progress being made. Since there was evidence that the child was receiving passing grades, the Court agreed with the hearing officer's determination that FAPE

was being provided. Indeed, even if the tests were an accurate reflection of the lack of academic progress, such a determination did not warrant a conclusion that the IEPs proposed by the school district were inappropriate.

Moreover, to the extent that the parents question the appropriateness of the Cranston's program for QD based upon whether he made progress, such an analysis is not proper. As the First Circuit Court of Appeals, as others, have ruled:

> "[T]he issue is not whether the IEP was prescient enough to achieve perfect academic results, but whether it was 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law. This concept has decretory significance in two respects. For one thing, actions of school systems cannot, as appellants would have it, be judged exclusively in hindsight. An IEP is a snapshot, not a retrospective. In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated."

*Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990). As noted recently by the Second Circuit, "inquiry into whether an IEP is valid is a necessarily prospective analysis, and that consideration of proof of whether an IEP meaningfully contributed to the child's education is not altogether proper." *D.F. v. Ramapo Cent. Sch. Dist.*, 430 F.3d 595, 598 (2nd Cir. 2005); *see also*, *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 530 (3d Cir. 1995) ("In any event, appropriateness is judged prospectively so that any lack of progress under a particular IEP, assuming arguendo that there was no progress, does not render that IEP inappropriate."); *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999) ("Instead of asking whether the [program] was adequate in light of the [child's] progress, the district court should have asked the more pertient question of whether the [program] was appropriately designed and implemented so as to convey ... a meaningful benefit. We do not judge [a program] in hindsight; rather, we look to the [program's] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were

reasonably calculated to confer ... a meaningful benefit.”).

Ultimately, the only evidence upon which the parents rely is the testimony of Dr. Goldfischer. And most of his testimony was to support a diagnosis of Asperger’s Syndrome for QD. As the evidence has shown, there is a significant dispute between Dr. Goldfischer and the school’s experts as to whether QD has Asperger’s. Indeed, it appears from the weight of the evidence that he does not, given his lack of restrictive repetitive interests. In fact, Dr. Goldfischer ignores completely the long-standing diagnosis of QD as having a primary anxiety disorder, a diagnosis provided by by the CDC and Dr. Steiner, who is a psychiatrist. If Dr. Goldishcer’s diagnosis of QD is so flawed, the remainder of his testimony, including his assertion that QD needs an immersion model of education, fails.

Regardless, there was no testimony as to why, even if one were to accept the Asperger’s diagnosis, QD’s program needs to be changed. Nowhere does Dr. Goldfischer state that, since QD has Asperger’s, he should be in an immersion model program. In fact, many such children are educated in the public schools, in an integrated program. The only basis Dr. Goldfischer relies upon is the alleged lack of academic progress as evidenced by the standardized tests.

In reviewing QD’s entire program, however, one sees that he is making progress, both academically and in the social and emotional realm. His classroom teacher noted that QD’s reading and math levels have improved, and is age and grade appropriate. He is adapting better to his environment, making friends, and learning self-control. The progress in some areas is better than others, but this should not be surprising. As the school psychologist noted, QD’s mental age and grade equivalency are below his normative age; and he has issues with accepting responsibility and consequences. As these areas improve, so will his academic abilities.

**2. The Wolf School is not an appropriate placement for QD.**

By comparison, there is no evidence that the Wolf School will provide a program that will improve either QD's academic or social and emotional growth. Although this program includes more in-class speech and language and occupational therapy, it contains no psychological counseling. Such counseling was found to be important by not just Dr. Steiner, but by Dr. Goldfischer as well. Yet the Wolf School has no trained psychologist, social worker or even guidance counselor. Instead, the school relies upon a regular education teacher, and non-teaching certified therapists to provide generalized counseling in the classroom.

Most amazingly, the school does not even prepare IEP's for its students, but relies upon a local sending school district to do so for them. Clearly, there is no student there on a tuition reimbursement case.

Finally, one cannot deny that QD will lose out on the very important consideration of the mainstreaming opportunities he receives in the public school. While he does not always participate in integrated environments, he does participate in art, music, and physical education. He has even participated on occasion without the necessity of an aide. He enjoys lunch and recess, and has made friends and participated in collaborative activities with non-disabled peers. These opportunities are simply unavailable in a school with 48 students, all of whom have significant disabilities such as QD's.

