**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CRANSTON SCHOOL DISTRICT** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **C.A. No. 06-538 ML** |
| **v.** | : | |
| | : | |
| **Q.D., through his parents and next friends,** | : | |
| **Mr. And Mrs. D.** | : | |
| | : | |
| **Defendant** | : | |

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS**

1. QD was born, March 9, 1996, and is currently eleven years old.

2. During the 2005-06 school year, QD was a fourth grade student at the George J. Peters Elementary School in Cranston, RI, in a self-contained classroom.

3. QD has been in a self-contained classroom since the beginning of the third grade.

4. From kindergarten through second grade, QD attended Cranston Public Schools at the Orchard Farms Elementary School in a regular classroom setting.

5. While the parents had signed an IEP for the 2004 (Exh. 23), they did not sign one for either 2005 or 2006. (Exhs. 24, and 25)

6. On December 31, 2003, The Rhode Island Hospital Child Development Center diagnosed QD with Attention Deficit Hyperactivity Disorder, and a non-verbal learning disability.

7. On June 10, 2005, Dr. Gregory Steiner diagnosed QD with a primary Anxiety Disorder, ADHD, and a non-verbal learning disability.

8. In June of 2006, the parents presented to their son's IEP team an evaluation prepared by Dr. Goldfischer, which contained a diagnosis of Asperger's Syndrome, and a non-verbal learning disability.

9. Dr. Goldfischer's report did not diagnosis QD with either ADHD or an Anxiety disorder.

10. Dr. Goldfischer never testified what factors under the DSM-IV supported his diagnosis, instead relying primarily upon his own observations, and responses by the parent and teacher to Gilliam Asperger's Disorder Scale (GADS) and Social Responsiveness Scale (SRS), and a limited review of the child's records. He never talked with any of the teachers or other staff members who have worked with QD, and did not review either the CDC psychological evaluation, (Exh. A), or Dr. Steiner's psychiatric evaluation (Exh. 14), both of which diagnosed QD with a primary Anxiety disorder, and not Asperger's. (Vol. I, p. 51-55)

11. Although it is mentioned nowhere in his evaluation, Dr. Golfischer testified that QD would benefit from a so-called immersion model of education, with speech and language and occupational therapy in the classroom, and more than the proposed .5 counseling services as set forth in the IEP. (P. 43-46)

12. Dr. Golfischer identified a few recommendations which he was unsure were being implemented in the Cranston program, such as sensory breaks, the assignment of a case manager, and avoiding sarcasm, figurative speech, idioms, slang, etc. He was unaware of whether these issues were already addressed by the school department. (P. 60-63)

13. Dr. Goldfischer testified about the need for QD to receive speech and language therapy, and more intensive occupational therapy, even though he devoted only one paragraph of those recommendations in his 33 page report. (Exh. 5, p.23, "QD's school is encouraged to evaluate him to determine eligibility to receive school-based Occupational Therapy to assist him with his fine motor coordination difficulties, sensory sensitivities, and poor

handwriting. Speech and Language Therapy might also be considered to help QD with aspects of nonverbal communications and improved social language.") (Vol. I, p. 73)

14. With regard to whether QD had made progress, Dr. Goldfischer conceded that he had never talked with the classroom teacher, never reviewed her progress notes, and never followed up on QD's progress subsequent to his February 2006 evaluation. (Vol. I, p. 47)

15. As for QD's social and emotional progress, Dr. Goldfischer was unaware of QD's interactions with normative peers at school, or the progress as reported on the IEP. (Vol. I, p. 66-67) Instead, the doctor relied upon the scales as reported by the teacher, even though these scales reflect impairment and not progress. (Vol I, p. 101)

16. The classroom teacher, Jean Irving, testified that based upon her informal RIGBY testing, QD had improved from a 2nd grade reading level in September of 2004 to a late 4th grade level in May of 2006, and that on the Houghton Mifflin Assessment, QD scored at the 5th grade level with a 72 percent accuracy. (Vol. III, p. 74-79)

17. With regard to his IEP, Mrs. Irving testified that QD made progress in many areas. In reading, he responded to literary discussions using the WH questions; uses his index cards, story maps, and making personal connections to story characters. He participated in a reading circle. QD could write independently about topics such as a home activity or friend without a prompt once he gets into a routine.

