**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CRANSTON SCHOOL DISTRICT** | : | |
| **Plaintiff** | : | |
| | : | |
| | : | |
| **vs.** | : | **C.A. # 06-538 ML** |
| | : | |
| **Q.D., through his parents and next friends,** | : | |
| **Mr. and Mrs. D.** | : | |
| **Defendants** | : | |

**DEFENDANTS' OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Now come the Defendants, and hereby object to Plaintiff's Motion for Summary Judgment. In support of their Objection, Defendants rely upon their Memorandum, attached hereto and made a part hereof.

Defendants/Counterclaim Plaintiffs,
By Their Attorneys

/s/ Mary Ann Carroll
Mary Ann Carroll #6664
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
April 26, 2007
macarroll@smrobinsonlaw.com

/s/ Vicki J. Bejma
Vicki J. Bejma, #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
April 26, 2007
vbejma@smrobinsonlaw.com

**CERTIFICATION**

I, the undersigned, hereby certify that on May 3, 2007 I sent a true copy of the within by electronic filing to all of the parties below:

Gregory P. Piccirilli, Esq.
Sciacca & Piccirilli
121 Phenix Avenue
Cranston, RI 02920

/s/ Vicki J. Bejma

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CRANSTON SCHOOL DISTRICT** | : | |
| **Plaintiff** | : | |
| | : | |
| | : | |
| **vs.** | : | **C.A. # 06-538 ML** |
| | : | |
| **Q.D., through his parents and next friends,** | : | |
| **Mr. and Mrs. D.** | : | |
| **Defendants** | : | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This matter comes before this Honorable Court on the Cranston School District's appeal of a November 17, 2006 special education due process decision pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. 1415(i)(2), as well as the Rhode Island Board of Regents' Regulations for the Education of Disabled Children, ("SPED Regs") § 300.512. At issue in said case was the services extended by the Cranston School District to Q.D. (hereinafter, "Quinn"), a fifth grade special education student residing with his parents, Mr. and Mrs. D., in the City of Cranston. By decision dated November 17, 2006, the Hearing Officer found that the Cranston Public Schools had failed to offer Quinn a free and appropriate public education ("FAPE") for the 2006-2007 school year, as required by the IDEA and SPED Regs. Accordingly, the Hearing Officer found that Mr. and Mrs. D. were justified in unilaterally placing their son at the Wolf School, a private school, and Cranston was responsible for paying the tuition.

The Cranston School District filed its complaint to this Court seeking the overturn of the hearing officer's decision. Mr. and Mrs. D. have filed a counterclaim for their attorney's fees

and costs in pursuing their due process action pursuant to 20 U.S.C.A. § 1415(i)(3)(B). By Order of this Court dated March 8, 2007, Cranston was directed to file its Motion for Summary Judgment, Defendants responding within thirty days.

## II. FACTUAL BACKGROUND

Prior to the 2006-2007 school year, Quinn had attended the Cranston Public Schools. He had been first identified as a child with a disability on December 3, 2003, when he was in second grade. (Ex. 21.) For the remainder of his second grade year, Quinn remained in the regular classroom. By the end of Quinn's second grade year, the Cranston School Department concluded that Quinn required a more restrictive environment. According to Quinn's second grade teacher, Jacqueline Ingalls, Quinn had begun his second grade year within the first grade level. (II:15.) However, as the year went on, Ms. Ingalls observed that Quinn had various difficulties in the areas of staying on task, social skills, and fine motor control. (II-7) By the end of his second grade year, Quinn academically progressed only to the "very early second grade level" in most of his subject areas, and in fact was a year behind. (II:10.) Ms. Ingalls also observed that Quinn stayed largely on the same level in terms of his staying on task, social skills, and fine motor control. (II:17-18.)

Quinn was then placed in a self-contained classroom under an IEP for his third grade year, that is, the 2004-2005 school year. (Ex. 23.) Despite the additional support of being in a self-contained classroom, Quinn continued to stagnate. This stagnation was observed by Quinn's parents, and also Cranston officials. In spring of 2005, Ms. Deschenes expressed her concerns regarding her son's lack of educational progress to Cranston officials, and requested that Quinn's triennial re-evaluation be conducted immediately, rather than waiting for the time when it would normally be due. (V:48.) The IEP Team clearly agreed with Ms. Deschenes' assessment, even

going as far as to note in their February 10, 2005 Educational Parent Conference Report: "Due to a lack of academic progress and the development of concerning behaviors, the Team determined the 3-year re-evaluation which was due November 2006, would be completed immediately." (Ex. 30.) Cranston's Director of Special Education echoed this notation in her own memorandum to one of Quinn's evaluators. (Ex. 28.) Ms. Irving, Quinn's classroom teacher, corroborated that the IEP Team had agreed to conduct Quinn's triennial re-evaluation early based upon Quinn's lack of educational progress, as determined by upon Ms. Irving's own observations. (II:83-84.)

Ms. Ingalls testified at hearing that she believed that by the end of his third grade year, Quinn had made little or no academic progress. Ms. Ingalls provided Quinn with tutoring over the summer after Quinn's third grade year in all of his subjects. (II:8-9) By the end of the tutoring, Ms. Ingalls concluded that Quinn had not made much or any academic progress since he had left her classroom the year before. (II:10.) Furthermore, he still exhibited difficulties with remaining on task, even in a one-on-one setting. (II:18-19.)

Cranston performed a re-evaluation. As part of this re-evaluation, Quinn was evaluated by Dr. Gregory Stiener at the behest of the Cranston School District. (V:9.) That re-evaluation was not Dr. Stiener's first contact with Quinn. Dr. Stiener had already been consulted by Quinn's parents in the fall of 2004. At that time, Dr. Stiener had diagnosed Quinn with anxiety disorder, NOS, ADHD, and a nonverbal learning disorder. (V:8.) Dr. Stiener testified that his 2005 diagnosis had not changed from his 2004 diagnosis. (V:10, Ex. 14.)

