**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CRANSTON SCHOOL DISTRICT** | : | |
| **Plaintiff** | : | |
| | : | |
| | : | |
| **vs.** | : | **C.A. # 06-538 ML** |
| | : | |
| **Q.D., through his parents and next friends,** | : | |
| **Mr. and Mrs. D.** | : | |
| **Defendants** | : | |

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

1. Q.D. (hereinafter, "Quinn,") was first identified as a child with a disability with December 3, 2003, when he was in second grade. (Ex. 21.)

2. For the remainder of his second grade year, Quinn remained in the regular classroom. (Ex. 22.)

3. According to Quinn's second grade teacher, Jacqueline Ingalls, Quinn had begun his second grade year within the first grade level. (II,15:20-24.) However, as the year went on, Ms. Ingalls observed that Quinn had various difficulties in the areas of staying on task, social skills, and fine motor control. (II, 7:20-8:3) By the end of his second grade year, Quinn academically progressed only to the "very early second grade level" in most of his subject areas, and in fact was a year behind. (II, 10:4-7.) Ms. Ingalls also observed that Quinn stayed largely on the same level in terms of his staying on task, social skills, and fine motor control. (II,17:23-18:5.)

4. Quinn was then placed in a self-contained classroom under an IEP for his third grade year, that is, the 2004-2005 school year. (Ex. 23.)

5. In spring of 2005, Ms. Deschenes requested that Quinn's triennial re-evaluation be conducted immediately, rather than waiting for the time when it would normally be due. (V, 48:23-25.)

6. The IEP Team agreed to perform that re-evaluation, noting in their February 10, 2005 Educational Parent Conference Report: "Due to a lack of academic progress and the development of concerning behaviors, the Team determined the 3-year re-evaluation which was due November 2006, would be completed immediately." (Ex. 30.)

7. Cranston's Director of Special Education wrote a February 28, 2005 memorandum indicating that "Due to a lack of academic progress and the development of concerning behaviors, the re-evaluation, which was due November 2006, would be completed immediately." (Ex. 28.)

8. Ms. Irving, Quinn's classroom teacher, corroborated that the IEP Team had agreed to conduct Quinn's triennial re-evaluation early based upon Quinn's lack of educational progress and also Ms. Irving's own observations. (II, 83:30-84:9.)

9. Ms. Ingalls provided Quinn with tutoring over the summer after Quinn's third grade year in all of his subjects. (II, 8:21-9:6)

10. By the end of the tutoring, Ms. Ingalls concluded that Quinn had not made much or any academic progress since he had left her classroom the year before. (II, 10:23-11:1.)

11. Furthermore, Ms. Ingalls found that Quinn still exhibited difficulties with remaining on task, even in a one-on-one setting. (II, 18:25-19:7.)

12. As part of the re-evaluation, Quinn was evaluated by Dr. Gregory Stiener at the behest of the Cranston School District. (Ex. 14.)

13. That re-evaluation was not Dr. Stiener's first contact with Quinn. Dr. Stiener had already been consulted by Quinn's parents in the fall of 2004. At that time, Dr. Stiener had diagnosed Quinn with anxiety disorder, NOS, ADHD, and a nonverbal learning disorder. (V,

8:13-15.) Dr. Stiener testified that his 2005 diagnosis had not changed from that time. (V, 10:12-17, Ex. 14.)

14. After his re-evaluation, Quinn continued to be found eligible for special education, but was now placed under the "emotional disturbance category" rather than "other health impaired. (Ex. 21, 27.)

15. After his re-evaluation, Quinn's identified needs were in the areas of social skills, attention and organizational skills, behavior management skills, sensory processing, visual perception and motor integration, written expression and written output, and reading and math skills. The MDT Report noted ". . . attention problems and anxiety/OCD symptoms appear to be the most significant obstacles to his continued academic success." (Ex. 27.)

16. Quinn remained in the self-contained classroom for his fourth grade year, again with Ms. Irving. (II, 26:7-9; Ex. 25.)

17. Ms. Irving testified that there were ten students in her classroom, ranging from grades three to five. (II, 26:10-14.)

18. Ms. Irving testified that some of the students are emotionally disturbed, others are classified as "other health impaired," and one is labeled within the autistic spectrum disorder. (II, 27:23-28:3.)

19. Ms. Irving acknowledged that some have behavioral problems. (II, 29:20-33:17.)

20. Ms. Irving has one full-time aide. (II, 28:10-11.)

21. Some of the students are pulled out during the day for inclusion, but Ms. Irving's room is their home base. (II, 28:17-29:19.)

22. Quinn himself left Ms. Irving's room for mainstream art class. Ms. Irving testified that after a transition period in the beginning of the year, Quinn might go to art class alone if he

indicated that he felt ready to do so. (II, 33:18-34:11.) If a situation arose where he felt he needed support, he could request that the aide accompany him. (II, 34:9-11.)

