UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CRANSTON SCHOOL DISTRICT, Plaintiff, | : | |
| v. | : | CA 06-538 ML |
| Q.D., through his parents and next friends, Mr. and Mrs. D., Defendants. | : | |

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

This action is brought pursuant to the Individuals with Disabilities Education Act ("IDEA" or "Act"), 20 U.S.C. §§ 1400-1487,[1] and specifically § 1415(i)(2)(A). See Complaint ¶ 1. Plaintiff Cranston School District ("Plaintiff" or "Cranston") seeks judicial review of a decision by an impartial due process hearing officer which found that Cranston had failed to provide Q.D. with a "free appropriate public education ["FAPE"]," 20 U.S.C. § 1412(a)(1)(A), and ordered Cranston to reimburse Q.D.'s parents for the cost of his tuition at The Wolf School, see Complaint ¶ 9.

Before the Court is Plaintiff, Cranston School Committee's Motion for Summary Judgment (Document ("Doc.") #14) ("Motion for

[1] The Individuals with Disabilities Education Act ("IDEA" or "Act"), 20 U.S.C. §§ 1400-1487, guarantees disabled children between the ages of three and twenty-one, see id. § 1412(a)(1)(A), access to a "free appropriate public education ["FAPE"]," id.; see also id. § 1400(d)(1)(A). "[T]he 'free appropriate public education' ordained by the Act requires participating states to provide, at public expense, instruction and support services sufficient 'to permit the child to benefit educationally from that instruction.'" Roland M. v. Concord Sch. Comm., 910 F.2d 983, 987 (1st Cir. 1990)(quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 203, 102 S.Ct. 3034, 3049 (1982)).

Summary Judgment" or "Motion"). Defendants, Q.D., through his parents and next friends, Mr. and Mrs. D. ("Defendants" or "Parents"), have filed an objection to the Motion. See Defendants' Objection to Plaintiff's Motion for Summary Judgment ("Objection") (Doc. #16). This matter has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons stated below, I recommend that the Motion be granted and that the decision of the hearing officer be reversed.

**I. Overview**

This IDEA case presents the question of whether a due process hearing officer's decision that a school district must reimburse a student's parents for the cost of his enrollment at a private school may be upheld where the hearing officer found that the school district had failed to provide the student with a FAPE because he was not making academic progress, but the omissions and/or deficiencies which the hearing officer found in the student's Individual Education Program ("IEP") could not reasonably have been known to the school district at the time the parents requested the due process hearing and the school district's reason for refusing to change the IEP, namely that the student was making social, emotional, and behavioral progress, had a factual basis. For the reasons stated herein, the Court concludes that in such circumstances the hearing officer's decision should not be upheld.

**II. Facts**

Plaintiff Q.D. ("Q.D.") was born in 1996. See Plaintiff's Statement of Undisputed Facts (Doc. #15) ("PSUF") ¶ 1. He was identified as a child with a disability in December of 2003 when he was in the second grade. See Hearing Exhibit ("Ex.") 21 (TQP Report dated 12/3/03). On December 31, 2003, the Rhode Island Hospital Child Development Center diagnosed Q.D. as having

Attention Deficit Hyperactivity Disorder ("ADHD") and a nonverbal learning disorder.[2] See PSUF ¶ 6; see also School Department Exhibit A[3] (Rhode Island Hospital Psychology Evaluation Report dated 12/31/03) at 5.

From kindergarten through second grade, Q.D. attended Cranston Public Schools at the Orchard Farms Elementary School in a regular classroom setting. See PSUF ¶ 4. His second grade teacher, Jacqueline Ingalls ("Ms. Ingalls"), testified that at the end of the second grade Q.D. was about a year behind in most subjects. See Hearing Transcript, Volume ("Vol.") II at 10.[4] Beginning with the third grade (2004-2005), Q.D. was placed in a self-contained classroom taught by a special education teacher, Jean Irving ("Ms. Irving"). See PSUF ¶ 3; Ex. 24 (IEP for 1/05 to 1/06) at 1; Vol. II at 23, 26. At an IEP meeting held on February 10, 2005,[5] it was determined that the three year re-evaluation which was due in November of 2006 would be completed immediately because of "a lack of academic progress and the development of concerning behaviors ...." Ex. 30 (Educational Parent Conference Report). Q.D.'s mother testified that she had asked at the meeting that he be evaluated because he was not

---

[2] Parents dispute that this diagnosis was correct. See Defendants' Response to Plaintiff's Statement of Undisputed Facts (Doc. #18) ("Response to PSUF") ¶ 6. They point instead to the diagnosis made by Howard M. Goldfischer, Psy.D., a pediatric neuropsychologist whom they engaged in the spring of 2006. See id. Dr. Goldfischer diagnosed Q.D. with Asperger's Disorder and a nonverbal learning disorder. See Hearing Exhibit ("Ex.") 5 (Dr. Goldfischer's Evaluation) at 16.

[3] School Department Exhibit A is located with the other Hearing Exhibits in the white ringbinder notebook. It is the last exhibit.

[4] The Hearing Transcript is contained in five volumes. Hereafter, the Court cites to this transcript by volume and page number (e.g., Vol. II at 33).

[5] Q.D.'s parents signed an IEP for 2004, but did not sign one for either 2005 or 2006. See PSUF ¶ 5.

making any progress. See Vol. V at 48.

In accordance with the determination made at the February IEP meeting, Q.D. was given an education evaluation on March 10, 2005, by Wendy Moscovitz ("Ms. Moscovitz"). See Ex. 12 (Educational Evaluation of 3/10/05). Ms. Moscovitz summarized her findings:

> When compared to others at his age level, Q[.D.]'s overall level of achievement is average. His academic skills, his ability to apply those skills, and his fluency with academic tasks are all within the average range.
>
> When compared to others at his age level, Q[.D.]'s performance is high average in written expression; average in broad reading, basic reading skills, reading comprehension, and math reasoning; and low average in math calculation skills and basic writing skills.

Ex. 12 at 3.

An occupational therapy evaluation of Q.D. was also conducted in March of 2005. See Ex. 15 (Occupational Therapy Evaluation). He was evaluated by Elizabeth Augenstein, M.S. ("Ms. Augenstein"), a registered, licensed occupational therapist. See id. at 6. Ms. Augenstein assessed Q.D. as having average visual motor and motor control skills and borderline/low average visual perception. See id. She opined that "the test results were impacted by Q[.D.]'s impulsivity and difficulty attending to task." Ex. 15 at 6.

