**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CRANSTON SCHOOL DISTRICT** | : | |
| **Plaintiff** | : | |
| | : | |
| | : | |
| **vs.** | : | **C.A. # 06-538 ML** |
| | : | |
| **Q.D., through his parents and next friends,** | : | |
| **Mr. and Mrs. D.** | : | |
| **Defendants** | : | |

**DEFENDANTS' OBJECTION TO MAGISTRATE'S REPORT AND RECOMMENDATION**

Now come the Defendants, and hereby object to the Report and Recommendation issued by the Magistrate on or about January 24, 2008, on Plaintiff's Motion for Summary Judgment. In support of their Objection, Defendants rely upon their Memorandum, attached hereto and made a part hereof.

Defendants/Counterclaim Plaintiffs,
By Their Attorneys

/s/ Mary Ann Carroll
Mary Ann Carroll #6664
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
February 7, 2008
macarroll@smrobinsonlaw.com

/s/ Vicki J. Bejma
Vicki J. Bejma, #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
February 7, 2008
vbejma@smrobinsonlaw.com

**CERTIFICATION**

I, the undersigned, hereby certify that on February 7, 2008 I sent a true copy of the within by electronic filing to all of the parties below:

Gregory P. Piccirilli, Esq.
Sciacca & Piccirilli
121 Phenix Avenue
Cranston, RI 02920

/s/ Vicki J. Bejma

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CRANSTON SCHOOL DISTRICT** | : | |
| **Plaintiff** | : | |
| | : | |
| | : | |
| **vs.** | : | **C.A. # 06-538 ML** |
| | : | |
| **Q.D., through his parents and next friends,** | : | |
| **Mr. and Mrs. D.** | : | |
| **Defendants** | : | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OBJECTION TO REPORT AND RECOMMENDATION OF MAGISTRATE**

## I. INTRODUCTION

This matter came before this Honorable Court on the Cranston School District's appeal of a November 17, 2006 special education due process decision pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. 1415(i)(2), as well as the Rhode Island Board of Regents' Regulations for the Education of Disabled Children, ("SPED Regs") § 300.512. At issue in said case was the adequacy and appropriateness of the special education services offered to Q.D. (hereinafter, "Quinn"), a fifth grade special education student residing with his parents, Mr. and Mrs. D., in the City of Cranston. By decision dated November 17, 2006, the Hearing Officer found that the Cranston Public Schools had failed to offer Quinn a free and appropriate public education ("FAPE") for the 2006-2007 school year, as required by the IDEA and SPED Regs. Accordingly, the Hearing Officer found that Mr. and Mrs. D. were justified in unilaterally placing their son at the Wolf School, a private school, and Cranston was responsible for paying the tuition.

The Cranston School District filed its complaint to this Court seeking the overturn of the Hearing Officer's decision.[1] This matter was initially referred to a Magistrate for Report & Recommendation. Said Report & Recommendation, issued on or about January 24, 2008, overturned the Hearing Officer's decision on the question of whether Cranston had offered Quinn FAPE. Mr. and Mrs. D. now file their Objection to the Report & Recommendation, on the grounds that the reviewing Magistrate failed to apply the appropriate standard of review to the Hearing Officer's determinations, and also made errors of law regarding Cranston's obligations to Quinn.

## II. STANDARD OF REVIEW

In its current posture, this matter is before the Court on review of the Magistrate Judge's Report and Recommendation overturning the Hearing Officer's decision. Pursuant to F.R.Civ.P. 72(b)(3), the District Judge applies a *de novo* standard of review to the magistrate judge's decisions on dispositive motions. A Motion for Summary Judgment is of course a dispositive-type motion to which the *de novo* standard of review applies. Admittedly, in cases involving reviews of the decisions of special education hearing officers, the typical standards for Motion for Summary Judgment do not apply. Instead, the Motion for Summary Judgment is a procedural device in which the parties seek to have the case decided on the basis of the administrative record. *See, e.g.*, Bristol Warren Regional Sch. Comm. v. Rhode Island Dept. of Educ., 253 F.Supp.2d 236, 240 (D.R.I. 2003). Unlike the process followed in a typical motion for summary judgment, this Court does not determine whether there is a material issue of fact, but instead reviews the decision of the Hearing Officer below. *See id.* Despite the fact that the

[1] Mr. and Mrs. D., in turn, filed a counterclaim for an award of attorneys' fees pursuant to 20 U.S.C. § 1415(i)(3)(B).

usual standards for deciding the Motion are not followed here, the Motion still is dispositive in character, and therefore the *de novo* standard should apply.

## III. FACTUAL BACKGROUND

Prior to the 2006-2007 school year, Quinn had attended the Cranston Public Schools. He had been first identified as a child with a disability on December 3, 2003, when he was in second grade. (Ex. 21.) For the remainder of his second grade year, Quinn remained in the regular classroom. By the end of Quinn's second grade year, the Cranston School Department concluded that Quinn required a more restrictive environment. According to Quinn's second grade teacher, Jacqueline Ingalls, Quinn had begun his second grade year reading within the first grade level. (II, 15:18-24.) However, as the year went on, Ms. Ingalls observed that Quinn had various difficulties in the areas of staying on task, social skills, and fine motor control. (II, 7:17-8:3) By the end of his second grade year, Quinn academically progressed only to the "very early second grade level" in most of his subject areas, and in fact was a year behind. (II, 10:4-7.) Ms. Ingalls also observed that Quinn stayed largely on the same level in terms of his staying on task, social skills, and fine motor control. (II, 17:23-18:5.)