Given the mental age and grade equivalency of QD, as testified to by the school psychologist, it is doubtful that QD will ever make the same academic progress as one would expect to see in other students not similarly situated. But even if one had evidence that the immersion model of teaching could produce some marginal better results in QD's academic

performance, that factor alone is not sufficient justification for denying QD the statutorily mandated requirement of an integrated environment in the public school. When addressing a similar situation in the case of *Roland M.*, the Court stated: "As a matter of maximizing [the student's] educational benefit, those special needs were properly considered by the IEP team, notwithstanding the parents' rather single-minded focus on academic results." 910 F.2d at 993.

**3. The hearing officer's decision must be reversed.**

Neither the hearing officer's criticism of the Cranston program, nor her ruling about the appropriateness of the Wolf School, is not supported by the record in this case,.

First, and most importantly, the hearing officer makes no specific findings as to whether QD made progress, either academically, or in the area of social and emotional growth. She completely ignores his report card and progress reports, all of which evidence progress being made by QD towards the goals and objectives in his IEP. (See Exh. 20) She discounts, without elaboration, the testimony of both the classroom teacher, and the school psychologist, who both testified as to his progress.

The hearing officer seems to accept, without condition, that QD showed a lack of academic progress based solely upon a comparison of Dr. Goldfischer's Woodcock-Johnson testing with the testing by the school district one year earlier. Dr. Steiner testified that the testing was not appropriate, since it compared un-timed scores with timed scores, and was done by a different evaluator in a different setting, and without considering the testimony of the classroom teacher who noted academic progress. To rely upon such testing to find a lack of academic progress, and therefore a lack of FAPE, is inappropriate under the IDEA. *See*, *P.D. v. Franklin*

*Township Bd. Of Ed.*, 2006 U.S. Dist. Lexis 16440 (D.N.J. 2006).

The hearing officer does cite the school district's concern over a lack of academic progress from February of 2005, but that concern was over one year prior to the time at issue in the complaint, and fails to consider the progress made by QD since that time.

The main thrust of the hearing officer decision regarding the lack of FAPE involves the type of classroom in which QD was placed. She noted that the IEP for QD mentioned that he presents with serious social and emotional concerns, and yet that QD was placed in a classroom with students who are emotionally disturbed and behaviorally disordered. She adds: "From a mere lay person's view, it is clear that placing this student with ED and BD children will not enhance his socialization, and more importantly, may adversely impact his socialization." (Id. at 13) With due deference, a mere lay person's standard of what classroom is appropriate for this child is not the standard by which a hearing officer should be deciding if FAPE has been denied to a special needs child.

Concededly, Dr. Goldfischer testified that placing QD in a classroom with behaviorally disorder students would be "very bad", because QD would be susceptible to modeling inappropriate behaviors. (Vol. I, p. 42) Dr. Golfischer provides no evidence that QD was, in fact, modeling such behavior; for example, that his behavior had gotten worse since he left the regular education classroom. He ignores that QD had opportunities to model the behavior of typical peers while in Cranston, an opportunity he will not have at a school like Wolf which has no such peers to model. For example, QD was noted as playing football and making up games with his friends. (Vol. III, p. 87-89) Instead, the parents have placed QD in a school with all disabled students, many of whom have a form of autism, who cannot be providing QD with much better in

terms of modeling behavior.

By blithely suggesting that the removal of QD from the public schools, and placing him in a school with all disabled students is not significant, the hearing officer violates the mandate of IDEA to have students educated with their non-disabled peers to the maximum extent possible. She suggests that a more restrictive environment, with no access to non-disabled peers, may serve QD better academically, even though there is no evidence to support the assumption that QD will perform better academically at the Wolf School. As the First Circuit has stated in *Rome School Comm., v. Mrs. B.*, 247 F.3d 29, 33 (1st Cir. 2001), "Mainstreaming may not be ignored, even to fulfill substantive educational criteria."

In conjunction with the findings regarding the placement of QD, the hearing officer noted: "[The classroom teacher's] responses to the Goldfischer ratings scale questionnaire belie progress or at least demonstrate that additional supports and services are necessary to the education of this child." The evidence presented, however, was that such scales are but a snapshot in time, and are not useful in determining progress. (Vol. V, p. 14) Moreover, the hearing officer ignores any mention of the type of social and emotional progress witnessed by the school staff.

As for what additional support and services were needed, no mention is made. Instead, it is suggested that a complete change in the child's classroom, i.e. placement at an outside facility, is the only way for this child to progress socially and emotionally. How removal from a public school setting, with its opportunities to interact with non-disabled peers, advances the child's ability to progress socially and emotionally, is never explained.