18. Mrs. Irving disagreed with Dr. Goldfischer's recommendation that QD be punished with a denial of recess for failing to properly correct classwork. (Vol. III, p. 79-83)

19. In the area of math, QD had learned some math facts, was reducing his dependance on finger counting, could tell time, was working towards improving his calculation of coins,

can read charts, graphs and maps, understood place and value, could do problem-solving patterns, and many multiplication tables. (Vol. III, p. 84-86)

20. In the area of his social and emotional growth, QD had made more progress. He was better able to cooperate in a small group setting, and had improved his communication skills considerably. He participated more readily in recess activities with other peers, including playing football. He made up a hockey game with sticks. (Vol. III, p. 87-89)

21. The makeup of Mrs. Irvings' classroom reflected a typical self-contained classroom setting. While some students had behavior issues, Mrs. Irving testified that her classroom was not out of control as suggested by the parents. The classroom had one aide during QD's fourth grade year, it was scheduled to have two aides for the current school year. With the help of a social worker, psychologist, building principal, and guidance counselor, there was plenty of support to deal with the occasional disruption. (Vol. III, p. 91-95)

22. Mrs. Irving prepared an extended school year IEP for QD for the summer of 2005, which would include a placement in a school setting. QD's parents did not avail themselves of this program, instead sending QD to camp, and having his 2nd grade regular education classroom teacher tutor him. This tutor chose not to follow any of the recommendations of Mrs. Irving, and taught QD in a one-on-one setting at home, rather than in a classroom setting. (Vol. III, p. 20-22) Mrs. Irving noted a regression in QD's ability to settle into a routine once he returned to school at the beginning of the fourth grade in the fall of 2005. (Vol. III, p. 95-98)

23. Mrs. Irving testified that the ratings scales prepared by Dr. Goldfischer which she filled out were accurate at the time she filled them out, but that she did not think the scales

reflected the progress QD had made in certain areas of his social and emotional development. (Vol. III, p. 90).

24. The primary foundational basis of the Wolf School is to provide a model whereby students are provided speech and language and occupational therapy services in the classroom, instead of on a pull-out model which is common for public schools. (Vol. III, p. 9)

25. The Wolf School is not state certified as a special education school. (Vol. III, p. 10)

26. The classroom to which QD was to be assigned has a regular education teacher, with no special education certification. (Vol. III, p. 39) The therapists are not certified teachers. (Vol. III., p. 41) There is no guidance counselor, (p. 36), or librarian (p. 44). While students have access to art and music, those courses are taught with only disabled peers. (P. 46)

27. Rosaline Granoff, the Director of the Wolf School, never met with or talked to anyone in the Cranston School Department about QD, and did not have any observations of what QD did in school. (Vol. III, p. 48)

28. The Wolf School does not prepare IEPs as those documents are envisioned under the IDEA. Instead, if a child is placed by a school district, the Wolf School relies upon that district to prepare and revise the IEPs. If there is no public school involvement, the parents and staff meet informally in parent-teacher conferences. (Vol. III., p. 56-67)

29. With regard to counseling services, the Wolf School provides these services through the classroom teacher, the speech and occupational therapists, and aides. No dedicated time is allotted for students to meet with a professional psychologist. (Vol. III, p. 72)

30. QD's school psychologist while in the Cranston Public Schools was Sheree Koval.

31. Ms. Koval counseled QD one time per week for approximately 30-45 minutes, as well as on other occasions as QD needed, and during the day in the school setting. (Vol. IV, p. 5)

32. The primary area in which Ms. Koval assisted QD was dealing with anxiety issues. She testified to the strategies that she taught QD, and his success in implementing and internalizing those strategies. QD also had issues with accepting limitations and responsibilities. She dealt with the fact that the consequences at school were not often carried over at home. (p. 6-9)

33. Ms. Koval noted that many of the characteristics she has noticed and counseled for Asperger's children were absent from QD. (Vol IV, p. 10) Particularly, QD does not present with significantly impaired social interactions. He makes eye contact, understands gestures, enjoys interacting with other children. He has play dates. He can express empathy, and has demonstrated that to Ms. Koval in the classroom setting. He does not have repetitive or stereotypical behaviors; while QD can become fixated on a topic, that fixation seldom lasts long, and will change. He lacks rigidity; QD often deals with changes in schedules and routine without problem. While QD at times perseverates, this is more of a function of his anxiety. (p. 11-12)