After his re-evaluation, Quinn continued to be found eligible for special education. However, his classification was different. Where Quinn had previously been classified as "other health impaired," Quinn was now placed under the "emotional disturbance category." (Ex. 21,

27.) His identified needs were in the areas of social skills, attention and organizational skills, behavior management skills, sensory processing, visual perception and motor integration, written expression and written output, and reading and math skills. The MDT Report noted ". . . attention problems and anxiety/OCD symptoms appear to be the most significant obstacles to his continued academic success." (Ex. 27.)

Quinn remained in the self-contained classroom for his fourth grade year, again with Ms. Irving. (II:26; Ex. 25.) Ms. Irving testified that there were ten students in her classroom, ranging from grades three to five. (II:26.) Some of the students are emotionally disturbed, others are classified as "other health impaired," and one is labeled within the autistic spectrum disorder. (II:27-28.) Ms. Irving acknowledged that some have behavioral problems. (II:29-33, 94.) Ms. Irving has one full-time aide. (II:28.) Some of the students are pulled out during the day for inclusion, but Ms. Irving's room is their home base. (II:28-29.)

Quinn himself left Ms. Irving's room for mainstream art class. (II:33.) Ms. Irving testified that after a transition period in the beginning of the year, Quinn might go to art class alone if he indicated that he felt ready to do so. (II:34.) If a situation arose where he felt he needed support, he could request that the aide accompany him. (II:34.) He did the work the other children in the art class were doing if he felt confident in doing so. If he did not feel confident about doing that work, he was allowed to draw. (II:34.) Quinn also went to music class. As with art, he may or may not have been accompanied by the aide. (II:36.) Quinn also went to physical education classes with Ms. Irving's aide. This aide needed to consult with Ms. Irving regarding strategies for coping with Quinn in this setting. (II:35-36.) Quinn is in a self-contained library class. (II:36.) Quinn formerly went to the cafeteria alone. However,

beginning about the first half of the year, the aide began to accompany him due to reports that he was having difficulties regarding inappropriate conversations. (II:36-37.)

By early 2006, Mr. and Mrs. D. came to believe that Quinn was not making academic progress even in the self-contained setting offered by Cranston. Accordingly, in April, 2006, Mr. and Mrs. D. brought their son to Dr. Howard M. Goldfischer for an evaluation. At hearing, Howard Goldfischer qualified as an expert in Pediatric Neuropsychology, without objection from the School Department. (I:4.) Dr. Goldfischer's evaluation included information directly from the Cranston School Department, as well as information from his parents, and a battery of tests performed by Goldfischer. (I:6-8; Ex. 6.) These tests included several rating scales to be responded to by Quinn's teachers. (Ex. 6.)

At hearing, Ms. Irving testified regarding her responses to Dr. Goldfischer's rating scales. Ms. Irving testified that she had filled out the rating scale based upon her observations of Quinn over the past six months. (III:99-100.) In those rating scales, she indicated that she had frequently observed that Quinn was inattentive to social stimuli, had difficulty playing with other children, seemed unaware of social conventions, and needed an excessive amount of reassurances. (II:43.) Ms. Irving also acknowledged that in response to the rating scale, she had indicated that she had frequently observed that Quinn had difficulties with transitions or new situations, talked about a single subject excessively, and exhibited exceptional, precise speech. (II:45.) Ms. Irving acknowledged that when responding to the rating scale, she had provided comments or questions when she did not understand a question or felt that clarification was in order. (II:46.) For example, Ms. Irving indicated she frequently observed that Quinn exhibited difficulty understanding what caused people to dislike his actions. (II:47.) The rating scale had

actually asked whether Quinn could not understand why people did not like “him,” but she substituted the word “actions.” (II:47.)

As part of his evaluation, Dr. Goldfischer also administered the Woodcock Johnson test. (I:36.) The School Department had administered the Woodcock Johnson a year before, in March, 2005. (Ex. 12.) The Woodcock Johnson administered by the School Department the year placed Quinn in the equivalent of grade 3.0, with a score of 92. The Woodcock Johnson performed by Dr. Goldfischer a year later placed Quinn at 2.9, with a score of 82. (I:36.)

Dr. Goldfischer testified that these Woodcock Johnson scores represented a serious regression for Quinn. (I:37-38.) Dr. Goldfischer also testified that the ratings scales also showed that Quinn had regressed socially and emotionally. (I:39.) Additionally, based upon his evaluation, including the teachers’ reports and Quinn’s past history, Dr. Goldfischer concluded that Quinn had been misdiagnosed. Dr. Goldfischer believed that Quinn’s proper diagnosis is Asperger’s Disorder and nonverbal learning disability. (I:9. Ex. 5.)

Quinn’s parents shared Dr. Goldfischer’s evaluation with the Cranston School Department at an IEP meeting of June 8, 2006. On or about June 14, 2006, Quinn’s parents, through their counsel, wrote to Ms. Zodda discussing their concerns regarding Quinn’s lack of academic progress and the failure to make changes to the IEP. (Ex. 7.) On or about June 20, 2006, Ms. Zodda responded to Quinn’s parents’ counsel’s letter regarding changes to the IEP. Ms. Zodda indicated that “. . . the reason the student had not made any academic progress was because student’s social, emotional needs interfer [sic] significantly with his academic on task behaviors, which in turn limits academic progress.” Ms. Zodda also indicated: “. . . I stated changes in current programming were not indicated. The student is making social, emotional,

and behavioral progress; as these areas continue to improve, time and attention to academic tasks will increase, and as a result, there will also be academic progress. (Ex. 10.)

On or about June 14, 2006, Quinn's parents also wrote to Ms. Zodda regarding Quinn's summer programming. Quinn's parents indicated that they believed that the services offered were inappropriate, in that the Team had indicated that Quinn needed a program that emphasized emotional and social skills, but the summer programming had only stressed academics. (Ex. 8.) On or about June 19, 2006, Ms. Zodda wrote to Quinn's parents' counsel regarding the summer programming. In that letter, she noted that ". . . the professionals working with the student feel strongly the areas of regression surpass his ability to interact with his peers." Ms. Zodda also noted: "Although the student does not regress academically, areas of regression effect [sic] his ability to follow the classroom structure and routines, effect [sic] his time on task, effect [sic] the frequency and duration of emotional issues and episodes related to the disability." (Ex. 9.)