23. Quinn did the work the other children in the art class were doing if he felt confident in doing so. If he did not feel confident about doing that work, he was allowed to draw. (II, 34:13-17.)

24. Quinn also went to music class. As with art, he may or may not have been accompanied by the aide. (II, 36:13-21.)

25. Quinn also went to physical education classes with Ms. Irving's aide. This aide needed to consult with Ms. Irving regarding strategies for coping with Quinn in this setting. (II, 35:11-36:4.)

26. Quinn is in a self-contained library class. (II, 36:7-12.)

27. Quinn formerly went to the cafeteria alone. However, beginning about the first half of the year, the aide began to accompany him due to reports that he was having difficulties regarding inappropriate conversations. (II, 36:24;37:14.)

28. In April, 2006, Mr. and Mrs. D. brought their son to Dr. Howard M. Goldfischer for an evaluation. (Ex. 5)

29. At hearing, Howard Goldfischer qualified as an expert in Pediatric Neuropsychology, without objection from the School Department. (I, 4:17-22.)

30. Dr. Goldfischer's evaluation included information directly from the Cranston School Department, as well as information from his parents, and a battery of tests performed by Goldfischer. (I:6:15-9:13.) These tests included several rating scales to be responded to by Quinn's teachers. (Ex. 6.)

31. Ms. Irving testified that she had filled out the rating scale based upon her observations of Quinn over the past six months. (III, 99:24-100:8.)

32. In those rating scales, she indicated that she had frequently observed that Quinn was inattentive to social stimuli, had difficulty playing with other children, seemed unaware of social conventions, and needed an excessive amount of reassurances. (II, 43:1-8, Ex. 6.)

33. Ms. Irving also acknowledged that in response to the rating scale, she had indicated that she had frequently observed that Quinn had difficulties with transitions or new situations, talked about a single subject excessively, and exhibited exceptional, precise speech. (II, 45:1-21; Ex. 6.)

34. Ms. Irving acknowledged that when responding to the rating scale, she had provided comments or questions when she did not understand a question or felt that clarification was in order. (II, 46:5-14.)

35. The School Department had administered the Woodcock Johnson a year before, in March, 2005. The Woodcock Johnson administered by the School Department the year placed Quinn in the equivalent of grade 3.0, with a score of 92. (Ex. 12.)

36. The Woodcock Johnson performed by Dr. Goldfischer a year later placed Quinn at 2.9, with a score of 82. (Ex. 5.)

37. Dr. Goldfischer testified that these Woodcock Johnson scores represented a serious regression for Quinn. (I:37:3-38:20.)

38. Dr. Goldfischer also testified that the ratings scales also showed that Quinn had regressed socially and emotionally. (I, 39:14-22.)

39. Dr. Goldfischer believed that Quinn’s proper diagnosis is Asperger’s Disorder and nonverbal learning disability. (Ex. 5.)

40. Quinn's parents shared Dr. Goldfischer's evaluation with the Cranston School Department at an IEP meeting of June 8, 2006. On or about June 14, 2006, Quinn's parents, through their counsel, wrote to Ms. Zodda discussing their concerns regarding Quinn's lack of academic progress and the failure to make changes to the IEP. (Ex. 7.)

41. On or about June 20, 2006, Ms. Zodda responded to Quinn's parents' counsel's letter regarding changes to the IEP. Ms. Zodda indicated that ". . . the reason the student had not made any academic progress was because student's social, emotional needs interfer [sic] significantly with his academic on task behaviors, which in turn limits academic progress." Ms. Zodda also indicated: ". . . I stated changes in current programming were not indicated. The student is making social, emotional, and behavioral progress; as these areas continue to improve, time and attention to academic tasks will increase, and as a result, there will also be academic progress." (Ex. 10.)

42. On or about June 14, 2006, Quinn's parents also wrote to Ms. Zodda regarding Quinn's summer programming. Quinn's parents indicated that they believed that the services offered were inappropriate, in that the Team had indicated that Quinn needed a program that emphasized emotional and social skills, but the summer programming had only stressed academics. (Ex. 8.)

43. On or about June 19, 2006, Ms. Zodda wrote to Quinn's parents' counsel regarding the summer programming. In that letter, she noted that ". . . the professionals working with the student feel strongly the areas of regression surpass his ability to interact with his peers." Ms. Zodda also noted: "Although the student does not regress academically, areas of regression effect [sic] his ability to follow the classroom structure and routines, effect [sic] his time on task,

effect [sic] the frequency and duration of emotional issues and episodes related to the disability." (Ex. 9.)