A neuropsychological evaluation of Q.D. was conducted on March 30, 2005, by Mary Lynne Kennedy, Ph.D. ("Dr. Kennedy"). See Ex. 13 (Neuropsychological Evaluation of 3/30/05). Dr. Kennedy noted that some of Q.D.'s sensory deficits and difficulty with change were suggestive of Asperger's Disorder, but also observed that the "parent report was not consistent with this diagnosis and Asperger's was ruled-out on prior evaluation." Id. at 6. Summarizing her findings, Dr. Kennedy noted that "[a]s

compared with prior testing, Q[.D.]'s performance has improved in several areas ...; however, he continues to demonstrate difficulty with visual-motor and visual-perceptual abilities." Id. at 6. Her findings were consistent, she believed, with the prior diagnosis of a nonverbal learning disability. See id. The primary obstacles to Q.D.'s successful performance in the classroom, in Dr. Kennedy's opinion, were Q.D.'s anxiety and his attention disorder. See id. at 7. She also noted that his behavior had become more oppositional. See id. Dr. Kennedy recommended that he be given a psychiatric evaluation to delineate the degree to which each of these problems was hindering his performance and to recommend appropriate treatment. See id.

On June 10, 2005, Cranston had Q.D. evaluated by Gregory Stiener, M.D. ("Dr. Stiener"), a child psychiatrist. See PSUF ¶ 7; Ex. 14 (Dr. Stiener's Evaluation of 6/10/05). This was not Dr. Stiener's first contact with Q.D. See Vol. V at 7. He had seen Q.D. twice in the fall of 2004 in his private practice and had diagnosed Q.D. at that time with anxiety disorder, ADHD, and a nonverbal learning disability. See id. at 8. Dr. Stiener's diagnosis in June of 2005 was the same with the addition of a sensory integration disorder.[6] See PSUF ¶ 7; see also Ex. 14 at 3. Dr. Stiener felt that it was important for Q.D. to be involved in a summer program in the form of summer school or a combination of tutoring and a camp placement. See Ex. 14 at 4. He wrote:

> Q[.D.] has a tendency to be dependent on adults and an entire summer with limited peer contact would not be healthy. In addition, he has made academic gains this year and it is important to reinforce the progress he has already made.

[6] Parents again dispute that this diagnosis was correct. See Response to PSUF ¶ 7.

Id. at 4-5.

Q.D.'s third grade teacher, Ms. Irving, prepared an extended school year IEP for him for the summer of 2005 which included placement in a school setting. See PSUF ¶ 22. She testified that the purpose of the program was to help Q.D. transition back into the next academic school year. See Vol. III at 95. According to Ms. Irving, there was a fear that, without a summer program which mimicked the school program he would have in the fall, Q.D. would have difficulty with that transition. See id. at 96. However, Q.D.'s parents did not avail themselves of this program, and instead sent him to camp and had his second grade teacher, Ms. Ingalls, tutor him. See PSUF ¶ 22. The tutoring was in all subjects, and Ms. Ingalls saw Q.D. for an hour and a half twice a week for eight weeks. See Vol. II at 9. By the end of the tutoring, Ms. Ingalls concluded that Q.D. had not made much progress from the time she had seen him at the end of the second grade. See id. at 10.

When school resumed in the fall of 2005, Q.D. entered the fourth grade and returned to Ms. Irving's self-contained classroom at the George J. Peters Elementary School. See PSUF ¶ 2. Ms. Irving testified that Q.D.'s behavior had regressed and that he had a lot of difficulty with the transition from the summer program back into school. See Vol. III at 98. She attributed this regression at least partly to Q.D. not being in the recommended summer program, see id. at 104, but she also noted that there were a few new students and a new teacher assistant in the classroom and agreed that these changes may have contributed to Q.D.'s difficulty in making the transition back to school, see id. at 98, 104-05. There were ten students in the class, and they had a variety of disabilities. See Vol. II at 26. Some were emotionally disturbed, see id. at 27, a few were classified as "other health impaired," id. at 27-28, and "one

child [was] labeled within the Autistic Spectrum Disorder," id. at 28. All the students had individual educational programs, and some students were "pulled out for integrated pieces throughout the day." Id. In Q.D.'s case, he left Ms. Irving's classroom for art, physical education, library, and music. See id. at 33, 35-36. He also went to the cafeteria for lunch, see id. at 36, and out for recess, see Vol. III at 88. Ms. Irving testified that Q.D. played football with children within his age group and that the group included children within the general education program. See id. at 88.

Ms. Irving further testified that she was scheduled (as of August 30, 2006) to have nine students in her classroom for the 2006-2007 school year and that she would have the assistance of two classroom aides. See Vol. III at 92. This was an increase from the one classroom aide whom she had during the 2005-2006 school year. See id.

Around February of 2006, Q.D.'s Parents contacted Howard M. Goldfischer, Psy.D. ("Dr. Goldfischer"), a pediatric neuro-psychologist, because they felt that Q.D. was not making progress and was regressing. See Vol. I at 4-6. Dr. Goldfischer testified that the concerns about Q.D. at that time included "significant academic deficits, anxiety ... attentional difficulties, poor social skills, problems with transitioning[,] and profound sensory issues." Id. at 5. Dr. Goldfischer conducted a neuropsychological evaluation of Q.D., spending about eight or nine hours with him over the course of two days, soliciting information from his parents and teachers, and reviewing his academic record. See id. at 6-7. However, in soliciting information from Q.D.'s teachers, Dr. Goldfischer did not talk with any of them. See id. at 48. Rather, he sent

rating scales[7] to Cranston which were completed by Ms. Irving during the period February 12-16, 2006. See Ex. 6; Vol. II at 40, 87; Vol. III at 87.

Dr. Goldfischer noted that Q.D.'s "performance seemed to be significantly affected by his distractibility, implusivity, and attentional difficulty." Ex. 5 at 4. This observation echoed Ms. Augenstein's of a year earlier. See Ex. 15 at 6. While Dr. Goldfischer found that Q.D.'s language abilities were generally at or just below expected levels, see Ex. 5 at 5, other test results indicated that he was significantly behind in academic areas such as spelling, math calculation, reading fluency, and penmanship compared to same-age peers, see id. at 9. Dr. Goldfischer opined that Q.D.'s neuropsychological profile appeared to meet the criteria for NLD, but that his social difficulties seemed to go beyond that expected for one with NLD. See id. at 15. It was Dr. Goldfischer's opinion that Q.D. had Asperger's Disorder. See Vol. I at 9; Ex. 5 at 16.

Around June 1, 2006, Parents' attorney, Mary Ann Carroll ("Attorney Carroll"), provided a copy of Dr. Goldfischer's thirty-three page evaluation to Cranston's Director of Special Education, Ann-Marie Zodda ("Ms. Zodda"). See Ex. 7 (Letter from Carroll to Zodda of 6/14/06) at 1. An IEP meeting was held either on June 7 or 8,[8] 2006, to discuss the evaluation and also extended school year services for Q.D. See id. According to Attorney Carroll, at the meeting she asked Ms. Zodda to compare

---

[7] The rating scales included the Gilliam Asperger's Disorder Scale ("GADS"), the Social Responsiveness Scale ("SRS"), the Behavior Assessment System for Children ("BASC-2"), and a behavior checklist. See Ex. 5 at 9; Ex. 6 at 3-13 (scales).