Quinn was then placed in a self-contained classroom under an IEP for his third grade year, that is, the 2004-2005 school year. (Ex. 23.) Despite the additional support of being in a self-contained classroom, Quinn continued to stagnate. This stagnation was observed by Quinn's parents, and also Cranston officials. In spring of 2005, Ms. D. expressed her concerns regarding her son's lack of educational progress to Cranston officials, and requested that Quinn's triennial re-evaluation be conducted immediately, rather than waiting for the time when it would normally be due. (V, 48:19-25.) The IEP Team clearly agreed with Ms. D.'s assessment, even going as far as to note in their February 10, 2005 Educational Parent Conference Report: "Due to a lack

of academic progress and the development of concerning behaviors, the Team determined the 3-year re-evaluation which was due November 2006, would be completed immediately." (Ex. 30.) Cranston's Director of Special Education echoed this notation in her own memorandum to one of Quinn's evaluators. (Ex. 28.) At hearing, Ms. Irving, Quinn's classroom teacher, corroborated that the IEP Team had agreed to conduct Quinn's triennial re-evaluation early based upon Quinn's lack of educational progress, as determined by upon Ms. Irving's own observations. (II, 82:21-84:13.)

Ms. Ingalls testified at hearing that she believed that by the end of his third grade year, Quinn had made little or no academic progress. Ms. Ingalls provided Quinn with tutoring over the summer after Quinn's third grade year in all of his subjects. (II, 8:21-9:9.) Ms. Ingalls based her tutoring on the suggestions of Ms. Irving regarding the subject matter, making some changes where appropriate. (II, 20-23-21:1, 21:15-19.) By the end of the tutoring, Ms. Ingalls concluded that Quinn had not made much or any academic progress since he had left her classroom the year before. (II, 10:23-11:10.) Furthermore, he still exhibited difficulties with remaining on task, even in a one-on-one setting. (II, 17:23-19:14.)

Cranston performed its re-evaluation. Dr. Gregory Stiener examined Quinn at the behest of the Cranston School District. (V, 9:2-5.) That re-evaluation was not Dr. Stiener's first contact with Quinn. Dr. Stiener had already been consulted by Quinn's parents in the fall of 2004. At that time, Dr. Stiener had diagnosed Quinn with anxiety disorder, NOS, ADHD, and a nonverbal learning disorder. (V, 8:13-15.) Dr. Stiener testified that his 2005 diagnosis had not changed from his 2004 diagnosis. (V, 10:13-20, Ex. 14.)

After his re-evaluation, Quinn continued to be found eligible for special education. However, his classification was different. Where Quinn had previously been classified as "other

health impaired," Quinn was now placed under the "emotional disturbance category." (Ex. 21, 27.) His identified needs were in the areas of social skills, attention and organizational skills, behavior management skills, sensory processing, visual perception and motor integration, written expression and written output, and reading and math skills. The MDT Report noted that ". . . attention problems and anxiety/OCD symptoms appear to be the most significant obstacles to his continued academic success." (Ex. 27.)

Quinn remained in the self-contained classroom for his fourth grade year, again with Ms. Irving. (II, 26:7-9; Ex. 25.) Ms. Irving testified that there were ten students in her classroom, ranging from grades three to five. (II, 26:10-14.) Some of the students are emotionally disturbed, others are classified as "other health impaired," and one is labeled within the autistic spectrum disorder. (II, 27:23-28:3.) Ms. Irving acknowledged that some have behavioral problems. (II, 29:20-33:17, 94:7-20.) Ms. Irving has one full-time aide. (II, 28:7-14.) Some of the students are pulled out during the day for inclusion, but Ms. Irving's room is their home base. (II, 28:15-29:19.)

Quinn himself left Ms. Irving's room for mainstream art class. (II, 33:20-21.) Ms. Irving testified that after a transition period in the beginning of the year, Quinn might go to art class alone if he indicated that he felt ready to do so. (II, 34:3-12.) If a situation arose where he felt he needed support, he could request that the aide accompany him. (II, 34:3-12.) He did the work the other children in the art class were doing if he felt confident in doing so. If he did not feel confident about doing that work, he was allowed to draw. (II, 34:13-17.) Quinn also went to music class. As with art, he may or may not have been accompanied by the aide. (II, 36:13-21.) Quinn also went to physical education classes with Ms. Irving's aide. This aide needed to consult with Ms. Irving regarding strategies for coping with Quinn in this setting. (II, 35:11-

36:4.) Quinn is in a self-contained library class. (II, 36:7-12.) Quinn formerly went to the cafeteria alone. However, beginning about the first half of the year, the aide began to accompany him due to reports that he was having difficulties regarding inappropriate conversations. (II, 36:22-37:14.)