Curiously, the hearing officer faults the school district for failing to provide speech and language services. It is apparent that the importance of speech and language services has more to

do with the nature of the program at the Wolf School, and less to do with QD's actually needs. Regardless, the only expert evidence related to QD's need for speech and language services is contained in a Speech and Language Evaluation conducted by Rehab New England (Exh. 18). That evaluation states on the bottom of the second page: "Speech and language therapy is not warranted at this time secondary to overall performance within the clinic setting."

In addition, the IEP team, which included both the parents and their attorney, in February of 2005 concluded that "Speech/Language Evaluation would *not* be completed. (Exh. 30)

Then, as part of Dr. Goldfischer's 33 page report, the only mention of such services is as follows: "QD's school is encouraged to evaluate him to determine eligibility to receive school-based Occupational Therapy to assist him with his fine motor coordination difficulties, sensory sensitivities, and poor handwriting. Speech and Language Therapy might also be considered to help QD with aspects of nonverbal communications and improved social language.") (Exh. 5, p.23; see also, Vol. I, p. 73)

In short, the accusation that the district failed to provide QD FAPE because there was no speech and language therapy in his IEP is belied by the evidence.

Also, the hearing officer faults the school district for not providing QD with more psychological counseling services. Yet the Wolf School provides none. Such a hypocritical finding cannot withstand the scrutiny of this Court.

In her decision, the hearing officer rules: "The district's determination in June of 2006 that the student's social and emotional problems precluded educational progress with out adjusting the student's IEP to address those issues as well as the failure to address Dr. Goldfischer's findings and recommendations constitute a denial of FAPE." (Dec. at 14) This statement is so vague that

it provides no guidance as to how the IEP should have been changed, or what findings and recommendations were ignored. The first time that Dr. Goldfischer suggested that QD be placed in an "immersion" type educational setting, with extensive speech and language services, was when he testified in August of 2006. Nowhere in his report, which was provided to the school district in June of 2006, was such an educational setting even mentioned, let alone recommended.

Lastly, the hearing officer suggests that the removal of QD from the public school, and placement of him in a school devoid of non-disabled peers, does not violate the mandate of IDEA that children with special needs be integrated to the maximum extent possible. The hearing officer apparently believed that QD would make better progress in such a restrictive setting than in the integrated setting of a public school. Such a determination violates the basic tenet of the IDEA that, "Mainstreaming may not be ignored, even to fulfill substantive educational criteria." *Rome School Comm., v. Mrs. B.*, 247 F.3d 29, 33 (1st Cir. 2001).

**VII. CONCLUSION:**

In summary, the hearing officer's decision that the school district denied QD FAPE, and that the Wolf School placement was appropriate, should be reversed. The decision essentially relies upon unsubstantiated expectations that an immersion model will enhance QD's academic abilities beyond what he has accomplished in the Cranston Public Schools. It ignores the social and emotional progress QD has been and would continue to achieve in a public school setting; the progress he has made in reading and math as evidenced by the classroom teacher's report card, progress notes and informal testing; and the significant social and emotional improvements made by QD, including his interactions with other students, both impaired and non-impaired. It

deprives QD of an education in the least restrictive environment, and the opportunity to interact with non-disabled peers.

Based upon all of the foregoing, the hearing officer's decision should be reversed, the parents' request for tuition reimbursement for the Wolf School for the 2006-07 school year should be denied, and the parents' claim for attorneys' fees, based upon prevailing party status should also be denied.

Plaintiff,
CRANSTON SCHOOL DISTRICT,
By its Attorney,

/s/ Gregory P. Piccirilli, Esq.
SCIACCA & PICCIRILLI
121 Phenix Avenue
Cranston, Rhode Island 02920
Phone: (401) 946-4900
Fax: (401) 944-3250
gregory@splawri.com

**CERTIFICATION**

I hereby certify that on April 16, 2007, I sent a true copy of the within by electronic filing to the following:

Mary Ann Carroll, Esq.
The Law Offices of Stephen M. Robinson
155 South Main St., Suite 402
Providence, RI 02903
macarroll@smrobinsonlaw.com

Vicki J. Bejma, Esq.
The Law Offices of Stephen M. Robinson
155 South Main St., Suite 402
Providence, RI 02903
vbejma@smrobinsonlaw.com

/s/ Gregory P. Piccirilli