34. With regard to Mrs. Irving's classroom, Ms. Koval found it well suited to QD. The classroom was well structured; Mrs. Irving was able to address the needs of all of her students. The interaction between the students and QD were positive. (Vol. IV, p. 13-14)

35. With regard to QD's mental age, Ms. Koval noted based upon the IQ scores, that it was 7 years 6 months, with a grade equivalency of 2.5. Vol. IV, p. 15) Based upon her experience and understanding of the classroom, she felt that QD was receiving an

educational benefit from the program in Cranston. She felt that the classroom setting was helping QD improve in all areas, both academically and social-emotionally. (P. 15-16)

36. Dr. Gregory Steiner is employed as the Cranston school district's psychiatrist.

37. Prior to Dr. Steiner evaluation of QD at the request of the school department, he had previously met QD and the parents in his private practice. (Vol. V, p. 7)

38. Dr. Steiner disputed Dr. Goldfischer's diagnosis of Asperger's. Under the DSM, there are two major diagnostic criteria categories, one of which is social impairment, under which QD clearly qualifies. The second category is restrictive repetitive areas of interest, under which QD does not qualify. Unless both categories are met, the diagnosis is not warranted. (p. 8-13) Specifically, QD is not cognitively fixated on specific topics. Nor does his perseveration focus on one topic; it is instead anxiety driven, and the topics on which QD obsesses will change often.

39. Dr. Steiner faulted Dr. Goldfischer's failure to note in his report any reference to QD's anxiety issues. While agreeing that QD suffers from a non-verbal learning disability, Dr. Steiner believes that QD's primary diagnosis is related to his anxiety. (P. 14)

40. With regard to the rating scales so heavily relied upon by Dr. Goldfischer in support of his diagnosis of Asperger's, Dr. Steiner found them not very helpful. (Vol. V, p.42) In terms of the usefulness of these scales to measure progress, Dr. Steiner emphasized that they reflect a snapshot in time, and are only useful to measure progress if the scales are given to the same person to fill out over a period of time. (*Id.*)

41. While Dr. Steiner agreed with many of Dr. Goldfischer's recommendations, he found them too numerous to be of practical use, and often contradictory.

42. As for Dr. Goldischer's testimony about an immersion model for QD, Dr. Steiner noted nothing in Dr. Goldischer's report to support such a recommendation. (P. 14-17)

43. In the area of the standardized testing, Dr. Steiner found that such tests often do not accurately reflect the actual measure of a child's academic progress. Concerns over who performs the evaluation, and the conditions under which the test is performed, may reduce its reliability. Just as important an indicator are the observations of the student's teachers, as reflected in report cards and progress reports. (P. 18-22)

44. With regards to QD, Dr. Steiner felt that he was receiving an educational benefit from being in Mrs. Irving's classroom. He was impressed with the behavior plan she had developed for QD, particularly as it related to his anxiety issues. He also liked her ability to adapt her program to QD's needs as they changed over time. (p. 22-25).

45. QD's report card and academic progress reports all show progress, both academically and in the area of social and emotional growth. (Exh. 20)

Plaintiff,
CRANSTON SCHOOL DISTRICT,
By its Attorney,

/s/ Gregory P. Piccirilli, Esq.
SCIACCA & PICCIRILLI
121 Phenix Avenue
Cranston, Rhode Island 02920
Phone: (401) 946-4900
Fax: (401) 944-3250
gregory@splawri.com

**CERTIFICATION**

I hereby certify that on April 16, 2007, I sent a true copy of the within by electronic filing to the following:

Mary Ann Carroll, Esq.
The Law Offices of Stephen M. Robinson
155 South Main St., Suite 402
Providence, RI 02903
macarroll@smrobinsonlaw.com

Vicki J. Bejma, Esq.
The Law Offices of Stephen M. Robinson
155 South Main St., Suite 402
Providence, RI 02903
vbejma@smrobinsonlaw.com

/s/ Gregory P. Piccirilli