Despite the fact that Cranston had noted a lack of academic progress, as well as regression in social and emotional issues, Quinn remained under the same IEP for the fourth grade year. Quinn's parents were thus faced with the decidedly unpalatable prospect of putting their son through a third year of an educational program that was plainly not working. Quinn's parents therefore unilaterally placed Quinn at the Wolf School in Providence for the 2006-2007 school year. Mr. and Mrs. D. also brought a due process complaint against the Cranston School District, alleging that the Cranston School District had violated the IDEA and the SPED Regs by failing to offer Quinn a "free and appropriate public education" ("FAPE"). As part of the relief requested, Mr. and Mrs. D. asked for reimbursement of Quinn's tuition payments to the Wolf School.

Mr. and Mrs. D's complaint was heard before a Due Process Hearing Officer. Said hearing stretched over five days. Dr. Goldfischer testified at the first day of hearing. Dr. Goldfischer presented extensive testimony as to his evaluation and diagnosis of Quinn, as well as Quinn's lack of educational progress as demonstrated by testing, and his recommendations as to Quinn's educational programming. Mr. and Mrs. D. also presented testimony from Jacqueline Ingalls and Ms. Irving regarding Quinn's lack of progress.

Rosaline Granoff testified as to the educational programming provided by the Wolf School. Ms. Granoff herself testified as an expert in children with learning disabilities, including disabilities in the areas of reading, as well as oral and written expression. (III:7.) Ms. Granoff also pointed out a number of flaws in Quinn's November, 2005 IEP. (III:14-29.) Ms. Granoff provided extensive testimony regarding the "immersion model" utilized at the Wolf School.

As Ms. Granoff explained, she and other the founders of the Wolf School utilized the "immersion model" because they recognized that many children who required speech and language or occupational therapy services had not been successful when the "pull out" approach was applied. The "pull out" approach made the children feel they were not part of a classroom community. More importantly, they could not carry over the skills they learned in the "pull out" program to the classroom. (III:9.)

In order to combat these problems more efficiently, under the "immersion model" offered by Wolf, such therapies are carried on in the classroom setting itself. (III:28-29.) Under the "immersion model," social skills, which are taught directly in the classroom. (III:29.) This was another area identified by Dr. Goldfischer as an area in which Quinn needed work. (III:52.) Another area in which Quinn required work was higher order language skills. (III:53.) At Wolf, a speech and language pathologist would work with Quinn to identify his specific needs, and

instruction in those areas would be worked into his regular classroom programming every day. (III:27.) Furthermore, maintaining self-regulation, sensory regulation, and social skills development are part of the daily classroom program at Wolf. (III:67-69.)

Ms. Granoff also testified as to the Wolf School's multiple modality approach to learning. Under this approach, learning is accomplished through senses other than merely auditory and visual. (III:16-17.) In other words, the multiple modality approach is a "work around" for children like Quinn, who have auditory and visual processing issues. (III:16-17.)

The Cranston School Department put on two witnesses. One was Sheree Koval, a Cranston school psychologist who saw Quinn once a week for about 30-45 minutes. Ms. Koval testified that Quinn is making progress "commensurate with his cognitive profile and his diagnosis." (IV:16.) However, Ms. Koval testified that she had no testing to substantiate whether Quinn had made progress, nor did her notes reflect such progress. (IV:23.)

The Cranston School Department also presented testimony from Dr. Gregory Stiener. Dr. Stiener disagreed with the conclusion that Quinn had made no academic progress. (V:23) However, he admitted that he had performed no testing of Quinn when he evaluated him at the behest of the Cranston School Department. (V:26-27.) Although Dr. Steiner disagreed with Dr. Goldfischer's diagnosis of Asperger's Disorder, he did agree with Dr. Goldfischer's diagnosis of nonverbal learning disorder, and acknowledged that Dr. Goldfischer's evaluation was complete. (V:14, 31) He agreed with many of Dr. Goldfischer's recommendations. (V:14.) He agreed that some changes should be made to Quinn's programming. V:37.) He even agreed that the Wolf School was an appropriate placement. (V:41.)

## III. LEGAL ARGUMENT

Jurisdiction over this matter resides in this Court pursuant to 20 U.S.C.A. 1415(i)(2), as well as the Rhode Island Board of Regents' Regulations for the Education of Disabled Children, ("SPED Regs") § 300.512. As is typical of reviews of hearing officer decisions, the Motion for Summary Judgment is a procedural device in which the parties seek to have the case decided on the basis of the administrative record. ***See, e.g.,*** Bristol Warren Regional Sch. Comm. v. Rhode Island Dept. of Educ., 253 F.Supp.2d 236, 240 (D.R.I. 2003). Unlike the process followed in a typical motion for summary judgment, this Court does not determine whether there is a material issue of fact, but instead reviews the decision of the hearing officer below. ***See id.***

The standard of review of the hearing officer decision is not that applied in an appellate court. As with an appellate court, the reviewing court does determine whether the hearing officer committed legal errors, and determines such questions of law *de novo*. *See id.* However, unlike an appellate court, this Court has a somewhat broader authority to review the factual determinations of the hearing officer. This Court's role in reviewing the factual determinations of the hearing officer has been described as one of "involved oversight." ***See*** Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990). While the decision must ultimately be an independent one based upon the preponderance of evidence, due deference must be given to the hearing officer's factual findings. ***See id.***

The rationale for this due deference to the hearing officer's factual findings is based upon a recognition that a state administrative agency, rather than a court, possesses the requisite expertise in educational matters and is therefore better equipped to make findings regarding educational policy. ***See id.*** at 989-90. ***See also*** Town of Burlington v. Dept. of Educ., 736 F.2d 773, 792 (1st Cir. 1984). As this Court once noted: "A searching examination of the decisions

rendered below is required, but this court may neither turn a blind eye towards these decisions, nor discard them without sound reason." *See* Kevin G. v. Jo-Ann G. by Cranston Sch. Comm., 965 F.Supp. 261, 263-64 (D.R.I. 1997).