44. Rosaline Granoff, Director of Admissions for Wolf, testified as an expert in children with learning disabilities, including disabilities in the areas of reading, as well as oral and written expression. (III, 3:23-24, 7:23-8:1.)

45. Ms. Granoff testified that the Wolf School utilized the "immersion model," in which speech and language and occupational therapies are offered in the classroom itself. (III, 28:8-29:7.)

46. Under the "immersion model," social skills, which are taught directly in the classroom. (III, 29:11-30:8.) This was another area identified by Dr. Goldfischer as an area in which Quinn needed work. (Ex. 5, p. 20.)

47. Another area in which Quinn required work was higher order language skills. (Ex. 5, p. 20.) At Wolf, a speech and language pathologist would work with Quinn to identify his specific needs, and instruction in those areas would be worked into his regular classroom programming every day. (III, 27:1-23.)

48. Furthermore, maintaining self-regulation, sensory regulation, and social skills development are part of the daily classroom program at Wolf. These were part of Quinn's IEP at Cranston. (III, 67:18-69:16.)

49. Ms. Granoff also testified as to the Wolf School's multiple modality approach to learning. Under this approach, learning is accomplished through senses other than merely auditory and visual. In other words, the multiple modality approach is a "work around" for children like Quinn, who have auditory and visual processing issues. (III, 16:15-18:17.)

50. Sheree Koval, a Cranston school psychologist, saw Quinn once a week for about 30-45 minutes. (IV:5:13-14.)

51. Ms. Koval testified that she had no testing to substantiate whether Quinn had made progress, nor did her notes reflect such progress. (IV, 23:4-15.)

52. Dr. Stiener performed no testing of Quinn when he evaluated him at the behest of the Cranston School Department. (V, 26:22-27:10.)

53. Although Dr. Steiner disagreed with Dr. Goldfischer's diagnosis of Asperger's Disorder, he did agree with Dr. Goldfischer's diagnosis of nonverbal learning disorder, and acknowledged that Dr. Goldfischer's evaluation was complete. (V, 14:9-11; 31:17-23)

54. Dr. Stiener agreed with many of Dr. Goldfischer's recommendations. (V, 14:19-20.)

55. Dr. Steiner agreed that some changes should be made to Quinn's programming. V, 37:11-17.)

56. Dr. Stiener agreed that the Wolf School was an appropriate placement. (V, 41:4-6.)

57. Ms. Irving testified that Quinn was making some progress in the area of writing five to seven word sentences. However, when presented with Quinn's journals, she admitted that there was no progress there at all. (II, 63:3-9.) Similarly, she testified that Quinn had "demonstrated that he can complete" the goal of comparing numbers of up to six digits. Later, she admitted that he was not consistent, and that in any case she was recording the numbers for him. (II, 68:2-11, 80:4-8.)

58. Ms. Irving testified that since Quinn entered her self-contained classroom in the third grade, Quinn was now able to follow small group activities, had made strides in communication and social relations, and played with other children at recess. (III, 88:1-89:10.)

59. When filling out Dr. Goldfischer's inventories in February, 2006, however, she had indicated that Quinn still had substantial difficulties in these areas. (Ex. 6.)

60. Ms. Irving testified that Quinn's scores on the Rigby assessment and the Houghton Mifflin word recognition test showed that he had made academic progress, she admitted that these were informal assessments. Additionally, Houghton Mifflin only tests word recognition. (III, 76:16-79:11.)

61. Ms. Deschenes testified that Ms. Irving had told her in the past that the lowest grade that Quinn could receive in her class was a C. (V, 50:16-20.)

62. Ms. Irving herself acknowledged that "rarely" gives D's. (II, 58:16-20.)

63. Dr. Goldfischer testified that Quinn's current placement with emotionally and behaviorally disturbed children deprived him of the appropriate models that he required. (I, 42:21-25.)

64. Dr. Goldfischer testified that if Quinn had remained in his program, he would fall further behind his peers, and as a result grow even more depressed and anxious – thus aggravating the very emotional difficulties that Cranston felt were in the way of Quinn's learning. (I, 46:5-14.)

Defendants/Counterclaim Plaintiffs,
By Their Attorneys

/s/ Mary Ann Carroll
Mary Ann Carroll #6664
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
April 26, 2007
macarroll@smrobinsonlaw.com

/s/ Vicki J. Bejma
Vicki J. Bejma, #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
April 26, 2007
vbejma@smrobinsonlaw.com

**CERTIFICATION**

I, the undersigned, hereby certify that on ______________________ I sent a true copy of the within by electronic filing to all of the parties below:

Gregory P. Piccirilli, Esq.
Sciacca & Piccirilli
121 Phenix Avenue
Cranston, RI 02920

/s/ Vicki J. Bejma