[8] Parents' attorney identifies the date of this IEP as June 8, 2006, see Ex. 7 (Letter from Carroll to Zodda of 6/14/06), while Cranston's Director of Special Education indicates that it occurred on June 7, 2006, see Ex. 10 (Letter from Zodda to Carroll of 6/20/06) at 1.

the results of the Woodcock-Johnson-Third Edition test administered by Dr. Goldfischer in April of 2006 with the one given by Ms. Moscovitz in March of 2005. See id. Asserting that it was obvious that Q.D. had "made no adequate progress within the Cranston School Department," Ex. 7 at 1 (bold omitted), Attorney Carroll asked Ms. Zodda to explain why the program developed for Q.D. was providing no academic progress, see id.[9] As Attorney Carroll and Ms. Zodda have different recollections of how Ms. Zodda responded to this question, the Court sets forth both of their accounts. According to Attorney Carroll, Ms. Zodda:

> tried to explain to us that the reason he was making no academic progress was because his social and emotional needs were so severe that they were interfering with his

[9] The grade level equivalent results of the two Woodcock-Johnson-Third Edition tests are set forth below:

| | Feb. 2006 | Mar. 2005 |
|---|---|---|
| BROAD READING | 3.1 | 3.0 |
| Letter/Word Identification | 3.5 | 3.0 |
| Reading Fluency | 2.7 | 3.2 |
| Passage Comprehension | 2.9 | 2.7 |
| BROAD MATHEMATICS | 2.6 | 2.8 |
| Calculation | 2.1 | 2.6 |
| Math Fluency | 2.3 | 2.2 |
| Applied Problems | 3.1 | 3.1 |
| MATH CALC SKILLS | 2.2 | 2.5 |
| BROAD WRITTEN LANGUAGE | 3.1 | 3.4 |
| WRITTEN EXPRESSION | 2.9 | 4.0 |
| Spelling | 3.3 | 2.8 |
| Writing Fluency | 3.3 | 4.2 |
| Writing Samples | 2.1 | 3.3 |
| BASIC READING SKILLS | 3.7 | 3.0 |
| Word Attack | 4.3 | 2.9 |
| ACADEMIC SKILLS | 3.0 | 2.9 |
| ACADEMIC FLUENCY | 2.9 | 3.4 |
| ACADEMIC APPLICATIONS | 2.8 | 3.0 |
| TOTAL ACHIEVEMENT | 2.9 | 3.0 |

Source: Ex. 5 at 28; Ex. 12 at 4 (misnumbered as "Page 3"). The dates of Dr. Goldfischer's evaluation were "2/6/06; 2/7/06; 4/27/06." Ex. 5 at 1.

> academics. I then asked you to explain what changes you intended to make to his program so that his social and emotional needs could be met so that he could make academic progress. At that point you had no answers and basically implied that Q[.D.] would be receiving the same program during the 06/07 program as he received during the previous two years.

Ex. 7 at 1. Ms. Zodda, however, disputes that she did not respond to Attorney Carroll's question regarding what changes Cranston intended to make to Q.D.'s program. Ms. Zodda's version of the exchange appears in her letter to Attorney Carroll of June 20, 2006:

> I explained the reason the student had not made any academic progress[10] was because student's social, emotional needs interfer[e] significantly with his academic on task behaviors, which in turn limits academic progress. In the June 14th letter, you wrote I was unable to respond to ... [your question]. This is inaccurate[.] I responded quite specifically to your inquiry[.] I stated changes in current programming were not indicated. The student is making social, emotional, and behavioral progress; as these areas continue to improve, time and attention to academic tasks will increase, and as a result, there will also be academic progress.

Ex. 10 at 1 (Letter from Zodda to Carroll of 6/20/06) at 1.

On June 14, 2006, Attorney Carroll advised Ms. Zodda that Parents were requesting that Q.D. be placed at The Wolf School for the 2006-2007 school year at public expense. See Ex. 7 at 2. Attorney Carroll explained the request by stating "that more of the same is not going to provide Q[.D.] with free and appropriate public education. More of the same is not going to provide him with a program where he is going to obtain adequate progress in

---

[10] Ms. Zodda's statement that "the student had not made any academic progress ...," Ex. 10 at 1, should be viewed contextually. In the preceding paragraph, she had written: "I am aware the student has made limited academic progress." Id.

his academics." Id.

Ms. Zodda responded to Parents' request in a June 20, 2006, letter which in part stated:

> The student has the following diagnoses:
>
> Anxiety Disorder NOS
> ADHD — Combined Type
> Learning Disorder NOS (Non-verbal Learning Disorder)
> Learning Disorder (Sensory Integration Disorder)
>
> The following are the social, emotional, and behavioral issues associated with the diagnoses with interfere with the student's academic progress:
>
> | | |
> |---|---|
> | Inattention | Impulse control |
> | Organization skills | Low frustration tolerance |
> | Poor concentration | Processing speed |
> | Anxiety | Distractibility |
> | Visual-spatial limitations | Limited finger dexterity |
> | Self esteem | Coping skills |
>
> The student requires and receives a myriad of social, emotional, behavioral, and academic supports and services. There is absolutely no basis for a private school program placement at public expense for this student.

Ex. 10 at 1-2.

On June 26, 2006, Parents requested an impartial due process hearing from the Rhode Island Department of Education. See Ex. 1 (Request for Impartial Due Process Hearing). Parents identified their specific complaint as being: 1) that Dr. Goldfischer's evaluation indicated that Q.D. had made little to no academic progress in his present placement; 2) that Cranston acknowledged that Q.D. had made limited academic progress; 3) that Cranston stated that Q.D.'s social and emotional needs interfere with his academic progress; and 4) that Cranston did not believe that

there was any need to change his current program.[11] See id. at 2-3 (Specific Complaint). They then summarized their complaint:

> Because Q[.D.] has made limited to no academic progress and because the Cranston School Department does not believe that there is a need to change Q[.D.]'s program[,] the Cranston School Department has failed to and will continue to fail to provide Q[.D.] with a Free and Appropriate Public Education.

Ex. 1 at 3. Parents requested that Cranston be directed to reimburse them for the tuition and costs to place Q.D. at The Wolf School and that Cranston also transport Q.D. to that facility. See id.

The impartial due process hearing was conducted on August 21, 22, 30, and September 7 and 8, 2006. See Vol. I - V. On November 17, 2006, the Hearing Officer rendered her decision. See Administrative Decision ("Decision"). She found that Cranston had failed to provide Q.D. with a FAPE and that, as a result, Parents were justified in removing him from Cranston Public Schools and placing him in a private school. See Decision at 15. The Hearing Officer further found that The Wolf School was an appropriate placement for Q.D. See id. She ordered Cranston to reimburse Parents for the cost of his enrollment at The Wolf School. See id.