By early 2006, Mr. and Mrs. D. came to believe that Quinn was not making academic progress even in the self-contained setting offered by Cranston. Accordingly, in April, 2006, Mr. and Mrs. D. brought their son to Dr. Howard M. Goldfischer for an evaluation. At hearing, Howard Goldfischer qualified as an expert in Pediatric Neuropsychology, without objection from the School Department. (I, 4:17-24.) Dr. Goldfischer's evaluation included information directly from the Cranston School Department, as well as information from his parents, and a battery of tests performed by Goldfischer. (I, 6:12-9:14; Ex. 6.) These tests included several rating scales to be responded to by Quinn's teachers. (Ex. 6.)

At hearing, Ms. Irving testified regarding her responses to Dr. Goldfischer's rating scales. Ms. Irving testified that she had filled out the rating scale based upon her observations of Quinn over the past six months. (III, 99:24-100:8.) In those rating scales, she indicated that she had frequently observed that Quinn was inattentive to social stimuli, had difficulty playing with other children, seemed unaware of social conventions, and needed an excessive amount of reassurances. (II, 42:16-43:21.) Ms. Irving also acknowledged that in response to the rating scale, she had indicated that she had frequently observed that Quinn had difficulties with transitions or new situations, talked about a single subject excessively, and exhibited exceptional, precise speech. (II, 45:5-21.) Ms. Irving acknowledged that when responding to the rating scale, she had provided comments or questions when she did not understand a question or felt that clarification was in order. (II, 46:1-13.) For example, Ms. Irving indicated she frequently

observed that Quinn exhibited difficulty understanding what caused people to dislike his actions. (II, 47:5-12.) The rating scale had actually asked whether Quinn could not understand why people did not like "him," but she substituted the word "actions." (II, 47:5-12.)

As part of his evaluation, Dr. Goldfischer also administered the Woodcock Johnson test. (I, 36:13-25.) The School Department had administered the Woodcock Johnson a year before, in March, 2005. (Ex. 12.) The Woodcock Johnson administered by the School Department the year placed Quinn in the equivalent of grade 3.0, with a score of 92. The Woodcock Johnson performed by Dr. Goldfischer a year later placed Quinn at 2.9, with a score of 82. (I, 36:13-37:6.)

Dr. Goldfischer testified that these Woodcock Johnson scores represented a serious regression for Quinn. (I, 36:13-37:6.) Additionally, based upon his evaluation, including the teachers' reports and Quinn's past history, Dr. Goldfischer concluded that Quinn had been misdiagnosed. Dr. Goldfischer believed that Quinn's proper diagnosis is Asperger's Disorder and nonverbal learning disability. (I, 9:16-17; Ex. 5.)

Quinn's parents shared Dr. Goldfischer's evaluation with the Cranston School Department at an IEP meeting of June 7, 2006. (Ex. 7.) On or about June 14, 2006, Quinn's parents, through their counsel, wrote to Ms. Zodda discussing their concerns regarding Quinn's lack of academic progress and the failure to make changes to the IEP. (Ex. 7.) On or about June 20, 2006, Ms. Zodda responded to Quinn's parents' counsel's letter regarding changes to the IEP. Ms. Zodda's letter indicated:

> During the June 7th IEP Review Meetings held to discuss the evaluation completed by Dr. Howard Goldfischer, I explained *the reason the student had not made any academic progress was because student's social, emotional needs interfer [sic] significantly with his academic on task behaviors, which in turn limits academic progress.* In the June 14th letter, you wrote I was unable to respond to this statement, "I then asked you to explain what changes you intend to

> make to his program so that social and emotional needs could be met so that he could make academic progress. This is inaccurate I responded quite specifically to your inquiry, *I stated changes in current programming were not indicated. The student is making social, emotional, and behavioral progress; as these areas continue to improve, time and attention to academic tasks will increase, and as a result, there will also be academic progress.*

(Ex. 10.) (Emphasis added.)

Despite the fact that Cranston had noted a lack of academic progress, Quinn remained under the same IEP for the fourth grade year. Quinn's parents were thus faced with the decidedly unpalatable prospect of putting their son through a third year of an educational program that was plainly not working. Quinn's parents therefore unilaterally placed Quinn at the Wolf School in Providence for the 2006-2007 school year. Mr. and Mrs. D. also brought a due process complaint against the Cranston School District, alleging that the Cranston School District had violated the IDEA and the SPED Regs by failing to offer Quinn a "free and appropriate public education" ("FAPE"). As part of the relief requested, Mr. and Mrs. D. asked for reimbursement of Quinn's tuition payments to the Wolf School.

Mr. and Mrs. D's complaint was heard before a Due Process Hearing Officer. Said hearing stretched over five days. Dr. Goldfischer testified at the first day of hearing. Dr. Goldfischer presented extensive testimony as to his evaluation and diagnosis of Quinn, as well as Quinn's lack of educational progress as demonstrated by testing, and his recommendations as to Quinn's educational programming. Mr. and Mrs. D. also presented testimony from Jacqueline Ingalls and Ms. Irving regarding Quinn's lack of progress.

The Cranston School Department put on two witnesses. One was Sheree Koval, a Cranston school psychologist who saw Quinn once a week for about 30-45 minutes. Ms. Koval testified that Quinn is making progress "commensurate with his cognitive profile and his

diagnosis." (IV, 16:6-21.) However, Ms. Koval testified that she had no testing to substantiate whether Quinn had made progress, nor did her notes reflect such progress. (IV, 23:7-15.)