The Cranston School District has not identified any sound reason for overturning the hearing officer's decision. Cranston has not identified any legal errors infecting this progress. Furthermore, given the evidence presented in this case, the Hearing Officer was entirely justified in finding that Cranston had not offered Quinn a FAPE for the 2006-2007. The simple fact of the matter is that Quinn had not been making reasonable academic progress for the past two years, and was in fact regressing. Cranston was aware of Quinn's stagnation, and had been aware of that for some time, but refused to make any adjustments to his programming. The appropriateness of the Wolf School was virtually undisputed, even by Cranston's own experts. For this reason, its appeal must fail.

## A. THE CRANSTON SCHOOL COMMITTEE FAILED TO OFFER QUINN FAPE FOR THE 2006-2007 SCHOOL YEAR.

When determining whether parents are entitled to tuition reimbursement after having unilaterally placed their child in a private educational setting, the first inquiry is whether the school district had initially offered the child FAPE. *See* Roland M., 910 F.2d at 991. Pursuant to the IDEA and the SPED Regs, a student found eligible to receive special education is entitled to receive a "free and appropriate public education," ("FAPE"), as that term is defined by the IDEA and SPED Regs. 20 U.S.C.A. § § 1400(d), 1401(9), SPED Regs § § 300.13, 300.121. If a school district fails to offer FAPE in a timely fashion, that student's parents may unilaterally place their child in a private school, and receive tuition reimbursement, provided that that private school placement was "appropriate." SPED Regs. § 300.403(c). *See* Roland M., 910 at 1000.

The hearing officer correctly found, based evidence presented at hearing, that the District in fact did not offer Quinn FAPE for the 2005-2006 school year.

The definition of FAPE is central to this dispute. The definition of FAPE has been one that has plagued experts in the field for many years. Admittedly, the statutory definition of FAPE is decidedly opaque:

> (9) Free appropriate public education
>
> The term "free appropriate public education" means special education and related services that—
> **(A)** have been provided at public expense, under public supervision and direction, and without charge;
> **(B)** meet the standards of the State educational agency;
> **(C)** include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> **(D)** are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C.A. § 1401(9).

There is only one U.S. Supreme Court clarifying the statutory definition of "FAPE," that of Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). *Rowley* is sometimes read as holding that a child should almost automatically be considered to be receiving FAPE if the IEP is reasonably calculated towards ensuring that the child will receive passing marks and advance from grade to grade. In other words, some argue, *Rowley* stands for the proposition that if it is reasonably certain that the child will "get by," then the child should be deemed to be receiving FAPE.

At issue in *Rowley* was a deaf student who had been placed in a regular classroom. Although she was an excellent lipreader, and was performing very well academically and

socially,[1] her parents felt that her potential would be maximized if she had a sign-language interpreter. Therefore, they attempted to argue that for their daughter, the FAPE requirement meant that the district must provide that interpreter.

The Supreme Court disagreed. Admittedly, the ***Rowley***'s decision was largely influenced by the fact that the child was already functioning very well in the classroom without a sign-language interpreter. The ***Rowley*** Court also held that although the child might arguably perform even better with that interpreter, the IDEA did not require that the school "maximize" a child's potential. ***Id***. at 198. However, the ***Rowley*** Court explicitly refused to hold that obtaining passing marks and advancing from grade to grade automatically meant that the child was receiving FAPE. ***Id***. at 203, n.25. Instead of relying solely upon mechanical tests such as whether the student was being passed from grade to grade, the ***Rowley*** Court instead established a definition of FAPE that would answer the IDEA's goal of individualized instruction for every child with a disability. In all cases, an IEP must be "reasonably calculated" to provide educational benefit. ***Id.*** at 203-04. The educational benefit to be conferred must be "meaningful." ***Id. at*** 192.

Also key to our discussion of FAPE is the breadth of services that must be offered in order to allow for a "meaningful" educational benefit. FAPE is not defined by academic achievement alone – whether in terms of passing from grade to grade or even excelling in one's studies. The drafters of the IDEA recognized that in order to benefit from any attempt to impart cognitive skills, the child's physical, emotional, or social skills may require development. ***See, e.g.***, Gonzalez v. Puerto Rico Dept. of Educ., 254 F.3d 350, 352-53 (1st Cir. 2001); Rome Sch. Comm. v. Mrs. B., 247 F.3d 29, 33 (1st Cir. 2001), ***citing*** Roland M., 910 F.2d at 990-92.

---

[1] The child was described as performing better than the average child in her class, was considered "remarkably well-adjusted," interacted and communicated well with her classmates, and furthermore had "developed an extraordinary rapport" with her teachers. ***Id.*** at 185-86.

"Education" under IDEA may include services necessary to improve the child's academic, physical, emotional, or social skills. ***See also*** Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1089-90 (1st Cir. 1993), ***citing*** Burlington, 736 F.2d at 788; Timothy W. v. Rochester, N.H. Sch. Dist., 875 F.2d 954, 970 (1st Cir. 1989); Lamoine Sch. Comm. v. Ms. Z., 353 F.Supp.2d 18, 30 (D. Me. 2005) Therefore, an IEP has been described as a package that must target all of a child's special needs. ***See*** Lenn at 1089-90, ***citing*** Burlington, 736 F.2d at 788; Roland M., 910 F.2d at 992; Timothy W. at 970; U.S. Dep't of Educ., Notice of Policy Guidance, Fed. Reg. 49,274 at 49,275 (1992). Included among these needs that must be addressed by an IEP are the opportunity to acquire the social skills, emotional well-being, and self-esteem that allow one to benefit from one's educational experience and eventually become self-sufficient. ***See, e.g.,*** Lawrence Township Bd. of Educ., 42 IDELR 241 (N.J. SEA, 2004.) The failure to provide those components in an IEP may justify a unilateral placement. ***See*** Lawrence.