**III. Travel**

Cranston filed its Complaint (Doc. #1) in this Court on December 12, 2006. See Docket. Parents filed their Answer (Doc. #3) on January 4, 2007, along with a counterclaim, seeking attorney's fees pursuant to 20 U.S.C. § 1415 for prevailing at the due process hearing. See Docket; Answer at 2. Cranston filed the administrative record on April 6, 2007, and on April

---

[11] Parents' "Specific Complaint" contains fifteen enumerated paragraphs. See Ex. 1 at 2-3. The Court has distilled these paragraphs to the four stated above.

16, 2007, the instant Motion for Summary Judgment. See Docket. Defendants filed their Objection to the Motion for Summary Judgment on May 3, 2007. See id. The Court conducted a hearing on the Motion on June 11, 2007. See id. Thereafter, the Court took the matter under advisement. See id.

**IV. Standard of Review**

Although a party in an IDEA appeal may move for "summary judgment," the fact that a motion is so captioned does not mean that the court uses its normal summary judgment standard of review in which it examines whether genuine issues of material fact exist. See Browell v. Lemahieu, 127 F.Supp.2d 1117, 1120 (D. Haw. 2000). Rather, the Act provides that, when an action is brought in the District Court, the Court:

> (i) shall receive the records of the administrative proceedings;
>
> (ii) shall hear additional evidence at the request of a party; and
>
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(C)(i)-(iii); see also T.B. v. Warwick Sch. Dep't, No. Civ.A. 01-122T, 2003 WL 22069432, at *6 (D.R.I. June 6, 2003). "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051 (1982). Due weight must be given to the state administrative proceedings. See id.; Abrahamson v. Hershman, 701 F.2d 223, 230 (1st Cir. 1983).

Although the exact quantum of weight is subject to the

> district judge's exercise of informed discretion, see Hampton [Sch. Dist. v. Dobrowolski], 976 F.2d [48,] at 52 [(1st Cir. 1992)]; G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 946 (1st Cir. 1991), the judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason. See Burlington [v. Dep't of Educ.], 736 F.2d [773,] at 792 [(1st Cir. 1984), aff'd, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)]("The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue."). In the end, the judicial function at the trial-court level is "one of involved oversight," Roland M. [v. Concord Sch. Comm.], 910 F.2d [983,] at 989 [(1st Cir. 1990)]; and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale.

Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993).

In short, "the law contemplates an intermediate standard of review on the trial-court level--a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review." Id. at 1086. "[T]he procedural protections provided by the administrative process would be rendered meaningless if courts could simply substitute their own preferences for the administrative officers' evaluations." Kevin G. v. Cranston Sch. Comm., 965 F.Supp. 261, 263 (D.R.I. 1997).

**V. Burden of Proof**

Cranston, as the complaining party, bears the burden of proving that the hearing officer's decision was wrong.[12] See

---

[12] Cranston, in discussing the burden of proof, states that "since the parents requested the due process hearing, they bore the burden of persuasion on all elements at the hearing." Plaintiff, Cranston School Committee's Memorandum in Support of Motion for Summary Judgment ("Plaintiff's Mem.") at 13. While this is an accurate statement, see Schaffer v. Weast, 546 U.S. 49, 62, 126 S.Ct. 528, 537 (2005)("[T]he burden of proof in an administrative hearing challenging

Roland M. v. Concord Sch. Comm., 910 F.2d 983, 991 (1st Cir. 1990); see also Schaffer v. Weast, 546 U.S. 49, 56, 126 S.Ct. 528, 534 (2005)("[T]he person who seeks court action should justify the request, which means that the plaintiffs bear the burdens on the elements in their claims."); id. at 57-58, 126 U.S. at 535 (concluding in IDEA case that "[a]bsent some reason to believe that Congress intended otherwise ... the burden of persuasion lies where it usually falls, upon the party seeking relief."); id., 546 U.S. at 56, 126 S.Ct. at 533-34 (explaining meaning of "burden of proof" in IDEA case as "which party loses if the evidence is closely balanced").

## VI. Discussion

### A. Hearing Officer's Decision

The Hearing Officer found that there was a difference of opinion among the experts regarding Q.D.'s learning disability or diagnosis. See Decision at 12. She concluded, however, that for purposes of the case, it was irrelevant whether Q.D. suffered from Asperger's Disorder or had a nonverbal learning disorder coupled with ADHD and anxiety. See id. The issue, as she saw it, was whether the educational program offered by Cranston provided Q.D. with a FAPE. See id. In addressing this question, the Hearing Officer stated that FAPE has been defined "as a course of instruction that is individually tailored to the student so as to address his disabilities and provide the student with access to a curriculum that is reasonably calculated to

---

an IEP is properly placed upon the party seeking relief."), in this Court Cranston bears the burden of proving that the hearing officer's decision was wrong, see Roland M. v. Concord Sch. Comm., 910 F.2d 983, 991 (1st Cir. 1990)(applying IDEA's predecessor, the Education of the Handicapped Act); see also Barnett v. Fairfax County Sch. Bd., 927 F.2d 146, 152 (4th Cir. 1991)("[T]he party challenging the hearing officer's decision properly bears the burden of proof in showing that the officer's decision was erroneous."); Town of Burlington v. Dep't of Educ. for Ma., 736 F.2d 773, 794 (1st Cir. 1984).

provide educational benefit." Id. Utilizing this definition, the Hearing Officer observed that:

> In the instant case, it is clear that the district was providing an individualized course of instruction with additional aids and services. However, it is not clear that the IEP afforded the student with an opportunity that was reasonably calculated to achieve educational benefit.

Id.

The Hearing Officer found that the objective evidence demonstrated that from the spring of 2005 to the spring of 2006 Q.D. regressed from an educational achievement level of 3.0 to 2.9.[13] See id. She noted that as early as February 2005, school personnel had identified a lack of progress and had accelerated Q.D.'s three year evaluation. See id. The Hearing Officer found that despite what she termed "the noted lack of progress ...," id., Cranston took no significant steps after receiving Dr. Stiener's June 2005 evaluation (Ex. 14) to change Q.D.'s program from what it had been in the 2004-2005 school year, see id. The Hearing Officer further faulted Cranston for not substantially altering Q.D.'s proposed IEP for 2006-2007 after receiving Dr. Goldfischer's evaluation in June of 2006. See id. In fact, she specifically found that Cranston's determination in June 2006 that Q.D.'s "social and emotional problems precluded educational progress without adjusting the student's IEP to address those issues as well as the failure to address Dr. Goldfischer's findings and recommendations constitutes a denial of FAPE." Id. at 14. The Hearing Officer also believed that it was particularly noteworthy that although Q.D.:

[13] The "objective evidence," Decision at 12, was the Woodcock-Johnson testing administered by Ms. Moscovitz in March of 2005 and by Dr. Goldfischer a year later, see Decision at 5; see also Facts at 9 n.9.