The Cranston School Department also presented testimony from Dr. Gregory Stiener. Dr. Stiener disagreed with the conclusion that Quinn had made no academic progress. (V, 22:9-10.) However, he admitted that he had performed no testing of Quinn when he evaluated him at the behest of the Cranston School Department. (V, 26:22-27:10.) Although Dr. Steiner disagreed with Dr. Goldfischer's diagnosis of Asperger's Disorder, he did agree with Dr. Goldfischer's diagnosis of nonverbal learning disorder, and acknowledged that Dr. Goldfischer's evaluation was complete. (V, 14:9, 31:17-20.) He agreed with of Dr. Goldfischer's recommendations "for the most part." (V, 14:19-15:3.) He agreed that some changes should be made to Quinn's programming, especially when Ms. Irving's ratings scales were considered. (V, 37:5-17.)

The Hearing Officer found that Cranston had failed to offer Quinn a FAPE for the 2006-2007 school year. The Hearing Officer found that Quinn's actual diagnosis was ultimately irrelevant to the proceedings. The issue was whether Quinn was offered an educational program that met his needs. In the view of the Hearing Officer, this is precisely what Cranston had failed to do. The Hearing Officer specifically found that Quinn had made little or no academic progress over the past two academic years – a situation acknowledged by Cranston. (Decision, p. 12-14.) In particular, the Hearing Officer faulted Cranston in that it had refused to make any changes to Quinn's IEP in June, 2006 – instead using Quinn's social and emotional problems as an excuse for the lack of progress. (Decision, p. 14.) The Hearing Officer also faulted Cranston for disregarding Dr. Goldfischer's recommendations – even though Cranston's own expert, Dr. Steiner, had supported many of those suggestions. (Decision, p. 13.) The Hearing Officer also

found that the Wolf School was appropriate for Quinn – a point that Dr. Steiner himself had conceded. (Decision, p. 14-15.) Therefore, Cranston was ordered to pay Quinn's tuition for Wolf.

## IV. LEGAL ARGUMENT

### *A. The Hearing Officer's Determination that Cranston Had Failed to Offer Q.D. FAPE Was Entitled to Due Deference.*

When reviewing a Special Education Hearing Officer's decision, the District Court is to apply what has been described as a "degree-of-deference continuum." *See* C.G. and B.S. v. Five Town Community Sch. Dist., 2008 WL 162481, *3 (1st Cir. 2008), *citing* Mr. I. v. Maine Sch. Admin. Dist. No. 55, 480 F.3d 1, 10 (1st Cir. 2007). This "degree-of-deference continuum" takes into account whether particular aspects of the hearing officer's determination were fact-dominated or law-dominated. *See id.* Where a particular aspect of a determination is one that is law-dominated, the reviewing court applies a *de novo* standard. *See* Bristol-Warren, 253 F.Supp.2d at 240. For that reason, the District Court must disregard any hearing officer determination affected by error of law. *See id*.

A much greater degree of deference is required where an issue is one of fact. *See* Milford v. William F., 129 F.3d 1252, *3 (1st Cir. 1007), *citing* Abrahamson v. Hershman, 701 F.2d 223, 230 (1st Cir. 1983). Given that the hearing officer actually observes witnesses and hears testimony, a high level of deference is given to factual findings, especially where the hearing officer is faced with conflicting testimony and must base a decision at least in part on witness credibility. *See* B.A. v. Cape Elizabeth Sch. Comm., 2000 WL 760734, * 3 (D.Me. 2000). A reviewing court may overturn factual findings when they are unreliable or incorrect in light of the totality of the record. *See* Milford, at 1252. However, this Court has recently held that factual findings should not be overturned lightly. A hearing officer's determination of an issue

of fact should not be overturned even when two or more legitimate interpretations of the evidence exist, unless the determination is clearly erroneous. *See* Slater v. Exeter-West Greenwich Reg. Sch. Dist., 2007 WL 2067719, *9 (D.R.I.), *citing* United States v. Espinoza, 2007 WL 1696150 (1st Cir. June 13, 2007).

Similarly, deference should be given to the hearing officer's determinations of mixed questions of fact and law – such as whether an IEP was appropriate. *See* C.G., 2008 WL 162481, *3; Mr. I, 480 F.3d at 10. The rationale for this due deference to the hearing officer's mixed findings of fact and law is based upon the recognition that a state administrative agency, rather than a court, possesses the requisite expertise in educational matters and is therefore better equipped to make findings regarding educational policy. *See* Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989-90 (1st Cir. 1990). *See also* Town of Burlington v. Dept. of Educ., 736 F.2d 773, 792 (1st Cir. 1984). As this Court once noted: "A searching examination of the decisions rendered below is required, but this court may neither turn a blind eye towards these decisions, nor discard them without sound reason." *See* Kevin G. v. Jo-Ann G. by Cranston Sch. Comm., 965 F.Supp. 261, 263-64 (D.R.I. 1997). As this Court also recently noted in the case of Beitle v. East Greenwich Sch. Comm., 2006 WL 3095658, *5 (D.R.I.), ". . . the issue is not whether this Court would have made the same determinations as the Hearing Officer but rather whether they are reasonably supported by the record and if so, whether the Hearing Officer properly applied the law regarding FAPE to those findings."[2]