The evidence on record plainly supports the Hearing Officer's conclusions that FAPE, as that term is understood, was not offered to Quinn for the 2006-2007 school year. As adduced at hearing, by the spring of 2006, Cranston had the objective evidence of Quinn's two Woodcock-Johnson tests, which showed that he was not making academic progress, and was even regressing. (Ex. 5, 12) Quinn's own classroom teacher had filled out rating scales. (Ex. 6.) Cranston was put on notice that it may have misdiagnosed Quinn. (Ex. 5.) By this time, the Cranston School Department itself had even repeatedly acknowledged that Quinn had not only failed to make academic progress, but was regressing in the social and emotional areas. (Ex. 30, 28, 10, 9) Despite this clear awareness, the Cranston School Department flatly refused to make adjustments to Quinn's programming. (Ex. 10.) It is manifestly a denial of FAPE to retain a child in an educational program that it knows or should have known is not working, and has not

been working for some time. ***See*** M.C. v. Central Regional Sch. Dist., 81 F.3d 389 (3d Cir. 1996); Watson Chapel Sch. Dist. (Ark. SEA 1998).

Cranston instead blamed the situation on Quinn's alleged social and emotional difficulties. (Ex. 10.) However, it is well-established that a school district does not absolve itself by claiming that that student's social and emotional difficulties impeded learning. Instead, the school district must adjust the IEP so as to address those social and emotional difficulties. ***See*** Lamoine, 353 F.Supp.2d at 33. It must be emphasized that Cranston not only refused to amend the IEP to address Quinn's academic difficulties, but also refused to amend the IEP to address these social and emotional difficulties. (Ex. 10.) In fact, Cranston even insisted upon summer programming that emphasized academics rather than social and emotional issues, even though it had already said that Quinn's academic problems were a by-product of his social and emotional issues. (Ex. 9.)

Cranston attempts to undermine the Hearing Officer's decision by claiming that she improperly focused on Quinn's lack of reasonable academic progress over the past two years. Cranston attempts to argue that the mere fact that Quinn had not made reasonable academic progress over the past two years should not be given great weight in disputes of this nature. Cranston urges this Court to focus on whether the IEP offered for 2006-2007 would have provided Quinn with FAPE. Cranston also attempts to cite case law in support of this proposition that its past failures with Quinn should be ignored. In particular, Cranston faults the Hearing Officer for having allegedly based her decision solely on the results of Quinn's Woodcock-Johnson tests.

This argument misses the point of the Hearing Officer's decision, and also the case law in question. It is true that a child's failure to make reasonable academic progress in the past, by

itself, does not render a school liable for unilateral placement in the future. ***See*** P.D. v. Franklin Township Bd. of Educ., 2006 WL 753152 (D.N.J. 2006), *8. However, that is not the same as saying that a child's lack of progress is wholly immaterial. An IEP still must be "reasonably calculated" to provide an educational benefit. ***See*** Roland M., 910 F.2d at 992. When a child is not making reasonable progress under a particular IEP, and has not done so for the past two years, and is even showing signs of regression, it is unreasonable to expect that continuing that IEP will yield any better result for the next year. ***See*** Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 534 (3rd Cir. 1995) ("Of course, if a student had failed to make any progress under an IEP in one year, we would be hard pressed to understand how the subsequent year's IEP, if simply a copy of that which had failed to produce any gains in a prior year, could be appropriate.") To hold otherwise is tantamount to giving schools permission to ignore disabled children who are not making any reasonable progress, and completely eviscerate the protections of the IDEA.

It was in fact Cranston's lack of appropriate response to Quinn's stagnation that was the deciding factor, not the past failures. (Decision, p. 12-14.) As the Hearing Officer noted, both in 2005 and 2006, Cranston was faced with evidence that Quinn was not making progress. In 2005, Cranston itself acknowledged this issue. (Ex. 28, 30.). In 2006, the Goldfischer evaluation once again placed Cranston on notice that something was amiss with Quinn's programming. (Ex. 5.) The Hearing Officer noted that Cranston failed to take make any substantive adjustments to Quinn's programming, despite the fact that it had before it a number of sound recommendations:

> In the instant case, it is clear from the evidence that the parents worked in good faith with the district in their efforts to gain a suitable program for their son. Their efforts persisted for more than one year after the district first identified the child as lacking in progress in February 2005. The district's determination in June 2006 that the student's social and emotional problems precluded educational progress without adjusting the student's IEP to address those issues as well as the failure to address Dr. Goldfischer's findings and recommendations constitutes a denial of FAPE.

(Decision, p. 14.) The Hearing Officer, then, did not improperly rely on the lack of progress to date, but instead focused on Cranston's failure to appropriately respond to Quinn's lack of progress. Indeed, as the Hearing Officer notes, Cranston appears to have not simply neglected to appropriately address Quinn's needs, but willfully failed to do so by blaming it on his emotional and social difficulties. (Ex. 10.) The Hearing Officer quite properly found that that course of inaction is impermissible. ***See*** Lamoine, 353 F.Supp.2d at 33.

Cranston also attempts to undermine the Hearing Officer's determination that the programming previously offered had not worked for Quinn in the past. The Hearing Officer was faced with conflicting testimony as to whether educational programming offered to Quinn – and which continued to be the only option extended to Quinn -- had worked in the past. The question at hand for the hearing officer, then, was a classic contest as to which account to believe, that of Quinn's parents, or that of Cranston. The Hearing Officer chose to believe the evidence. Credibility determinations of this nature are uniquely within the province of the Hearing Officer ***See*** Carlisle, 62 F.3d at 528.

The Hearing Officer could quite reasonably find that the evidence adduced by Cranston was not worthy of credence. Ms. Irving testified that Quinn was making some progress in the area of writing five to seven word sentences. However, when presented with Quinn's journals, she admitted that there was no progress there at all. (II:63.) Similarly, she testified that Quinn had "demonstrated that he can complete" the goal of comparing numbers of up to six digits. (II:68.) Later, she admitted that he was not consistent, and that in any case she was recording the numbers for him. (II:68, 80.) In some cases, Ms. Irving's testimony contradicted her earlier observations. She testified that since Quinn entered her self-contained classroom in the third grade, Quinn was now able to follow small group activities, had made strides in communication

and social relations, and played with other children at recess. (III:88-89.) When filling out Dr. Goldfischer's inventories in February, 2006, however, she had indicated that Quinn still had substantial difficulties in these areas. (Ex. 6.) Ms. Irving attempted to indicate that Quinn's scores on the Rigby assessment and the Houghton Mifflin word recognition test showed that he had made academic progress, she admitted that these were informal assessments.[2] (III:76-79.)