> presents with "serious social and emotional concerns," he was nevertheless placed in a self-contained classroom with students who are emotionally disturbed and behavior disordered. From a mere lay person's view, it is clear that placing this student with ED and BD children will not enhance his socialization, and more importantly, may adversely impact his socialization.

Decision at 13.

The Hearing Officer concluded that Cranston had failed to provide Q.D. with an educational program "individualized to address his specific disabilities and provide him with the necessary supports and services as will enable him to have an opportunity to access an education and make academic progress." Id. Citing Regulation 300.403(c) of the Regulations of the Board of Regents for Elementary and Secondary Education Governing the Education of Children with Disabilities, see id. at 13, the Hearing Officer found that Parents were justified in removing Q.D. from the district because a FAPE was not made available in a timely manner prior to his enrollment at The Wolf School and also found that The Wolf School was an appropriate placement, see id. at 15. Accordingly, she ordered Cranston to reimburse Parents for the cost of Q.D.'s tuition at The Wolf School. See id.

**B. Analysis**

Bearing in mind that this Court's "principal function is one of involved oversight," Roland M. v. Concord Sch. Comm., 910 F.2d at 989, and that the persuasiveness or lack of persuasiveness of a particular administrative finding "is likely to tell the tale," Lenn v. Portland Sch. Comm., 998 F.2d at 1087, the Court examines the Hearing Officer's findings and conclusions. Her determination that it is irrelevant whether Q.D. suffers from Asperger's Disorder or has a nonverbal learning disorder coupled

with ADHD, see Decision at 12, passes muster.[14] Regardless of the precise nature of his disability, Cranston is required to provide Q.D. with a FAPE.

In concluding that Cranston had failed to fulfill this statutory obligation, the Hearing Officer listed a number of reasons. While finding that Cranston was providing an individualized course of instruction with additional aids and services, the Hearing Officer was not convinced that the IEP "was reasonably calculated to achieve educational benefit." Decision at 12. She noted that from the spring of 2005 to the spring of 2006 Q.D. regressed from an educational achievement level of 3.0 to 2.9. See id. She also noted that as early as February 2005, school personnel identified a lack of progress and accelerated Q.D.'s three year evaluation. See id. Both of these statements are supported by the record. See Ex. 5 at 28; Ex. 12 at 4 (misnumbered as "Page 3"); Ex. 12 at 1; Ex. 28 (Memorandum from Zodda to Kennedy of 2/18/05); Ex. 30.

If the only issue in this case was whether as of June 2006 Q.D. had made adequate academic progress, the Court's task would be relatively easy. Cranston does not really dispute the lack of academic progress.[15] See Plaintiff, Cranston School Committee's

---

[14] Dr. Goldfischer and Dr. Stiener both diagnosed Q.D. with a nonverbal learning disorder. See Ex. 5 at 16; Ex. 14 at 3. However, Dr. Goldfischer diagnosed Q.D. as having Asperger's Disorder, see Vol. I at 9, while Dr. Stiener disagreed with that diagnosis, see Vol. V at 11. Ms. Koval, the school psychologist, testified that in her career she had dealt with at least twenty-five children with Asperger's Disorder and recounted differences which she observed between Q.D. and those children. See Vol. IV at 10-12. While Dr. Stiener believed that Q.D. had an anxiety disorder, see Vol. V at 8; id. at 14 ("anxiety is an important part of what is going on with Q[.D.]"), Dr. Goldfischer did not make that diagnosis, although he referenced anxiety many times in his report, see id. at 14.

[15] This is not to suggest that the Hearing Officer's finding that Q.D. made little or no academic progress between 2005 and 2006 necessarily means that he has been denied a FAPE. See P.D. v.

Memorandum in Support of Motion for Summary Judgment ("Plaintiff's Mem.") at 5 ("The school department's special education director acknowledged the apparent lack of progress as measured by the two tests; however, she emphasized that QD was making good social and emotional progress, which would lead to more noticeable academic progress in the future."); see also Ex. 10 ("I am aware the student has made limited academic progress."). Rather, Cranston's complaint, in essence, is that its decision to continue with the proposed IEP was appropriate based on the evidence which existed at the time Parents made their request for private placement, see Plaintiff's Mem. at 5, and that the deficiencies and/or shortcomings which the Hearing Officer identified in the IEP are either not supported by the evidence in the record or, at the very least, could not have been reasonably known to Cranston at the time Parents made their request, see id. at 5-6, 11-12. The Court is compelled to agree.

The Hearing Officer faulted Cranston for not changing Q.D.'s program following Dr. Stiener's June 2005 evaluation despite the lack of progress. See Decision at 12. However, Dr. Stiener's evaluation stated in two separate places that Q.D. had made academic progress. In the section immediately beneath the heading "Academic History," Ex. 14 at 2, Dr. Stiener wrote that Q.D. "has made significant gains this year with additional

---

Franklin Township Bd. of Educ., Civ. No. 05-2363 (SRC), 2006 US Dist. LEXIS 16440, at *22 (D.N.J. Mar. 22, 2006)(stating that whether student has made little or no academic progress over previous four years has no bearing on whether IEP for next school year is appropriate)(citing Carlisle Area Sch. v. Scott P., 62 F.3d 520, 530 (3rd Cir. 1995)); see also Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1089 (1st Cir. 1993) ("[A]n IEP is designed as a package. It must target *all* of a child's special needs, whether they be academic, physical, emotional, or social.")(internal quotation marks and citations omitted); Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992 (1st Cir. 1990)(explaining that "purely academic progress ... is not the only indic[ium] of educational benefit").

classroom structure and the behavior plan available in his classroom," id. Later, in stating his recommendations, Dr. Stiener again noted that Q.D. "has made academic gains this year and it is important to continue to reinforce the progress he has already made."[16] Id. at 5. Moreover, Dr. Stiener opined that Q.D. "is currently in an excellent classroom placement. His teacher [Ms. Irving] has created a wonderful behavior program that has been very successful." Id. at 4. In short, there is nothing in Dr. Stiener's June 2005 evaluation which supports the Hearing Officer's determination that Cranston should have made significant changes to Q.D.'s program at that time. The two examples of changes which she cited as being needed, addition of a speech and language component and an increase in counseling services, see Decision at 12, were not indicated by Dr. Stiener's evaluation. He did not include either of these services in his recommendations,[17] see Ex. 14 at 4-5, and there is nothing in the record which indicates that these changes were warranted at the time of Dr. Stiener's report. This is especially true in light of Dr. Stiener's statements about Q.D.'s "academic gains," id. at 5, and his laudatory comments regarding Q.D.'s classroom placement, see id. at 4.