---

[2] Our own First Circuit has indicated that particular deference is due to a state administrative decision has found that a proposed IEP did not comply with the state's substantive requirements – as was impliedly done here:

> Where a state administrative decision rules a proposed IEP invalid because it has not met the state's substantive or procedural requirements pertaining to a free appropriate public education for a particular disabled child, a federal court should accord the findings deference. In such a situation, as here, a federal court continues to have the power of

The Report & Recommendation did not rule that the hearing officer's decision was affected by any error of law. Instead, the ultimate issue in this case is whether the IEP proposed for the 2006-2007 school year was adequate and appropriate for Q.D. If Cranston failed to offer Q.D. an IEP an adequate and appropriate IEP, and the Wolf School was appropriate for Q.D., then Cranston is responsible for payment of Q.D.'s tuition at the Wolf School. *See* Roland M., 910 F.2d at 991. The question of whether an appropriate IEP was offered is treated as a mixed question of law and fact. *See* Kathleen H. v. Massachusetts Dept. of Educ., 154 F.3d 8, 13 (1st Cir. 1998), *citing* Roland M., at 990.

As we shall explain in greater detail, the more deferential standard applied to the Hearing Officer's determination that FAPE was not offered. Furthermore, the Report & Recommendation failed to give the appropriate level of deference to the Hearing Officer's factual determinations – particularly those which relied heavily on the assessment of witness credibility.

***B. The Report & Recommendation Failed to Apply the Due Deference Standard to the Hearing Officer's Determination that the Cranston Public Schools Had Failed to Offer Quinn FAPE.***

The Report & Recommendation was essentially correct in reciting the standard for review of the Hearing Officer's determination that Cranston's proffered IEP failed to offer FAPE, that is, that that determination was entitled to due deference. Unfortunately, the Report &

---

> review on both federal and state grounds but should be more circumspect about its intrusion. It is hard to locate a significant federal interest in displacing a state agency's supportable ruling that one of its school systems has not complied with state standards. In turn, where a state agency holds an IEP to have met state standards, the federal court has a continuing obligation to ensure that the state standards themselves and as applied are not below the federal minimums. This important obligation persists despite any state administrative rulings on federal law or on state recodifications of federal law.

*See* Town of Burlington v. Dept. of Educ., 736 F.2d 773 (1st Cir. 1984).

Recommendation failed to apply that standard. Instead, the Report & Recommendation embarks on a lengthy analysis of the disputed evidence on the record regarding whether the previous IEPs had been successful, and the nature of the recommendations made for Quinn's IEP by Dr. Goldfischer. The Report & Recommendation's analysis of the conflicting evidence, although giving the appearance of thorough review, focuses on the minutiae of the evidence on the record, but completely misses the larger point upon which the Hearing Officer's determination was based: the fact that Quinn had made little or no discernable academic progress under the previous two years' IEPs, that Cranston was fully aware of that fact – but unreasonably proposed to do absolutely nothing about it. Because that determination was more than amply supported by the evidence on record, the principles of due deference command that it should have been left undisturbed. *See especially* Beitle, 2006 WL 3095658, *5 (D.R.I.).

The definition of FAPE is central to this dispute. The definition of FAPE has been one that has plagued experts in the field for many years. Admittedly, the statutory definition of FAPE is decidedly opaque:

> (9) Free appropriate public education
>
> The term "free appropriate public education" means special education and related services that—
> **(A)** have been provided at public expense, under public supervision and direction, and without charge;
> **(B)** meet the standards of the State educational agency;
> **(C)** include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> **(D)** are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C.A. § 1401(9).

There is only one U.S. Supreme Court clarifying the statutory definition of "FAPE," that of Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d

690 (1982). *Rowley* is sometimes read as holding that a child should almost automatically be considered to be receiving FAPE if the IEP is reasonably calculated towards ensuring that the child will receive passing marks and advance from grade to grade. In other words, some argue, Rowley stands for the proposition that if it is reasonably certain that the child will "get by," then the child should be deemed to be receiving FAPE.

At issue in Rowley was a deaf student who had been placed in a regular classroom. Although she was an excellent lipreader, and was performing very well academically and socially,[3] her parents felt that her potential would be maximized if she had a sign-language interpreter. Therefore, they attempted to argue that for their daughter, the FAPE requirement meant that the district must provide that interpreter.

The Supreme Court disagreed. Admittedly, the Rowley's decision was largely influenced by the fact that the child was already functioning very well in the classroom without a sign-language interpreter. The Rowley Court also held that although the child might arguably perform even better with that interpreter, the IDEA did not require that the school "maximize" a child's potential. *Id.* at 198. However, the Rowley Court explicitly refused to hold that obtaining passing marks and advancing from grade to grade automatically meant that the child was receiving FAPE. *Id.* at 203, n.25. Instead of relying solely upon mechanical tests such as whether the student was being passed from grade to grade, the Rowley Court instead established a definition of FAPE that would answer the IDEA's goal of individualized instruction for every child with a disability. In all cases, an IEP must be "reasonably calculated" to provide

[3] The child was described as performing better than the average child in her class, was considered "remarkably well-adjusted," interacted and communicated well with her classmates, and furthermore had "developed an extraordinary rapport" with her teachers. *Id.* at 185-86.

educational benefit. *Id.* at 203-04. The educational benefit to be conferred must be "meaningful." *Id. at* 192.