Similarly, Ms. Koval's assessment that Quinn had made progress was not worthy of credence. Ms. Koval testified that she believed that Quinn was making progress "commensurate with his cognitive profile and his diagnosis." (IV:16.) However, Ms. Koval admitted that she had no testing to substantiate her claims, nor did her notes reflect such progress. (IV:23.)

Cranston also complains that the Hearing Officer improperly focused on the two Woodcock-Johnson tests administered to Quinn when determining that the programming offered to Quinn simply was not working. We note that at hearing, Cranston School Department officials did not challenge the validity of the Woodcock Johnson as a measure of Quinn's educational progress. (V:32.) In any case, it is incorrect to claim, as Cranston does, that the test scores should be discounted because the first test was not timed, and the other was not. There is no support for the assertion that the first test was not timed.

More importantly, the Hearing Officer did not rely solely upon the Woodcock-Johnson testing alone when determining that the programming offered to Quinn had not worked. The Hearing Officer also had before her the ratings scales produced by Quinn's teachers demonstrate social and emotional regression. (I:39.) The Hearing Officer had before her even more compelling evidence of Quinn's stagnation -- the Cranston School Department officials' own recognition of that state of affairs. (Ex. 28, 30, 10, 8.)

---

[2] In any case, the Houghton Mifflin test only examines *one* isolated skill – word recognition.

Cranston also complains that the Hearing Officer ignored evidence such as Quinn's report cards and promotion from grade to grade. However, as we discussed above, the receipt of passing grades and promotion itself is not dispositive of whether or not a child has received FAPE. *See* Hall v. Vance County Bd. of Educ., 774 F.2d 629, 635-36 (4th Cir. 1985). For that matter, promotions may be discounted as evidence of FAPE when it is clear that they were influenced by a policy of social promotion. *See* Hall at 636. Similarly, passing grades may be discounted when those grades were inflated or affected by some other inaccuracy. *See* Duneland Sch. Corp., 31 IDELR 222 (Indiana SEA 2000). Under the evidence presented, the Hearing Officer also could permissibly choose to discount the evidence regarding Quinn's promotions and grades. Ms. Deschenes testified that Ms. Irving had told her in the past that the lowest grade that Quinn could receive in her class was a C. (V:50.) Ms. Irving herself acknowledged that "rarely" gives D's. (II:58.) Accordingly, Quinn's grades and promotion are not probative evidence of whether or not he made educational progress, and the Hearing Officer was free to discount it.

Cranston also devotes a great deal of time to undermining Dr. Goldfischer's diagnosis of Asperger's Disorder. This point really is not germane to the Hearing Officer's decision. The Hearing Officer explicitly indicated that she found the precise diagnosis to be irrelevant. Instead, she focused upon whether or not Quinn's educational needs were being met. (Decision, p. 12-13.) Also, contrary to Cranston's suggestions, there was in fact a great deal of evidence to support findings as to Quinn's specific educational needs, and also a finding that the programming offered by Cranston did not address them. Indeed, even Dr. Stiener agreed that he felt that Quinn's program required some changes. (V:37.)

The Hearing Officer particularly noted that the IEP offered no speech and language component. (Decision, p. 12.) As Dr. Goldfischer testified, Quinn has strong needs in the areas of speech and language, especially non-literal language.[3] (I:41, 62.) Quinn's speech and language needs are not addressed in his IEP. (I:41, III:25.) Quinn requires a great deal of services in the occupational therapy domain, particular sensory diet and visual motor skills. The development of these skills are not addressed in his IEP. (I:41-42, 85-86; III:23-25.) Additionally, the ½ hour a week of counseling from Ms. Koval is insufficient to address Quinn's need to develop social skills. (I:41.) As Ms. Koval's testimony indicates, if she and Quinn tried to work out strategies for dealing with a particular problem, and those strategies did not work, he would have to wait another week to discuss the matter. (IV:6-.7.) There appears to be no strategies for coping with one of Quinn's most serious deficits, information processing. At hearing, we heard testimony from Ms. Granoff, the Director of Admissions at Wolf, who qualified as an expert in children with learning disabilities. (III:7.) As Ms. Granoff testified, when a child has problems with information processing, it is inappropriate to remain with a paper and pencil approach; the child's other senses must be employed if he or she is ever to be able to develop skills. (III:16-17.) It is worthy of note in this regard that Cranston appears never to have contested these assessments. In fact, Dr. Stiener supported all but a few of Dr. Goldfischer's recommendation. (V:15-17.)

We also observed that Cranston has attempted to suggest that Quinn has made all of the progress towards his educational goals that he can reasonably be expected to make, given his intellectual disabilities. Even if we assumed that that were true, that situation still would not absolve Cranston from its failure to fulfill its responsibilities. An IEP must contain annual goals

---

[3] Although Cranston repeatedly attempts to suggest otherwise, Dr. Goldfischer's evaluation extensively discusses Quinn's speech and language issues. (Ex. 5, p. 20, 23.)

that the student should reasonably be expected to accomplish within one year, in light of his abilities. *See* Avon Lake Sch. Dist., 25 IDELR 790 (Ohio SEA). Given the evidence that Quinn was not meeting his IEP goals, and was even regressing socially and emotionally, the proper approach would have been to review and revise Quinn's IEP goals to make them reasonably attainable. *See* Watson Chapel Sch. Dist. (Ark. SEA 1998). That Cranston did not do so should be deemed evidence that Cranston in fact believed those goals to be reasonably attainable within a year.