It appears that in citing these examples the Hearing Officer was conflating the question of whether Cranston should have changed Q.D.'s IEP after Dr. Stiener's 2005 evaluation with whether it should have changed the IEP after receiving Dr.

---

[16] Dr. Stiener's conclusion that Q.D. had made progress during the third grade is also supported by the March 2005 educational evaluation conducted by Ms. Moscovitz. See Facts supra at 4 (quoting Ex. 12).

[17] Dr. Stiener did include among his recommendations in June of 2005 that: "Q[.D.] might benefit from a social skills group. There are only limited options available in the community but I did speak to Q[.D.]'s mom about the program run by Dr. Larry Hirschberg." Ex. 14 at 5. The Court does not read this statement as suggesting an increase in counseling by school authorities.

Goldfischer's report in June of 2006. The Court reaches this conclusion because there is nothing in Dr. Stiener's evaluation (or elsewhere in the then-existing record) which warranted a change in Q.D.'s IEP in June 2005 relative to such services. The Hearing Officer indicated that she believed such services were necessary because Dr. Stiener had allegedly identified Q.D. "as having serious social and emotional issues." Decision at 12. However, this characterization of Q.D.'s social and emotional issues does not appear in Dr. Stiener's 2005 evaluation. See Ex. 14. Rather, it appears to be taken from Dr. Stiener's testimony at the hearing when he agreed with Attorney Carroll that the information provided by Ms. Irving in the rating scales (which were completed in February of 2006) indicated "a child who has some serious social and emotional and behavioral concerns[.]" Vol. V at 34. Similarly, the Hearing Officer's statement that "[d]espite the specified need for counseling, the IEP remained at .5 hours per week," Decision at 13, also appears to refer to Dr. Goldfischer's testimony at the hearing where he repeatedly stated that the .5 hours of counseling specified in the 2006 IEP was insufficient, see Vol. I at 41 ("he has one-half hour one day a week and that is clearly not enough"); id. at 42 ("not just .5 a week"); id. at 82 ("Having .5 for counselling is not enough.").

In sum, to the extent that the Hearing Officer found Cranston deficient for failing to change Q.D.'s educational program after receiving Dr. Stiener's June 2005 evaluation, such finding is unpersuasive and not supported by the record. Accordingly, it is rejected by the Court.

The Court now turns to the question of whether Cranston failed to provide Q.D. with a FAPE by refusing to change his IEP after receiving Dr. Goldfischer's report. The Hearing Officer clearly found that Cranston's failure to do so constituted a denial of FAPE. See Decision at 13 ("Despite the Goldfischer

recommendation ... the district did not substantively alter the student's proposed 2006-07 IEP."); id. at 14 ("the failure to address Dr. Goldfischer's findings and recommendations constitutes a denial of FAPE").

Dr. Goldfischer's thirty-three page, largely single-spaced report contains more than sixty recommendations. See Ex. 5. In stating his recommendations, Dr. Goldfischer uses a variety of descriptions, which range from the imperative,[18] the near imperative,[19] unqualified recommendations,[20] and suggestions.[21] These recommendations are interspersed throughout the last nine pages of the "Summary and Conclusions" portion of the report. This organizational style greatly hinders the process of identifying which measures Dr. Goldfischer thought were essential for Q.D.'s success and which measures he thought might merely be helpful (or could also be considered).[22]

Even more problematic, some of the recommendations are contradictory. For example, Dr. Goldfischer cautions that "[a]ny timed assignments will need to be modified or eliminated," Ex. 5 at 17, and that "[t]ime constraints often prove to be counterproductive, as Q[.D.] can be easily overwhelmed by the unrealistic expectations of his teachers," id. Yet, he also

---

[18] See, e.g., Ex. 5 at 17 ("Adjustments must be made ...."); id. at 19 ("[T]he teacher must ...."); id. at 20 ("Very firm expectations must be set ...."); id. at 21 ("Teachers must ...."); id. ("It is critical ....").

[19] See, e.g., id. at 23 ("It is strongly recommended ...."); id. at 17 ("Use of a computer word processor is highly recommended ....").

[20] See, e.g., id. ("It is recommended ....").

[21] See, e.g., id. ("The following is suggested ...."); id. ("Speech and Language Therapy also might be considered.").

[22] Emblematic of the difficulty of making practical use of Dr. Goldfischer's evaluation is the fact that the "Summary and Conclusions" section begins on page 13 and continues to page 24.

advises that "[c]lass work that is not completed within the time limit ... must be made up during the child's own time (i.e., during breaks or during the time used for pursuit of special interests," id. at 20. He is seemingly even more emphatic about this later in the report:

> Very firm expectations must be set for the quality of work produced. Work executed within timed periods must be not only complete but done carefully. Q[.D.] should be expected to correct poorly executed class work during recess or during the time he usually pursues his own interests.[23]

Ex. 5 at 20-21.

Despite recommending that Q.D. be required to correct poorly executed class work during recess, see id. at 21, Dr. Goldfischer also advises that "punitive measures" should be avoided, id. at 17, that "his teachers should encourage him to put forth his best work product, rather than focus on his speed of performance," id. at 22, and that "[e]mphasis on timelines and requirements appear to place undue anxiety on Q[.D.]," id. at 24. Similarly, Dr. Goldfischer counsels that "[a]djustments must be made in teacher expectations for volume of written products," id. at 17, and that "[a]dditional time will be needed for all written assignments," id., but he also warns that "Q[.D.] can sometimes be stubborn and therefore needs firm expectations ...," id. at 20, and that "[v]ery firm expectations must be set for the quality of work produced," id.[24] Additionally, Dr. Goldfischer advocates having

---

[23] Equally contradictory, in the preceding paragraph, Dr. Goldfischer states: "It may be necessary to lessen Q[.D.]'s homework/class work load and/or provide time in a resource room where a special education teacher can provide the additional structure he needs to complete class work and homework." Ex. 5 at 20.

[24] It is somewhat ironic, given the contradictory nature of several of his recommendations, that Dr. Goldfischer also recommends that Q.D.'s teachers "offer[] a high level of consistency." Ex. 5 at 21.

Q.D. repeat directions to "help ensure that all steps of a task are understood," id. at 16, but four pages later casts doubt on the efficacy of this technique, cautioning that Q.D. may "parrot back what he has heard ...," id. at 20, without understanding it.[25]

The Hearing Officer faulted Cranston for failing to add a speech and language component to Q.D.'s IEP, see Decision at 12, but in his report Dr. Goldfischer did not identify this as a significant need. Rather, in the context of the entire report, speech and language therapy appears almost as an afterthought which school authorities might also wish to consider:

> 12. Q[.D.]'s school is encouraged to evaluate him to determine eligibility to receive school-based Occupational Therapy to assist him with his motor coordination difficulties[,] sensory sensitivities, and poor handwriting. Speech and Language Therapy might also be considered to help Q[.D.] with aspects of nonverbal communication and improved social language.