Also key to our discussion of FAPE is the breadth of services that must be offered in order to allow for a "meaningful" educational benefit. FAPE is not defined by academic achievement alone – whether in terms of passing from grade to grade or even excelling in one's studies. The drafters of the IDEA recognized that in order to benefit from any attempt to impart cognitive skills, the child's physical, emotional, or social skills may require development. *See, e.g.,* Gonzalez v. Puerto Rico Dept. of Educ., 254 F.3d 350, 352-53 (1st Cir. 2001); Rome Sch. Comm. v. Mrs. B., 247 F.3d 29, 33 (1st Cir. 2001), *citing* Roland M., 910 F.2d at 990-92. "Education" under IDEA may include services necessary to improve the child's academic, physical, emotional, or social skills. *See also* Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1089-90 (1st Cir. 1993), *citing* Burlington, 736 F.2d at 788; Timothy W. v. Rochester, N.H. Sch. Dist., 875 F.2d 954, 970 (1st Cir. 1989); Lamoine Sch. Comm. v. Ms. Z., 353 F.Supp.2d 18, 30 (D. Me. 2005) Therefore, an IEP has been described as a package that must target all of a child's special needs. *See* Lenn at 1089-90, *citing* Burlington, 736 F.2d at 788; Roland M., 910 F.2d at 992; Timothy W. at 970; U.S. Dep't of Educ., Notice of Policy Guidance, Fed. Reg. 49,274 at 49,275 (1992). Included among these needs that must be addressed by an IEP are the opportunity to acquire the social skills, emotional well-being, and self-esteem that allow one to benefit from one's educational experience and eventually become self-sufficient. *See, e.g.,* Lawrence Township Bd. of Educ., 42 IDELR 241 (N.J. SEA, 2004.) The failure to provide those components in an IEP may justify a unilateral placement. *See* Lawrence.

It is true that a child's failure to make reasonable academic progress in the past, by itself, does not render a school liable for unilateral placement in the future. *See* P.D. v. Franklin

Township Bd. of Educ., 2006 WL 753152 (D.N.J. 2006), *8. However, an IEP still must be "reasonably calculated" to provide an educational benefit. *See* Roland M., 910 F.2d at 992. When a child is not making reasonable progress under a particular IEP, and has not done so for the past two years, and is even showing signs of regression, it is patently unreasonable to expect that continuing that IEP will yield any better result for the next year. *See* Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 534 (3rd Cir. 1995) ("Of course, if a student had failed to make any progress under an IEP in one year, we would be hard pressed to understand how the subsequent year's IEP, if simply a copy of that which had failed to produce any gains in a prior year, could be appropriate.") For that reason, continuing a student in an IEP that has already demonstrably failed to yield any progress is in itself a denial of FAPE. *See See* M.C. v. Central Regional Sch. Dist., 81 F.3d 389, 397 (3d Cir. 1996); Watson Chapel Sch. Dist. (Ark. SEA 1998).

***1. The Hearing Officer's Findings that Quinn Had Not Made Academic Progress Should Have Been Granted Deference.***

The Hearing Officer's conclusion that FAPE had not been offered to Quinn for the 2006-2007 school year was based largely upon the fact that Quinn had been given virtually identical IEPs for the past two academic years, and had made no discernable academic progress under those IEPs. (Decision, p. 12, 14.) Quinn's lack of academic progress was a factual finding that was entitled to a great deal of deference. *See* Milford, 129 F.3d 1252, *3, *citing* Abrahamson, 701 F.2d at 230. This is particularly so when one takes into account that the Hearing Officer was placed in the position of hearing a great deal of conflicting testimony and evidence regarding Quinn's academic progress, and accordingly had to make credibility determinations. *See* B.A., 2000 WL 760734, * 3.

The Hearing Officer chose to give a great deal of weight to the results of the objective testing performed on Quinn. (Decision, p. 12.) As referenced in her findings of fact, in March

2005, Cranston had administered the Woodcock-Johnson test, which placed Quinn at the 3.0 grade level. When Dr. Goldfischer administered the same testing in the February, 2006, Quinn was placed at the 2.9 grade level. The Hearing Officer gave credence to Dr. Goldfischer's interpretation of this result as a "significant regression." She also observed that the Woodcock-Johnson had showed even more significant regression in Quinn's mathematical ability. (Decision, p. 5.) It is difficult to fathom how the Hearing Officer could be faulted for having placed a great deal of reliance upon the results of objective testing. This is particularly so given that Cranston School Department officials did not challenge the validity of the Woodcock Johnson as a measure of Quinn's educational progress. (V, 32:7-17.)