Accordingly, the Cranston School Department violated Quinn's right to a FAPE by maintaining him in an educational program that was not working. The Cranston School Department compounded its failure by refusing to make modifications to its program despite the fact that it was placed on clear notice that his current IEP was not appropriate. Not only did the Cranston School Department have evidence that it had misdiagnosed Quinn, but it also had the objective evidence of Quinn's testing, which showed that he had stagnated at the third grade level. The Cranston School Department even repeatedly acknowledged that Quinn had not only stagnated at the third grade level, but was regressing in the social and emotional areas. Despite this clear awareness, the Cranston School Department flatly refused to make adjustments to Quinn's programming. The Cranston School Department, then, effectively sentenced Quinn to yet another year of stagnation and/or regression. Accordingly, the Deschenes family is entitled to compensation for a unilateral placement.

## B. THE HEARING OFFICER CORRECTLY FOUND THAT WOLF WAS AN APPROPRIATE PLACEMENT, AND THAT THEREFORE QUINN'S PARENTS WERE ENTITLED TO TUITION REIMBURSEMENT.

Under the SPED Regs, Mr. and Mrs. Deschenes were also required to establish that their unilateral placement was "appropriate" in order to receive reimbursement. § 300.403(c). The

hearing officer's decision correctly found that the Wolf School was in fact "appropriate." The School Department has failed to produce any convincing argument undermining the hearing officer's decision in this regard.

The School Department essentially faults the Wolf School placement primarily on the argument that Quinn will not receive the mainstreaming opportunities allegedly offered at the School Department. It is important to note the legal standards for an "appropriate" placement at this juncture. Under the SPED Regs, parental placements are held to a somewhat different standard than those made by the district:

> (c) Reimbursement for private school placement. If the parents of a child with a disability, who previously received special education and related services under the authority of a LEA, enroll the child in a private preschool, elementary, or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the LEA had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate. *A parental placement may be found to be appropriate by a hearing officer or a court even if it does not meet the State standards that apply to education provided by the SEA and LEAs.*

SPED Regs § 300.403(c). (Emphasis added.) Under the SPED Regs, then, a parental placement may be found appropriate and reimbursable by a hearing officer even if would not necessarily have been an appropriate placement had the district offered it. *See also* Florence County v. Carter, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). In particular, state approval is not necessary. *See id.* at 14.

The definition of an "appropriate" parental placement has been clarified by case law. The parental placement of course must provide educational benefit. *See* Menlo Park City Elementary Sch. Dist., 35 IDELR 202 (Cal. SEA, 2001), *citing* Florence County; Alamo Heights Independent Sch. Dist. v. State Bd. of Educ., 790 F.2d 1153, 1161 (5th Cir. 1986). Furthermore,

there is also some relaxation of the "least restrictive environment" standard. A number of circuits have explicitly rejected the proposition that a parental placement must be in the "least restrictive environment." *See* M.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers, 231 F.3d 96, 103 (2d Cir. 2000); Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 249 (3d Cir. 1999); Cleveland Heights-University Heights Sch. Dist. v. Boss, 144 F.3d 391, (6th Cir. 1998); Bd. of Educ. of Murphysboro Community Unit Sch. Dist. v. Illinois State Bd. of Educ., 41 F.3d 1162 (7th Cir. 1994); Menlo Park. There are serious policy concerns militating against holding parents strictly to the "least restrictive environment" standard. As the Sixth Circuit indicated, if we were to limit parent placements only to the "least restrictive environment," then that would be to say that the student would be forced to languish in a clearly inappropriate educational environment offered by the public school and be denied a more appropriate education in a private placement. *See* Cleveland Heights at 400. In any case, in most cases, the only viable alternative for parental placements would be in a private school that only accepted disabled children. *See id*, n.7. Holding parents to the "least restrictive environment" standard, then, would work to eviscerate the private placement remedy. *See* Cleveland Heights at 400. *See also* Ridgewood at 249.

Our own First Circuit has apparently not yet had the opportunity to fully explore the issue of whether parental placements must be in the "least restrictive environment." In the recent case of Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21 (1st Cir. 2002), the First Circuit held that mainstreaming cannot be ***completely*** ignored in unilateral placements, even to maximize academic achievement. *Id.*, *citing* Roland M., 910 F.2d at 992-93. However, the First Circuit has never gone as far as to hold that that the parents' placement must be strictly within the "least restrictive environment" standard to which the district would be held. In fact, in an earlier case,

that of Colin K. v. Schmidt, 715 F.2d 1 (1st Cir. 1983), the First Circuit strongly suggested that where the school district offered an inadequate IEP, parental placements did not necessarily need to be in the "least restrictive environment." In *Colin K.*, the Middletown school district had argued on appeal that the District Court for Rhode Island had erred in ordering it to continue funding placement at a private, residential placement because that placement was allegedly not in the "least restrictive environment." The lower court had found that the IEP offered by the school district was inadequate. The children in question had been at the private, residential placement for two years, and had at least been provided an adequate special education. Therefore, district court had ordered continued tuition payments until the school district offered an adequate IEP. *See id.* at 7. The First Circuit approved of the district court's decision, finding that it ". . . reflects a sensible accommodation of the state's interest in shaping the children's educational programs and the children's interest in receiving sufficient educational attention while those programs are being developed." *See id.* at 7-8.

The First Circuit has also recognized that while mainstreaming considerations are a component of an appropriate placement, it does not necessarily follow that placement in a regular classroom will be appropriate for every child. For example, the case of *Roland M.*, involved a child with various learning disabilities. He had been attending public schools until fifth grade, when his parents had unilaterally placed the child in a private residential school. The *Roland M.* Court refused to order funding of this placement. The *Roland M.* Court appears to have rested largely upon its holding that a residential placement was unduly restrictive, despite the fact that the parents had argued that the residential placement had helped maximize the child's academic ability. In fact, *Roland M.* is often frequently cited for its pronouncement in this area: "Mainstreaming cannot be ignored, even to fulfill substantive educational criteria." *Id.*

at 992-93. The *Roland M.* Court, however, also indicated that in some instances, mainstreaming goals might have to take a back seat in order to ensure that reasonable educational progress can be made:

> Correctly understood, the correlative requirements of educational benefit and least restrictive environment operate in tandem to create a continuum of educational possibilities. [citations omitted] *To determine a particular child's place on this continuum, the desirability of mainstreaming must be weighed in concert with the Act's mandate for educational improvement.* [cite omitted] Assaying an appropriate educational plan, therefore, requires a balancing of the marginal benefits to be gained or lost on both sides of the maximum benefit/least restrictive fulcrum. Neither side is automatically entitled to extra balance.