Ex. 5 at 23. There is certainly nothing in the above paragraph which would make speech and language therapy stand out as a significant need which the school authorities should have promptly addressed. Moreover, in recounting Q.D.'s test results Dr. Goldfischer wrote that "Q[.D.]'s language abilities were generally at or just below expected level," id. at 5, and that "[o][verall, there were no formal language problems identified," id. at 6. Dr. Goldfischer also wrote that Q.D.'s "receptive language skills appear to be well developed ...." Id. at 15. Given this assessment of Q.D.'s language capability and Dr.

---

[25] In addition to the inconsistency of some recommendations, the practical value or relevance of others seems questionable given that Q.D. was only ten years old. See, e.g., Ex. 5 at 20 ("Emotional nuances, multiple levels of meaning, and relationship issues as presented in novels will often not be understood."); id. at 24 ("Often, a teen with impulse control difficulties finds typical homework loads daunting.").

Goldfischer's presumably deliberate choice not to use language stronger than "might also be considered," id. at 23, Cranston could not reasonably have known from Dr. Goldfischer's report that adding a speech and language component to Q.D.'s IEP was necessary (or even indicated).

The same problem exists with regard to the Hearing Officer's apparent conclusion that Cranston was deficient for not increasing counseling services after receiving Dr. Goldfischer's report. See Decision at 12-13. To begin with, nowhere in the report does Dr. Goldfischer indicate that the amount of counseling Q.D. was receiving as of June 2006 is insufficient or that it should be increased. See Ex. 5. While the report states that Q.D. "would strongly benefit from individual therapy to address his prominent problems with social skills, anxiety, depression, attentional difficulties, as well as impulse control," see id. at 19, it is certainly not clear that Dr. Goldfischer is referring to school based counseling as opposed to private counseling. His use of the term "therapist," id., as opposed to the term counselor is certainly more suggestive of the latter than the former.

The Hearing Officer especially faulted Cranston for placing Q.D. in a self-contained classroom with students who were emotionally disturbed and behavior disordered even though he presented with "serious social and emotional concerns ...." Decision at 13. She asserted that even "from a mere lay person's view ...," id., such placement would not enhance his socialization "and more importantly, may adversely impact his socialization," id. Implicit in these statements is the Hearing Officer's belief that Cranston should have determined in June 2006 that Q.D.'s placement in Ms. Irving's classroom was inappropriate and altered his IEP accordingly. However, the record does not support the Hearing Officer's conclusion. As

already noted, Cranston had Dr. Stiener's June 2005 psychiatric evaluation which stated that Ms. Irving's self-contained classroom was an excellent placement for Q.D. and that she had "created a wonderful behavioral program that ha[d] been very successful." Ex. 14 at 4. Dr. Stiener reiterated his highly favorable opinion of Ms. Irving when he testified in September 2006 at the administrative hearing. See Vol. V at 22-23 ("I thought she was doing a great job .... I thought she developed a nice behavioral plan. The thing I liked most was that she was willing to adapt over time. Not, this is the plan and we are doing it no matter what. She was willing to change it to make it different .... So she was always creating new ways of reinforcing his behavior to keep it fresh for him. To be honest, there are not a lot of teachers willing to put that much effort into it. I thought she did a great job.").

Furthermore, Cranston could not have gleaned from Dr. Goldfischer's report that he considered Q.D.'s classroom placement to be inappropriate. Nowhere among the sixty plus recommendations is there an explicit statement that Q.D. should not be in a classroom with children who are emotionally and/or behaviorally disordered. See Ex. 5. Indeed, to the extent that Dr. Goldfischer comments upon Q.D.'s classroom placement at all, his comments suggest that placement in Ms. Irving's self-contained classroom is not inappropriate. See id. at 18 ("Q[.D.] needs to be assigned to one case manager at school who will oversee his progress ...."); id. at 19 ("The home and school setting should be highly structured, attempt to minimize transition, offer consistent daily routine ..."); id. ("Protect him from bullying and teasing."); id. at 21 ("Children with Asperger's Disorder have the intelligence to compete in regular education but they often do not have the emotional resources to cope with the demands of the classroom."); id. at 23-24 ("[H]e

requires additional structure in his environment at the outset in order to maintain more appropriately controlled behavior.”). While it is true that at the administrative hearing Dr. Goldfischer testified (in response to a direct question on this point from Attorney Carroll) that it “would be very bad for Q[.D.],” Vol. I at 42, Cranston had no reasonable basis to draw such a conclusion in June 2006 when Parents requested unspecified changes in his IEP.

In short, the Hearing Officer’s contention that even a lay person would have recognized that the placement would not enhance Q.D.’s socialization and might adversely impact his socialization is unpersuasive given Dr. Stiener’s highly favorable assessment of Q.D.’s classroom placement. Moreover, a hearing officer may not substitute her personal opinion regarding the appropriateness of Q.D.’s classroom placement for that of the local educator’s expert judgments. See Arlington County Sch. Bd. v. Smith, 230 F.Supp.2d 704, 715 (E.D. Va. 2002)(“[T]he Supreme Court and Fourth Circuit have admonished hearing officers and reviewing courts alike when they substitute personal opinions or judgments as to proper educational policy, and best placements for the disabled student, in the place of the local educators’ expert judgments”)(citing Bd. of Educ. v. Rowley, 458 U.S. at 206, 102 S.Ct. at 3051).

It is true that the Hearing Officer found that Ms. Irving’s responses to the rating scales “belie progress or at least demonstrate that additional supports and services are necessary to the education of this child.” Decision at 13. However, Ms. Irving testified that when she filled out the scales it was based on “what Q[.D.] was exhibiting at that time behaviorwise.” Vol. III at 86. She noted that the scales did not ask whether she had seen specific areas of growth. See Vol. II at 41. They were not in her opinion a means to measure progress, but rather were a

"snapshot in time." Vol. III at 90. Dr. Stiener agreed with this characterization. See Vol. V at 42. He explained that the scales could be used to measure progress if one set of scales were compared with another set completed by the same person at a different point in time. See id. However, absent this circumstance, the scales only reflected an assessment at a given "point in time." Id.

Ms. Irving testified that she disagreed with the contention that Q.D. had "made no academic progress last year [2005-2006]," Vol. III at 78, and testified to areas in which she observed progress, see id. at 78-80, 85-89. In particular, she noted that Q.D. had "come a long way with his communication skills," id. at 88, and that she had "noticed a big difference in his outdoor recess activities," id. Regarding the latter, Ms. Irving stated that Q.D. was playing football with other children within his age group, including children in the general education program, and that he had made up a game similar to hockey which involved other children during indoor recess. See id. at 88-89. She observed that one of his IEP objectives was "ask[ing] peers to play a game during recess, either indoor or outdoor."[26] Id. at 89.