The Report & Recommendation appears to have completely ignored the fact that the Hearing Officer based much of her conclusions regarding Quinn's lack of progress on the objective evidence of standardized testing. The Report & Recommendation even appears to have faulted the Hearing Officer for having failed to give credence to the conflicting testimony presented by the Cranston officials. (R & R, p. 28.) However, the Hearing Officer's failure to give credence to the anecdotal testimony offered by Cranston should not have been reversed. As the Report & Recommendation observed, Cranston *never* disputed that there had in fact been little or no academic progress. (R & R, p. 18.)

Accordingly, the Report & Recommendation identifies no sound reason to overturn the Hearing Officer's findings regarding Quinn's lack of academic progress. Although there might have been conflicting evidence on the record, the resolution of that question was a factual matter to be left soundly within the province of the Hearing Officer. The magistrate's mere disagreement was therefore not sufficient grounds to overturn that determination. *See* Slater, 2007 WL 2067719, *9.

### *2. The Hearing Officer's Finding that Cranston Failed to Offer Quinn FAPE for the 2006-2007 School Year Should Be Upheld.*

The Hearing Officer also had to make a determination of a mixed question of fact and law as to whether Cranston's response to that lack of academic progress – that is, offering virtually the same IEP -- was reasonable. The Hearing Officer held that Cranston's lack of response was unreasonable under the circumstances. This conclusion is more than amply supported by the evidence on the record, and was also entitled to deference that was not granted. ***See*** Kathleen H., 154 F.3d at 13 (1st Cir. 1998), ***citing*** Roland M., at 990. Furthermore, the Report & Recommendation's conclusions of law regarding Cranston's obligations to Quinn are grossly erroneous.

As noted by the Hearing Officer, in June, 2006, Cranston had before it evidence that Quinn had academically stagnated, that is, the results of the Woodcock-Johnson testing. (Decision, p. 12.) Furthermore, as referenced by the Hearing Officer's decision, the student had been presenting with serious emotional and social difficulties, and that Cranston itself had indicated that those social and emotional problems precluded educational progress. (Decision, p. 14.) Indeed, Cranston's correspondence to parents' counsel specifically cited those social and emotional problems as the reason for Quinn's academic stagnation:

> During the June 7th IEP Review Meetings held to discuss the evaluation completed by Dr. Howard Goldfischer, I explained *the reason the student had not made any academic progress was because student's social, emotional needs interfer [sic] significantly with his academic on task behaviors, which in turn limits academic progress.* In the June 14th letter, you wrote I was unable to respond to this statement, "I then asked you to explain what changes you intend to make to his program so that social and emotional needs could be met so that he could make academic progress. This is inaccurate I responded quite specifically to your inquiry, *I stated changes in current programming were not indicated. The student is making social, emotional, and behavioral progress; as these areas continue to improve, time and attention to academic tasks will increase, and as a result, there will also be academic progress.*

(Ex. 10.) (Emphasis added.)

The Hearing Officer quite properly rejected Cranston's attempt to use Quinn's social and emotional difficulties as an excuse for lack of academic progress. A school district does not absolve itself from its FAPE responsibilities by claiming that that student's social and emotional difficulties impeded learning. Instead, the school district must adjust the IEP so as to address those social and emotional difficulties. ***See*** Lamoine, 353 F.Supp.2d at 33. As the Hearing Officer found, Cranston flatly refused to make these adjustments, despite having the benefit of Dr. Goldfischer's recommendations. Instead, Cranston counseled that Quinn and his parents should simply wait until the social and emotional difficulties worked themselves out and wait for academic progress to come later.

Cranston's position in June, 2006 went beyond the bounds of reasonableness. It is manifestly a denial of FAPE to retain a child in an educational program that it knows or should have known is not working, and has not been working for some time. ***See*** Ringwood Bd. of Educ., 2007 WL 4353433, *4 (3rd Cir. 2007). As noted by the Hearing Officer, Quinn had had an almost identical IEP for the past two years, and Quinn's social and emotional issues apparently still had not sorted themselves out enough to allow academic progress. (Decision, p. 12-14.) It is difficult to imagine precisely when Cranston felt that the miracle would occur under essentially the same IEP.

As noted by the Hearing Officer, what pressed Cranston's position even further beyond the bounds of reasonableness is the fact that there was evidence on the record that Quinn in fact needed more social and emotional supports than he was receiving. (Decision, p. 12.) Cranston certainly had before it Dr. Goldfischer's evaluation, and his rating scales – which had been filled out by Quinn's own teachers. Finally, at hearing, as noted in the Hearing Officer's decision,

Cranston's *own expert* acknowledged that changes should have been made in the IEP, and supported "most if not all" of Dr. Goldfischer's recommendations. (V, 37:5-17.)