*Id.* at 992. (Emphasis added.)

Under *Roland M.*, then, the question is always one of balance. One cannot isolate a child from non-disabled peers solely for the purpose of maximizing academic achievement. That approach – the one taken by the parents in *Roland M.* – clearly ignores mainstreaming in favor of academic achievement, and is therefore unacceptable. *See also* Rafferty, at 26-27. On the other hand, the *Roland M.* Court freely acknowledges that in some instances, placing a child in a more restrictive environment – even a residential placement -- will be necessary if reasonable academic progress is to be made at all. *See id*. at 992.

The hearing officer properly took this type of balancing approach when finding that the Wolf School was appropriate. The hearing officer correctly observed that for several years, Quinn's disabilities had already rendered him incapable of all but one of the most restrictive placements. (Decision, p.14.) For his third and fourth grade school years, Quinn was in a self-contained classroom, with forays into the regular classroom for "itinerant" types of activities, such as art and music. (II:33-36.) Even in art and music, he would occasionally require an aide. (II:33-36.) In many cases, he would not even be able to participate in the actual classroom activity. For example, in art classes, he would simply draw rather than work on the same project

as the rest of the class. (II:33-34.) Quinn's connection to the regular classroom – and his chance to interact with non-disabled peers – was therefore minimal in any case.

As we discussed earlier, Quinn was not even making reasonable educational progress in that self-contained classroom. Under these circumstances, it would be entirely appropriate for the hearing officer to conclude that Quinn's academic progress should take precedence over his alleged mainstreaming needs. This is particularly so, given that there was evidence on the record that remaining in his current place would be actively detrimental to Quinn. As Dr. Goldfischer testified, Quinn's current placement with emotionally and behaviorally disturbed children deprived him of the appropriate models that he required. (I:42.) Worse, there was testimony on the record indicating that if Quinn had remained in his program, he would fall further behind his peers, and as a result grow even more depressed and anxious – thus aggravating the very emotional difficulties that Cranston felt were in the way of Quinn's learning. (I:46.)

The hearing officer also had before her solid evidence indicating that the Wolf School is fully prepared to fulfill appropriate educational objectives for Quinn. The Wolf School specializes in educating children with a broad range of learning disabilities. (III: 34-35.) The Wolf School's approach is to address a child's needs in the realms of the speech and language or occupational services directly in the classroom. (III: 9, 27-29.) This approach is believed to be superior to the "pull out" approach, in that it is easier for children to generalize their speech, language, emotional regulation, or other skills. (III: 9.) The teaching team at the Wolf School would consist of a regular classroom teacher, a speech and language pathologist, an occupational therapist, and a teacher's aide. (III: 28.) Classes are small, and no less than two members of the teaching team would be present, thus providing a great deal of individual attention. (III:28.) Quinn's specific goals – for example, language development – would be identified, and

instruction would be worked into the regular classroom programming. (III:27.) The children's sensory diet needs are also included in the regular daily programming. (III:23-25.) Social skills are directly taught in the classroom – the setting in which the child will use them. (III:29.) Not only is Wolf prepared to deal with Quinn's language and sensory issues in this fashion, but also adopts a multiple modality approach towards dealing with Quinn's auditory and visual processing issues. (III: 16-18.) Most tellingly, not only did Dr. Goldfischer testify that the Wolf School is appropriate for Quinn (I: 44, 76), but Dr. Stiener concurred. (V: 41.)

Furthermore, the District is incorrect when it attempts to argue that the Wolf School was not providing Quinn with psychological services that he needs. The District argues that the Wolf School is inappropriate for Quinn because it does not provide psychological counseling. This argument completely ignores evidence that while at Wolf, Quinn will in fact receive the very type of psychological services that he requires. The Cranston School District had provided Quinn with weekly visits to its psychologist, Ms. Koval, in order to provide Quinn with guidance on dealing with his anxiety, impulsivity, difficulty with dealing with frustration, and maintaining friendships. (IV:5-7.) The Wolf School, however, will be providing Quinn with the exactly same types of service. The uncontroverted testimony indicates that the daily classroom program at Wolf involves maintaining self-regulation, sensory regulation, and development of social skills. (III: 29, 52, 67-69.) In other words, while at Wolf, Quinn will be working on precisely the same issues as he did with Ms. Koval. The only difference is that Quinn will be receiving this assistance in the classroom setting, in the very setting in which he would face these issues, rather than in isolated, weekly segments of 30-45 minutes. For that matter, as the Hearing Officer noted, Wolf can provide Quinn access to a school psychologist and social worker on a one-on-one basis, if needed. (Decision, p. 14, III: 36, 67.)

The Wolf School, then, is fully equipped to meet Quinn's particular needs. While Quinn is not in the regular school environment at Wolf, that concern is counterbalanced by the evidence that the Wolf School is providing for his needs where Cranston did not. Even professionals that did not agree on Quinn's precise diagnosis believe that Wolf offers a chance for Quinn to make reasonable educational progress. The Wolf School, then, has provided Quinn with appropriate educational programming. Therefore, this placement is eligible for reimbursement pursuant to § 300.403(c).

## IV. CONCLUSION

For the above-referenced reasons, the Plaintiff's Motion for Summary Judgment should be DENIED.

Defendants/Counterclaim Plaintiffs,
By Their Attorneys

/s/ Mary Ann Carroll
Mary Ann Carroll #6664
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
April 26, 2007
macarroll@smrobinsonlaw.com

/s/ Vicki J. Bejma
Vicki J. Bejma, #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
April 26, 2007
vbejma@smrobinsonlaw.com

**CERTIFICATION**

I, the undersigned, hereby certify that on ______________________ I sent a true copy of the within by electronic filing to all of the parties below:

Gregory P. Piccirilli, Esq.
Sciacca & Piccirilli
121 Phenix Avenue
Cranston, RI 02920

/s/ Vicki J. Bejma