In sum, Ms. Irving's testimony was that while Q.D.'s academic progress "may be minimal ...," Vol. II at 92, he was making significant progress "in other areas ...," id. This assessment was shared by the school psychologist, Ms. Koval,[27]

[26] On cross-examination, Dr. Goldfischer testified that it was his understanding that Q.D. did not interact with his peers during recess and that he would be surprised if Q.D. "plays football and has other interactions [with his peers]." Vol. I at 67. Dr. Goldfischer acknowledged that in preparing his evaluation he did not speak with Ms. Irving, Dr. Kennedy, Dr. Stiener, Ms. Zodda, Q.D.'s occupational therapist, or anyone else in the school department. See id. at 47-49.

[27] The Hearing Officer found Ms. Koval's testimony that she saw Q.D. "a few times a week on an ad hoc basis ... not credible given the fact that she was only present at the school 1 ½ days per week." Decision at 13. In making this finding, the Hearing Officer either

who frequently observed Ms. Irving's classroom, see Vol. IV at 13, and testified that Q.D. was "[a]bsolutely," id. at 15, receiving an educational benefit from being in Ms. Irving's classroom, see id.[28]

The other deficiencies which the Hearing Officer identified as a basis for finding that Cranston had failed to provide Q.D. with a FAPE are essentially all based on evidence adduced at the administrative hearing. See Decision. However, the deficiencies in the IEP which Dr. Goldfischer identified at the hearing were either not stated in his report or not stated with sufficient clarity that they could reasonably be discerned by school authorities. There are simply too many recommendations, not all of which are consistent, for the report to be of practical value, at least for busy school personnel who have multiple demands on their time.[29]

---

misunderstood or misconstrued Ms. Koval's testimony. Ms. Koval did not testify that she saw Q.D. "a few times a week on an ad hoc basis." Rather, she stated that she saw him on this basis "two to three times a month," Vol. IV at 5, in addition to weekly counseling sessions of thirty to forty-five minutes each, see id. This frequency was entirely consistent with her testimony that she was in the school building "[a]ll day on Tuesday and half a day on Wednesday." Id. at 18. Thus, the Hearing Officer's basis for rejecting Ms. Koval's testimony is not supported by the record.

[28] The Court is aware that this view was not shared by Parents. Q.D.'s mother testified that she did not think her son had made any academic progress. See Vol. V at 48.

[29] While Dr. Stiener thought that many of Dr. Goldfischer's recommendations were excellent, he also described their number as "a little burdensome." Vol. V. at 14-15. Having read Dr. Goldfischer's report, the Court can only conclude that Dr. Stiener was attempting to be diplomatic in characterizing the number of recommendations as "a little burdensome."

It is also worth noting that a good number of the recommendations contained in Dr. Goldfischer's report had already been made in the earlier reports by Cranston professionals, see, e.g., Ex. 13 (Neuropsychological Evaluation by Mary Lynne Kennedy, Ph.D.) at 7-8; Ex. 14 (Dr. Stiener's Evaluation of 6/10/05) at 4-5, and that Cranston was already doing some of the things which Dr. Goldfischer

Moreover, Cranston's refusal to make changes in Q.D.'s IEP was not without reasonable basis. Dr. Stiener believed that Q.D. was in an excellent classroom, a view shared by Ms. Koval, and Ms. Irving believed that Q.D. was making progress. Thus, Cranston's implicit conclusion that Q.D. was receiving the required educational benefit from the instruction being provided has substantial support in the evidence. Academic progress is not the only factor which determines whether a child is receiving educational benefit. See Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992 (1st Cir. 1990)(explaining that "purely academic progress ... is not the only indic[ium] of educational benefit"). In sum, Cranston's response to Parents' request for an out-of-district placement was reasonable based on what was known to Cranston at that time. Thus, for the reasons stated, the Hearing Officer's conclusion that Cranston denied Q.D. a FAPE by not adjusting his IEP in June of 2006 after receiving Dr. Goldfischer's report is unpersuasive. The Court finds that Cranston did not deny Q.D. a FAPE by reason of such failure.[30]

It is true that, in reviewing the decision reached at the administrative hearing level, this Court's focus is upon the educational program which finally emerged from the administrative

---

recommended. For example, Dr. Goldfischer recommended that Q.D. "needs to be assigned to one case manager at school ...." Ex. 5 at 18. Ms. Irving testified that she was Q.D.'s case manager. See Vol. II at 39. Thus, Dr. Stiener's testimony that he agreed with many of Dr. Goldfischer's recommendations is not evidence that Cranston should have made changes to Q.D.'s IEP in June of 2006 based on Dr. Goldfischer's report.

[30] To the extent that Parents argue that they presented Cranston with Dr. Goldfischer's report, which clearly demonstrated that Q.D. was not making academic progress, and that it was up to Cranston to figure out what specific changes should be made in his IEP, the Court finds such argument unpersuasive. The evidence which Cranston had indicated that he was receiving an educational benefit from the IEP and that significant changes to the IEP were not indicated. This was a reasonable position for Cranston to take.

review process, not the IEP as originally proposed. See Roland M. v. Concord Sch. Committee, 910 F.2d at 988. The Hearing Officer rejected Cranston's arguments that The Wolf School was not an appropriate placement for Q.D.,[31] see Decision at 14, and ordered Cranston to reimburse Parents for his tuition and to provide transportation, see id. at 15. Thus, the education program which finally emerged from the administrative review process was Q.D.'s placement at the Wolf School at public expense. See id. However, whether The Wolf School is appropriate placement for Q.D. is not the determinative issue in this appeal.[32] The determinative issue is whether Cranston denied Q.D. a FAPE by refusing to make unspecified changes in Q.D.'s IEP when Cranston had evidence that he was making social, emotional, and behavioral progress and reasonably believed that as he made progress in these areas his academic performance would improve.

Because the Court has determined that the changes which the Hearing Officer found Cranston should have made to the IEP either could not reasonably have been known to Cranston or were not indicated by the then-existing record, her finding that Cranston denied Q.D. a FAPE is erroneous. Accordingly, the decision of the Hearing Officer should be reversed, and I so recommend.

## VII. Conclusion

For the reasons stated above, I recommend that Plaintiff's Motion for Summary Judgment be GRANTED and that the Decision of

---

[31] It appears that Cranston pointed out to the Hearing Officer, as it has to this Court, see Plaintiff's Mem. at 22-23, that The Wolf School does not have a school psychologist who sees students individually, see Vol. III at 36-37, that it does not have a guidance counselor, see id., and that Q.D.'s teacher at The Wolf School is not a certified special education teacher, see id. at 39.

[32] Dr. Stiener, who testified for Cranston, agreed that The Wolf School was an appropriate placement for Q.D. See Vol. V at 41.

the Hearing Officer be reversed. Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); D.R.I. Local R. 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
January 24, 2008