The Report & Recommendation attempts to undermine the Hearing Officer's determination in this regard on several fronts. First, the Report & Recommendation criticizes the Hearing Officer for not having considered the anecdotal testimony of the Cranston officials regarding Quinn's social and emotional growth under the same IEP. (R & R, p. 27-29.) The Report & Recommendation appears to suggest that had Quinn stayed in the same IEP, then perhaps his social and emotional issues would have been sufficiently resolved to have allowed eventual academic progress. However, the Hearing Officer would have quite properly discounted this evidence, as it was often self-contradictory. Indeed, Ms. Irving testified that since Quinn entered her self-contained classroom in the third grade, Quinn had gained the ability to follow small group activities, had made strides in communication and social relations, and played with other children at recess. (III, 88:5-89:10.) When filling out Dr. Goldfischer's inventories in February, 2006, however, she had indicated that Quinn still had substantial difficulties in these areas. (Ex. 6.) Accordingly, if the Hearing Officer did not give any credence to Cranston's attempts to claim that Quinn was in fact making social and emotional progress under his current IEP, she acted quite properly, as that evidence was not worthy of credence.[4]

The Report & Recommendation also faults the Hearing Officer for having relied upon the results of the ratings scales to show a lack of social and emotional progress. This is a

[4] For that matter, the teacher similarly contradicted herself on numerous points on Quinn's academic progress. Ms. Irving asserted that Quinn was making some progress in the area of writing five to seven word sentences. (II, 12-17.) However, when presented with Quinn's journals, she admitted that there was no progress there at all. (II, 63:3-10.) Similarly, she testified that Quinn had "demonstrated that he can complete" the goal of comparing numbers of up to six digits. (II, 68:5-11) Later, she admitted that he was not consistent, and that in any case she was recording the numbers for him. (II, 68:5-11, 80:6-8.)

mischaracterization of the Hearing Officer's findings. The Hearing Officer qualified her interpretation of the ratings scales to indicate that they at very least demonstrated that additional supports and services were necessary. A conclusion of this nature is precisely the sort of decision involving educational expertise that is due the highest deference. *See* Roland M., 910 F.2d at 989-90. In any case, the Report & Recommendation does little to explain away the fact that even Cranston's own expert testified that adjustments to the program, as suggested by Dr. Goldfischer, should have been made. (V, 37:5-17.)

The Report & Recommendation also focuses upon the alleged deficiencies contained in Dr. Goldfischer's recommendations. The Report & Recommendation discounts Dr. Goldfischer's recommendations as self-contradicting and too numerous ". . . at least for busy school personnel who have multiple demands on their time." (R & R, p. 29.) These alleged flaws in Dr. Goldfischer's recommendations simply did not excuse Cranston from its own responsibility to provide FAPE. Cranston may have chosen to adopt some of the recommendations and reject others. Cranston may have arrived at entirely different recommendations. Cranston, however, was not free to simply do nothing in the face of obvious failure. *See* Ringwood, 2007 WL 4353433, *4.

Furthermore, Cranston cannot be permitted to rely upon the excuse that it "doesn't have time" to consider readjustments to a failed IEP. The burden of providing FAPE remains with the school district, whether the parents have retained their own experts or not. The drafters of the IDEA clearly understood this, and therefore imposed a "child find" requirement on the LEAs. SPED Regs § 300.125. The courts themselves have also clearly recognized that a child is entitled to the applied expertise of their school districts, and that parents are not expected to fill that gap with outside experts. *See* Lamoine, 353 F.Supp.2d at 35, *citing* M.C., 81 F.3d at 397

("[A] child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) . . .") The Report & Recommendation therefore errs as a matter of law, in that ignored Cranston's failure to adjust the failing IEP, and attempts to shift the burden onto Quinn's parents to find an expert to identify the precise nature of the failing.

The Report & Recommendation also focuses upon the Hearing Officer's agreement with Dr. Goldfischer's opinion that placement in a classroom with emotionally and behaviorally disturbed children would have a negative impact on Quinn. (R & R, p. 27.) Again, this is precisely the type of credibility determination and decision regarding educational policy that should be granted deference. In any case, it is plain that Dr. Goldfischer's opinion was far from dispositive in this matter. For that reason, focus on this aspect of the Hearing Officer's opinion is a red herring. The focus of the Hearing Officer's determination was that Cranston had chosen to remain completely inactive despite clear evidence that that course of action was inappropriate.

The Report & Recommendation, then, not only failed to offer due deference to the Hearing Officer's decision, but is infected by error of law, and even threatens to eviscerate the protections of the IDEA. If that Report & Recommendation is permitted to stand as precedent, then this Court virtually gives local school districts permission to avert their eyes to special needs children. When squarely presented with objective evidence that the educational program being provided for a particular child simply is not working, and has not been working for some time, the district may simply chose to do the same things, and declare that those things will achieve a different result. Continuing to do the same things and expecting a different result has never been identified as an indicator of sound educational policy, but certainly has been considered an indicator of downright insanity. The IDEA, however, demands much better for

children like Quinn, and that is precisely what the Hearing Officer sought to ensure that he received.

## V. CONCLUSION

For the above-referenced reasons, the Report and Recommendation of the Magistrate should be rejected, and the Hearing Officer's decision be upheld.

Defendants/Counterclaim Plaintiffs,
By Their Attorneys

/s/ Mary Ann Carroll
Mary Ann Carroll #6664
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
February 7, 2008
macarroll@smrobinsonlaw.com

/s/ Vicki J. Bejma
Vicki J. Bejma, #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
February 7, 2008
vbejma@smrobinsonlaw.com

## CERTIFICATION

I, the undersigned, hereby certify that on February 7, 2008 I sent a true copy of the within by electronic filing to all of the parties below:

Gregory P. Piccirilli, Esq.
Sciacca & Piccirilli
121 Phenix Avenue
Cranston, RI 02920

/s/ Vicki J. Bejma