**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CRANSTON SCHOOL DISTRICT** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **C.A. No. 06-538 ML** |
| **v.** | : | |
| | : | |
| **QD, through his parents and next friends,** | : | |
| **Mr. And Mrs. D.** | : | |
| | : | |
| **Defendant** | : | |

**PLAINTIFF, CRANSTON SCHOOL COMMITTEE'S**
**RESPONSE TO DEFENDANTS' OBJECTION TO**
**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Pursuant to Fed. R. Civ. P. 72(b)(2), and D.R.I. Local R. 72(d)(3), Plaintiff, Cranston School Committee, hereby responds to Defendants' objection to Magistrate Judge Martin's Report and Recommendation.

The reasons for said response are more fully set forth in the accompanying memorandum of law.

Plaintiff,
CRANSTON SCHOOL DISTRICT,
By its Attorney,

/s/ Gregory P. Piccirilli, Esq.
SCIACCA & PICCIRILLI
121 Phenix Avenue
Cranston, Rhode Island 02920
Phone: (401) 946-4900
Fax: (401) 944-3250
gregory@splawri.com

**CERTIFICATION**

I hereby certify that on February 14, 2008, I sent a true copy of the within by electronic filing to the following:

Mary Ann Carroll, Esq.
The Law Offices of Stephen M. Robinson
155 South Main St., Suite 402
Providence, RI 02903
macarroll@smrobinsonlaw.com

Vicki J. Bejma, Esq.
The Law Offices of Stephen M. Robinson
155 South Main St., Suite 402
Providence, RI 02903
vbejma@smrobinsonlaw.com

/s/ Gregory P. Piccirilli

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CRANSTON SCHOOL DISTRICT** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **C.A. No. 06-538 ML** |
| **v.** | : | |
| | : | |
| **QD, through his parents and next friends,** | : | |
| **Mr. And Mrs. D.** | : | |
| | : | |
| **Defendant** | : | |

**PLAINTIFF, CRANSTON SCHOOL COMMITTEE'S MEMORANDUM OF LAW IN SUPPORT OF ITS RESPONSE TO DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

## I. INTRODUCTION:

This case began as an appeal by the Cranston School Department of a decision and order by a due process hearing officer involving a special education complaint under the Individuals With Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq*. In their initial complaint, the parents complained that the school department failed to provide their son with a Free Appropriate Public Education (FAPE) as required by the IDEA. As a result, the parents unilaterally placed their child at a private facility, the Wolf School, and sought tuition reimbursement from the school department. The hearing officer found that the school department had failed to provide QD with FAPE, and granted the parents' request for tuition reimbursement.

For the reasons set forth below, the parents have failed to meet the legal requirements for reimbursement, and this Court should adopt as its decision the Magistrate Judge's Report and Recommendation to reverse the hearing officer's award of the tuition reimbursement.

## II. PROCEDURAL HISTORY:

This case began when the parents of QD filed a request for an independent due process hearing on June 26, 2006. The school department filed a written response on July 7, 2006, and hearings on this matter were held on August 21, 22, 30, September 7, and 8, 2006.

Testifying at the hearing for the parents was their expert, Dr. Goldfischer, a pediatric neuropsychologist, who had conducted an evaluation of QD in the spring of 2006. Next, was QD's second grade teacher, Jacqueline Ingalls, who testified about the brief tutoring she provided QD during the summer of 2005, between his third and fourth grade.

The parents also presented the testimony of the Director of the Wolf School, Rosaline Granoff, who described the nature of that school's program, but who had no direct knowledge of QD or his Cranston program.

Jean Irving, QD's third and fourth grade public school teacher, testified extensively about QD's program and the progress he made, as did his counselor, the school psychologist, Sheree Koval.

For Cranston, its school psychiatrist, Dr. Gregory Stiener testified. Dr. Stiener was familiar with QD from both his private practice, and from working with him on behalf of the school district. Lastly, the mother testified briefly about her observations of her son's educational progress.

Thirty-one full exhibits were accepted into evidence. These included QD's IEPs from 2004 through 2006, as well as his report cards and progress reports. Also introduced were Dr. Goldfischer's 33-page report, replete with testing results, a diagnosis, and recommendations, as well as evaluations conducted by RI Hospital's Child Development Center, and Dr. Stiener. There

were also presented both educational and speech/language evaluations. Various correspondence and meeting notes were also introduced.

On November 17, 2006, the hearing officer issued her decision finding that the school district had denied QD FAPE, that the placement at the Wolf School was appropriate, and awarding tuition reimbursement to the parents.

First, the hearing officer found that the issue of QD's diagnosis was "irrelevant" to the case. (Dec. at p. 12) Conceding that Cranston was providing QD an individualized course of instruction with supporting aids and services, she focused on whether QD's IEP was affording him with "an opportunity that was reasonably calculated to achieve educational benefit." (Id.)

To support her decision, the hearing officer noted that the IEP for QD mentioned that he presents with serious social and emotional concerns, and yet that QD was placed in a classroom with students who are emotionally disturbed and behaviorally disordered. She added: "From a mere lay person's view, it is clear that placing this student with ED and BD children will not enhance his socialization, and more importantly, may adversely impact his socialization." (*Id*. at 13)

She accepted that QD has not made academic progress, based in part upon the comparison of Dr. Goldfischer's Woodcock-Johnson testing with the school district testing from a year earlier, and in part upon the school district's educational conference report of February 10, 2005, which noted a concern over a lack of academic progress. (Exh. 30) The hearing officer made no specific findings of fact with regard to whether QD was making progress in the area of social-emotional growth in the 2005-06 school year. She made no reference to the record of progress as reflected in QD's report card, progress reports, and in the testimony of the classroom special

education teacher and the school psychologist.

The hearing officer faulted the school district for not providing QD with individualized speech and language services, and for providing no more than .5 hours per week of counseling services by a certified school psychologist.

Finally, the hearing officer rejected the argument that the Wolf School is a more restrictive placement than a self-contained classroom in a public school, since "a private school placement that provides the student with appropriate supports and services cannot be rejected as more restrictive than a special education self-contained classroom simply because the school is located outside the district, particularly where there is no evidence of a comparable school setting within the district." (Dec. at 14)

On December 12, 2006, Cranston filed with this Court a complaint in the nature of an appeal of the hearing officer's decision. Pursuant to this Court's pretrial order of March 8, 2007, the parties filed statements of undisputed facts, and joint motions and memoranda of law in support of summary judgment.

A hearing was held before Magistrate Judge Martin on June 11, 2007. While awaiting decision on the motions, Defendants filed a motion for enforcement of stay-put, seeking payment of tuition for the Wolf School for the 2007-08 school year. Plaintiff objected, and Magistrate Judge Martin ruled on January 8, 2008, that Cranston pay only the tuition for the first half of the academic year at the Wolf School. This order is currently on appeal to this Court.

Subsequently, Judge Martin issued his Report and Recommendation on January 24, 2008, recommending that the hearing officer's decision awarding tuition reimbursement at the Wolf School be reversed. He reasoned that, based upon the record of the case, Cranston did provide

FAPE to the student, since the child made social, emotional and behavioral progress at his Cranston public school placement. Moreover, he found that the alleged deficiencies in the IEP identified by the hearing officer were not supported by the evidence. Because the hearing officer erred in ruling that Cranston had denied the student with FAPE, the Magistrate Judge did not need to address the issue of whether the private school placement at the Wolf School was appropriate.

## III. FACTUAL BACKGROUND:

QD was born on March 9, 1996, is currently eleven years old and is in the sixth grade at the Wolf School, having been placed there in September of 2006 by his parents. He was a student in Cranston since kindergarten, most recently at the George J. Peters Elementary School in a self-contained classroom. He had been in such an environment since the beginning of the third grade, after having attended the Orchard Farms Elementary School in a regular classroom. While the parents had signed an IEP for the 2004 (Exh. 23), they did not sign one for either 2005 or 2006. (Exhs. 24, and 25)

After an evaluation by Cranston's school pychiatrist, QD was diagnosis with an Anxiety Disorder, ADHD, and a non-verbal learning disability. (Exh. 14) At the end of the fourth grade, QD's parents presented to the school department an evaluation by Dr. Goldfischer, which included the Asperger's Syndrome, an autism-spectrum disorder. (Exh. 5) In addition, the evaluation contained a litany of recommendations, none of which suggested a change in the nature of the educational program QD was receiving. Instead, the parents questioned the apparent lack of academic progress as measured by the Woodcock-Johnson-3rd Ed. Test of Achievement. In

particular, the parents noted that the test, as administered by Dr. Goldfischer, showed little or no progress academically from one administered approximately one year earlier by the school's educational evaluator, Wendy Muscovitz. (Exh. 7).

The school department's special education director acknowledged the apparent lack of progress as measured by the two tests; however, she emphasized that QD was making good social and emotional progress, which would lead to more noticeable academic progress in the future. Based upon that determination, the school department felt that continuing along the academic path as set forth in its proposed IEP was appropriate for QD, and declined to consider any change in placement. (Exh. 8)

The parents presented testimony of Dr. Goldfischer to prove their case that QD was achieving little or no educational benefit from the Cranston Public School program, and to justify the private placement at the Wolf School. First, Dr. Goldfischer spent considerable time attempting to explain and validate his diagnosis of Asperger's Syndrome. (Vol. I, p. 9-33) Ultimately, he never testified what factors under the DSM-IV supported his diagnosis, instead relying primarily upon his own observations, and responses by the parent and teacher to Gilliam Asperger's Disorder Scale (GADS) and Social Responsiveness Scale (SRS), and a limited review of the child's records. He never talked with any of the teachers or other staff members who have worked with QD, and did not review either the CDC psychological evaluation, (Exh. A), or Dr. Stiener's psychiatric evaluation (Exh. 14), both of which diagnosed QD with a primary Anxiety disorder, and not Asperger's. (Vol. I, p. 51-55)

In addition, Dr. Goldfischer testified about what program QD should receive. Based solely upon the lack of progress as based upon the two Woodcock-Johnson test scores, he

testified that he did not believe that Cranston's program was affording QD FAPE. (Vol. I, p. 37-38) Although it is mentioned nowhere in his evaluation, Dr. Golfischer testified that QD would benefit from a so-called immersion model of education, with speech and language and occupational therapy in the classroom, and more than the proposed .5 counseling services as set forth in the IEP. (P. 43-46)

On cross-examination, Dr. Golfischer identified a few recommendations which he was unsure were being implemented in the Cranston program, such as sensory breaks, the assignment of a case manager, and avoiding sarcasm, figurative speech, idioms, slang, etc. Admittedly, he was unaware of whether these issues were already addressed by the school department. (P. 60-63)

He also mentioned the need for speech and language therapy, and more intensive occupational therapy, even though he devoted barely one paragraph to those recommendations in his 33 page report. (Exh. 5, p.23, "QD's school is encouraged to evaluate him to determine eligibility to receive school-based Occupational Therapy to assist him with his fine motor coordination difficulties, sensory sensitivities, and poor handwriting. Speech and Language Therapy might also be considered to help QD with aspects of nonverbal communications and improved social language.") (Vol. I, p. 73)

With regard to whether QD had made academic progress, Dr. Goldfischer conceded that he had never talked with the classroom teacher, never reviewed her progress notes, and never followed up on QD's progress subsequent to his February 2006 evaluation. (Vol. I, p. 47) As for QD's social and emotional progress, Dr. Goldfischer was unaware of QD's interactions with normative peers at school, or the progress as reported on the IEP. (P. 66-67) Instead, the doctor relied upon the scales as reported by the teacher, even though these scales reflect impairment and

not progress. (P. 101)

The classroom teacher testified extensively about the progress she believed QD was making both academically and socially. For example, she testified that based upon her informal RIGBY testing, QD had improved from a 2nd grade reading level in September of 2004 to a late 4th grade level in May of 2006. On the Houghton Mifflin Assessment, QD scored at the 5th grade level with a 72 percent accuracy. (Vol. III, p. 74-79)

With regard to his IEP, Mrs. Irving testified that QD made progress in many areas. In reading, he responded to literary discussions using the WH questions; uses his index cards, story maps, and making personal connections to story characters. He participated in a reading circle. Written expression is an area of considerable weakness for QD, although he would write independently about topics such as a home activity or a friend without a prompt once he gets into a routine. Mrs. Irving disagreed with Dr. Goldfischer's recommendation that QD be punished with a denial of recess for failing to properly correct classwork. (Vol. III, p. 79-83)

In the area of math, QD had learned some math facts, was reducing his dependance on finger counting, could tell time, was working towards improving his calculation of coins, could read charts, graphs and maps, understood place and value, could do problem-solving patterns, and many multiplication tables. (Vol. III, p. 84-86)

In the area of his social and emotional growth, QD had made more progress. He was better able to cooperate in a small group setting, and had improved his communication skills considerably. Remarkably, he participated more readily in recess activities with other peers, including playing football. He even made up a hockey game with sticks. (Vol. III, p. 87-89)

The makeup of QD's classroom reflected a typical self-contained classroom setting. While

some students have behavior issues, Mrs. Irving testified that her classroom was not out of control as suggested by the parents. The classroom had one aide during QD's fourth grade year, it was to have two for the subsequent year. With the help of a social worker, psychologist, building principal, and guidance counselor, there was plenty of support to deal with the occasional disruption. (Vol. III, p. 91-95)

Mrs. Irving testified that she had prepared an extended school year IEP for QD for the summer of 2005, which would include a placement in a school setting. QD's parents did not avail themselves of this program, instead sending QD to camp, and having his 2nd grade regular education classroom teacher tutor him. This tutor chose not to follow any of the recommendations of Mrs. Irving, and taught QD in a one-on-one setting at home, rather than in a classroom setting. (Vol. III, p. 20-22) Not surprisingly, Mrs. Irving noted a regression in QD's ability to settle into a routine once he returned to school at the beginning of the fourth grade in the fall of 2005. (Vol. III, p. 95-98)

In the parents' case in chief, Mrs. Irving was asked about the rating scales. Mrs. Irving testified that, although these ratings were accurate at the time she filled them out, she did not think the scales reflected the progress QD had made in certain areas of his social and emotional development. (Vol. III, p. 90).

Finally, the parent presented the testimony of Rosaline Granoff, who is the Director of Admissions at the Wolf School. The primary foundational basis of the school was to provide a model whereby students are provided speech and language and occupational therapy services in the classroom, instead of on a pull-out model which is common for public schools. (Vol. III, p. 9)

The school is not state certified as a special education school. (Vol. III, p. 10) The

classroom to which QD was to be assigned has a regular education teacher, with no special education certification. (Vol. III, p. 39) The therapists are not certified teachers. (Vol. III., p. 41) There is no guidance counselor, (p. 36), or librarian (p. 44). While QD would have access to art and music, he would be taking those courses with only the other 7 disabled peers in his classroom. (P. 46)

While Ms. Granoff provided some critique of Cranston's program, she conceded that she never met with or talked to anyone in the Cranston School Department about QD, and did not have any observations of what QD did in school. (Vol. III, p. 48)

After some considerable confusion, Ms. Granoff noted that her school does not prepare IEPs as those documents are envisioned under the IDEA. Instead, when a child is placed by a school district, the Wolf School relies upon that district to prepare and revise the IEPs. If there is no public school involvement, the parents and staff meet informally in parent-teacher conferences. (Vol. III., p. 56-67)

With regard to counseling services, these services are provided through the classroom teacher and the therapists and aides. No dedicated time is allotted for QD to meet with a professional psychologist. (Vol. III, p. 72)

Next to testify was QD's school psychologist, Sheree Koval. According to the IEP, she counseled QD one time per week for approximately 30-45 minutes, as well as on other occasions as QD needed, and during the day in the school setting. (Vol. IV, p. 5) The primary area in which Ms. Koval assisted QD was dealing with anxiety issues. She testified to the strategies that she taught QD, and his success in implementing and internalizing those strategies. QD also had issues with accepting limitations and responsibilities. She dealt with the fact that the consequences at

school were not often carried over at home. (p. 6-9)

With regard to QD's diagnosis, although Ms. Koval did not seek to directly contradict Dr. Goldfischer, she did note that many of the characteristics she has noticed and counseled in Asperger's children were absent from QD. (Vol IV, p. 10) Particularly, QD does not present with significantly impaired social interactions. He makes eye contact, understands gestures, enjoys interacting with other children. He has play dates. He can express empathy, and has demonstrated that to Ms. Koval in the classroom setting. He does not have repetitive or stereotypical behaviors; while QD can become fixated on a topic, that fixation seldom lasts long, and will change. He lacks rigidity; QD often deals with changes in schedules and routine without problem. While QD at times perseverates, this is more of a function of his anxiety. (p. 11-12)

With regard to Mrs. Irving's classroom, she found it well suited to QD. The classroom was well structured; Mrs. Irving was able to address the needs of all of her students. The interaction between the students and QD were positive. (Vol. IV, p. 13-14)

With regard to QD's mental age, Ms. Koval noted based upon the IQ scores, that it was 7 years 6 months, with a grade equivalency of 2.5. Vol. IV, p. 15) Based upon her experience and understanding of the classroom, she felt that QD was receiving an educational benefit from the program in Cranston. She felt that the classroom setting was helping QD improve in all areas, both academically and social-emotionally. (P. 15-16)

Next, Dr. Stiener testified about his observations of QD. Although Dr. Stiener evaluated QD at the request of the school department, he had previously met QD and the parents in his private practice. (Vol. V, p. 7) First, Dr. Stiener disputes Dr. Goldfischer's diagnosis of

Asperger's. Under the DSM, there are two major diagnostic criteria categories, one of which is social impairment, under which QD clearly qualifies. The second category is restrictive repetitive areas of interest, under which QD does not qualify. Unless both categories are met, the diagnosis of Aspergers' is not warranted. (p. 8-13) Specifically, QD is not cognitively fixated on specific topics. Nor does his perseveration focus on one topic; it is instead anxiety driven, and the topics on which QD obsesses will change often.

More troubling for Dr. Stiener in reviewing Dr. Goldfischer's report is his lack of reference to QD's anxiety issues. While agreeing that QD suffers from a non-verbal learning disability, Dr. Stiener believes that QD's primary diagnosis is related to his anxiety. (P. 14)

With regard to the rating scales so heavily relied upon by Dr. Goldfischer in support of his diagnosis of Asperger's, Dr. Stiener found them not very helpful. (Vol. V, p.42) In terms of the usefulness of these scales to measure progress, Dr. Stiener emphasized that they reflect a snapshot in time, and are only useful to measure progress if the scales are given to the same person to fill out over a period of time. (*Id.*)

While Dr. Stiener agreed with many of Dr. Goldfischer's recommendations, he found them too numerous to be of practical use, and often contradictory. As for Dr. Goldischer's testimony about an immersion model for QD, Dr. Stiener noted nothing in Dr. Goldischer's report to support such a recommendation. (P. 14-17)

In the area of the standardized testing. Dr. Stiener found that such tests often do not accurately reflect the actual measure of a child's academic progress. Concerns over who performs the evaluation, and the conditions under which the test is performed, may reduce its reliability. Just as important an indicator are the observations of the student's teachers, as

reflected in report cards and progress reports. (P. 18-22)

With regards to QD, Dr. Stiener felt that he was receiving an educational benefit from being in Mrs. Irving's classroom. He was impressed with the behavior plan she had developed for QD, particularly as it related to his anxiety issues. He also liked her ability to adapt her program to QD's needs as they changed over time. (p. 22-25)

Lastly, QD's report card and academic progress reports all show progress, both academically and in the area social and emotional growth. (Exh. 20)

## IV. STANDARD OF REVIEW:

The IDEA provides for an impartial due process hearing whenever a complaint is filed by a parent alleging a violation of the Act. 20 U.S.C.§ 1415(f). The decision of the due process hearing officer may then be appealed by way of a civil action in court, 20 U.S.C. § 1415(i)(2)(B). In reviewing these decisions, this Court "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Id.

As the First Circuit has noted, in reviewing the administrative record, the trial court's "principal function is one of involved oversight." Roland M. v. Concord School Committee, 910 F.2d 983, 989 (1st Cir. 1990). The Court must be:

> "deferential, recognizing the expertise of the administrative agency, considering the agency's findings carefully and endeavoring to respond to the hearing officer's resolution of each material issue. Jurists are not trained educators. Thus, the statutory scheme binds the trial courts to give 'due weight' to the state agency's decision in order to prevent judges from imposing their view of preferable educational methods upon the States."

Id. (Citations and interior quotes omitted). The Court is not free to substitute its own views on

the proper adjudication of a parent's complaint. "Rather, the law contemplates an intermediate standard of review on the trial-court level -- a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review." Lenn v. Portland School Committee, 998 F.2d 1083, 1086 (1st Cir. 1993). Otherwise, "the procedural protection provided by the administrative process would be rendered meaningless if courts could simply substitute their own preferences for the administrative officers' evaluations." Kevin G. by Jo-Ann G. v. Cranston School Committee, 965 F. Supp. 261, 264 (D.R.I. 1997).

**V. BURDEN OF PROOF:**

The United States Supreme Court has held that the same standard of proof applies is IDEA cases as in traditional cases. Schaffer v. Weast, 546 U.S. 49 (2005). Therefore, since the parents requested the due process hearing, they bore the burden of persuasion on all elements at the hearing.

In his Report and Recommendation, the Magistrate Judge places the burden of proving the hearing officer's decision was wrong upon the school district. R& R at 14. The cases cited by the Magistrate Judge for this proposition were all decided prior to the Supreme Court's Weast decision. Such a distinction is not relevant, since the Magistrate Judge found that Cranston had met its burden. Nevertheless, the school district reiterates that the parents had the burden of persuasion at the hearing officer level, and that this Court should review the decision in that light.

## VI. ARGUMENT:

### A. The legal standard for tuition reimbursement.

The legal standard for tuition reimbursement under the IDEA emanated from the seminal case of School Committee of Burlington v. Department of Education, 471 U.S. 359 (1985). In that case, the court stated the following:

> [Parents who] "'unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials,' . . . are entitled to reimbursement only if . . . the public placement violated IDEA and [] the private school placement was proper under the Act."

Id. at 373-74 (1985), as quoted by Florence County School District Four v. Carter, 510 U.S. 7, 15 (1993). This pronouncement of the Court is codified in the IDEA, and was most recently amended under the 2004 Reauthorization. 20 U.S.C. § 1412 (a)(10)(C). See also Board of Regents for Elementary and Secondary Education Regulations Governing the Education of Children with Disabilities, § 300.403.

In determining whether FAPE has been provided, the Courts have longed adhered to the standard that the "IDEA does not require a public school to provide what is best for a special needs child, only that it provide an IEP that is 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law." L.T. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st Cir. 2004), *citing* Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992-93 (1st Cir. 1990) (*quoting* Board of Educ. v. Rowley, 458 U.S. 176, 207 (1982)).

Unlike certain other states, such as Massachusetts, which requires that an IEP assure that a special education child receive the "maximum possible development", Rhode Island has not required anything more than the federally mandated floor. Scituate School Committee v. Robert B., 620 F. Supp. 1224, 1233 (D.R.I. 1985); *cf.* G.D. v. Westmoreland School District, 930 F.2d

942, 951 (1st Cir. 1991). As one Kansas court put it, the IDEA requires the equivalent of a "serviceable Chevrolet for all disabled children, not a Cadillac for the individual." Logue v. Shawnee Mission Public Sch. Dist. No. 512, 959 F. Supp. 1338, 1351 (D. Kan. 1997), *aff'd w/o opinion* 153 F.3d 727 (10th Cir. 1998). As long as the proposed IEP meets the minimal federal standard for appropriateness, "the Act does not require school districts to reimburse parents who choose a superior placement for their child." Hampton School District v. Dobrowolski, 976 F.2d 48, 52 (1st Cir. 1992).

In determining whether the IEP was appropriate, the Courts do not look simply as to whether and to what extent academic progress has been made in the past. As stated in Roland M.:

> "Among the related services which must be included as integral parts of an appropriate education are 'such development, corrective, and other supportive services (including . . . psychological services . . . and counseling services) as may be required to assist a handicapped child to benefit from special education.' . . . So long as the means for doing so fit within the statutory compendium, the Act 'requires that all of a child's special needs must be addressed in the educational plan.' . . . Thus, purely academic progress -- maximizing academic potential -- is not the only indicia of educational benefit implicated either by the Act or by state law."

Id. at 991-2 (citations omitted). Explained another way: "an IEP is designed as a package. It must target all of a child's special need, whether they be academic, physical, emotional, or social." Lenn v. Portland School Committee, 998 F.2d 1083, 1089 (1st Cir. 1993) (citations omitted).

Another important factor to consider in determining the appropriateness of a program is the degree to which that program is offered in the least restrictive environment. "Mainstreaming may not be ignored, even to fulfill substantive educational criteria." Rome School Comm., v. Mrs. B., 247 F.3d 29, 33 (1st Cir. 2001).

Even if a parent were to prove a denial of FAPE, reimbursement is not allowed unless the

private placement is found to be appropriate. Thus, a placement that fails to provide for integration into a mainstream setting may not be considered appropriate for purposes of the Act, and tuition denied, regardless of whether FAPE was provided. Rafferty v. Cranston School Comm., 315 F.3d 21, 26-7 (1st Cir. 2002).

Lastly, Courts have recognized that, as explained in Rowley, they "are ill-equipped to second guess reasonable choices that school districts have made among appropriate instructional methods." L.T. v. Warwick Sch. Comm., 361 F.3d at 83.

**B. The Magistrate Judge gave appropriate deference to the hearing officer's decision.**

**1. Contrary to the suggestion of the Defendants in their objection, the standard of review by the District Court of an IDEA due process hearing officer decision has not changed.**

The Magistrate Judge clearly followed the standard of review required of this Court in an appeal of an IDEA due process hearing officer's decision. R&R at 13-14. Contrary to the suggestion of the Defendants, this long-standing standard of review in this Circuit is in no way altered by the decisions in C.G. and B.S. v. Five Town Community Sch. Dist., 2008 U.S. Lexis 1053 (1st Cir. 2008); or Mr. I v. Maine Sch. Adm. Dist. No. 55, 480 F.3d 1 (1st Cir. 2007).

In those cases, the First Circuit Court of Appeals was describing the standard by which that Court, i.e. the Appeals Court, reviews decisions of a District Court in an IDEA case: "In IDEA cases, as elsewhere, we review the district court's answers to questions of law de novo and its findings of fact for clear error." C.G. and B.S. v. Five Town Community Sch. Dist., 2008 U.S. Lexis 1053, at *8. See also, Mr. I v. Maine Sch. Adm. Dist. No. 55, 480 F.3d 1, 10 ("While we have never expressly set forth our standard of review for a district court's decision on IDEA

eligibility, we have treated 'ultimate determinations in cases under the Act' as mixed questions of fact and law.")

The Appeals Court in Five Towns made its ruling after noting that the Magistrate Judge below had "canvassed the record, made extensive findings of fact, and set forth various conclusions of law." 2008 U.S. Lexis 1053, at 3. The Court further noted: "The district judge, in a summary order, adopted the magistrate judge's recommended analysis in its entirety and entered judgment accordingly. For simplicity's sake, we do not distinguish further between the magistrate judge and the district judge but, rather, take an institutional view and refer only to 'the district court." Id. (citations omitted.)

Therefore, the Defendants incorrectly attempt to limit the degree to which the Magistrate Judge may review factual findings of the hearing officer. The standard of review for a District Court in an IDEA appeal, as expressed by the First Circuit in Roland M. v. Concord School Committee, 910 F.2d 983, 989 (1st Cir. 1990) and its progeny is still the same.

Any fair review of the Magistrate Judge's Report and Recommendation must conclude that he engaged in an exhaustive review of the entire record on appeal. Moreover, there are no witness credibility questions which the Magistrate Judge addressed. Instead, he accepted the facts as adduced at the hearing, and determined that those facts did not support the hearing officer's decision. He engaged in exactly the type of review as contemplated by the IDEA, and by the decisions of this Court.

The parents identify certain findings of the hearing officer to which they claim the Magistrate Judge failed to give appropriate deference. Primarily, they rely upon the lack of academic progress for the student, which the parents allege is conclusive evidence of a denial of

FAPE. Second, the parents contend that the school district's failure to change the student's IEP also is conclusive evidence of a denial of FAPE. As the Magistrate Judge properly concluded, both assertions are contrary to the law, and the evidence as adduced at the hearing.

**2. The lack of academic progress is not dispositive of the issue of whether FAPE was provided.**

As an initial matter, the Magistrate Judge did not concern himself with the hearing officer's determination that the diagnosis of the student was irrelevant to the issue of whether FAPE was provided. Instead, he agreed that the issue for the hearing was whether the IEP afforded to the student was reasonably calculated to achieve some educational benefit.

The Magistrate Judge noted the reasons that the hearing officer cited as support for the finding that the IEP failed to be "reasonably calculated to achieve educational benefit." The first basis was that the child showed a lack of academic progress as evidenced by the comparison of the two Woodcock-Johnson tests in the spring of 2005 and the spring of 2006.

The Defendants argue that the Magistrate Judge's Report and Recommendation "appears to have completely ignored the fact that the Hearing Officer based much of her conclusions regarding Quinn's lack of progress on the objective evidence of the standardized testing." Objection at 19. That is a manifestly inaccurate statement, since the Magistrate Judge accepted that the child had made little or no academic progress. See R&R 18 ("If the only issue in this case was whether as of June 2006 QD had made adequate academic progress, the Court's task would be relatively easy.")

However, mere lack of academic progress is not determinative of whether an IEP is appropriate, or whether FAPE was being provided. As the First Circuit Court of Appeals, as

others, have ruled:

> "[T]he issue is not whether the IEP was prescient enough to achieve perfect academic results, but whether it was 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law. This concept has decretory significance in two respects. For one thing, actions of school systems cannot, as appellants would have it, be judged exclusively in hindsight. An IEP is a snapshot, not a retrospective. In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated."

Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992 (1st Cir. 1990). As noted recently by the Second Circuit, "inquiry into whether an IEP is valid is a necessarily prospective analysis, and that consideration of proof of whether an IEP meaningfully contributed to the child's education is not altogether proper." D.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 598 (2nd Cir. 2005); *see also*, Carlisle Area Sch. v. Scott P., 62 F.3d 520, 530 (3d Cir. 1995) ("In any event, appropriateness is judged prospectively so that any lack of progress under a particular IEP, assuming arguendo that there was no progress, does not render that IEP inappropriate."); Adams v. Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999) ("Instead of asking whether the [program] was adequate in light of the [child's] progress, the district court should have asked the more pertient question of whether the [program] was appropriately designed and implemented so as to convey ... a meaningful benefit. We do not judge [a program] in hindsight; rather, we look to the [program's] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer ... a meaningful benefit.").

Even where no academic progress was noted based in comparing two Woodcock-Johnson tests performed four years apart, that evidence alone is insufficient to find that a student was denied FAPE. For example, in P.D. v. Franklin Township Bd. Of Ed., 2006 U.S. Dist. Lexis 16440 (D.N.J. 2006), the Court upheld a hearing officer's finding that, since the tests were not

administered in a comparable way (the second was timed while the first was not), the tests were not an accurate indication of the progress being made. Since there was evidence that the child was receiving passing grades, the Court agreed with the hearing officer's determination that FAPE was being provided. Indeed, even if the tests were an accurate reflection of the lack of academic progress, such a determination did not warrant a conclusion that the IEPs proposed by the school district were inappropriate.

Based upon this legal backdrop, the Magistrate Judge refused to accept the parents' simplistic argument that a lack of academic progress, without more, constituted a denial of FAPE. That decision is sound both legally and factually. Instead, the Judge looked at whether this lack of academic progress, in light of other evidence regarding the student's program, warranted some change in the IEP as proposed by Cranston. Although there was a concern about academic progress, Dr. Stiener's report showed that QD "made academic gains this year and it is important to continue to reinforce the progress he has already made."; and that the child was "in an excellent classroom environment;" with a teacher who "created a wonderful behavior program that has been very successful". See R&R at 20. Since there was no evidence presented at the IEP meeting in June of 2006 that the student's program needed to be changed, there was no basis for finding the IEP as presented to be inadequate.

The parents cite to Ringwood Bd. Of Ed., v. K.H.J., ex rel. K.F.J., 2007 WL 4353433 (3rd Cir. 2007) for the proposition that "it is manifestly a denial of FAPE to retain a child in an educational program that it know or should have known is not working, and has not been working for some time." First, the decision of the Third Circuit in that case contains a caveat that it should not be used for as precedent. Second, the decision nowhere provides a citation as

suggested by the parents. That case involved:

> "a child with 'above average' intelligence. In consideration of this fact and based on the testimony elicited at the administrative hearing, the ALJ made a factual finding that K.J. had the 'potential of performing at least in the average grade level in reading.' Contrary to the Board's assertion, expecting a child with 'above average' intelligence to perform in the 'average' range hardly qualifies as 'maximizing' that child's potential. We have previously stated that '[w]hen students display considerable intellectual potential, IDEA requires "a great deal more than a negligible benefit."' Because K.J. had only made 'negligible progress' during the 2001-2002 school year and was still one to two years behind grade level after the 2002-2003 school year, we find that the ALJ properly concluded that the Board failed to provide K.J. with an appropriate education under the IDEA."

Ringwood Bd. of Educ. v. K.H.J. ex rel. K.F.J., 2007 U.S. App. LEXIS 28876 , *10. That case is hardly of import here, where the evidence is undisputed that the student here is not of "above average" intelligence.

Similarly, the parents cite the case of M.C. v. Central Regional Sch. Dist., 81 F.3d 389 (3rd Cir. 1996), for the proposition that continuing a student in an IEP that has already demonstrably failed to yield any progress is itself a denial of FAPE. Ironically, that case involved an appeal of a hearing officer decision which denied a parent's claim for a residential placement. The district court, finding no evidence to support the hearing officer's finding that the child was making appropriate progress, convened a hearing to admit supplemental evidence, and reversed the hearing officer's decision. Id. at 393. Under relevant circuit court precedents, the school district there needed to show that the child was receiving more than a *de minimus* benefit from his IEP. Id.

In upholding the district court, the Third Circuit emphasized the district court's finding, after conducting an evidentiary hearing, that the child was capable of making meaningful progress in a residential placement, progress which the child could not make in the current setting. Id. at 394. The child there was a severely mentally retarded sixteen year old who suffered serious

regression in basic life skills such as toileting, and basic dining skills. Id. at 391-2. Moreover, there was no evidence that he was making any progress in his stated IEP goals. Id. at 393.

That case is nothing like the instant matter. Here, the student did show progress in his IEP goals; that issue was never questioned. Moreover, there is no suggestion that the student here was receiving no educational benefit from his program in Cranston. The child was clearly benefitting from his inclusive environment, learning to interact with other students, and gaining social and emotional skills. Finally, the M.C. case involved a claim for compensatory education, not tuition reimbursement, and the Court there specifically noted that the residential placement sought in that case would be temporary, and that the child's progress should be evaluated yearly to determine whether he should return to a more inclusive setting. Id. at 394-5. As the evidence in this case shows, QD has been evaluated at the Wolf School, and he is actually regressing both academically and socially there.

Further, the parents cite to the case of Lamoine Sch. Comm. v. Ms. Z., 353 F. Supp. 2d 18 (D. Me. 2005), to claim that Cranston cannot rely upon the proposition that it does not have time to consider readjustments to a failed IEP. That case involved a student with major depression, anxiety and a learning disability. After various school placements, the student stopped taking his medication, and stopped attending school. By the time the team met, this; "multi-disciplinary group of professionals was understandably flummoxed. They faced a young man who was not attending school, who had proven refractory to counseling, and who was at risk of failure. Instead of galvanizing the PET, the minutes confirm the PET, in a manner inconsistent with [M.C. v. Central Regional Sch. Dist.], turned N.S. over to Ms. Z., charging her with the sole obligation to act for her son." Id. at 35-6.

Certainly, that case has no bearing on the within matter. At no time has Cranston abandoned its obligation to the student. To the contrary, it was Cranston which pro-actively called an IEP meeting in February of 2005 to address the lack of academic progress, ordered the three-year evaluation due in November of 2006 be pushed up, and got Dr. Stiener involved. R&R at 3-6. Moreover, the IEP team was not "flummoxed" with how to deal with QD; in June of 2006, when presented with Dr. Goldfischer's report, the team responded quite forcefully that the IEP program was working, and that "changes in current programming were not indicated. The student is making social, emotional, and behavioral progress; as these areas continue to improve, time and attention to academic tasks will increase, and as a result, there will be academic progress." See R&R at 10, quoting Ann-Marie Zodda, Cranston Special Education Director, Exh. 10.

**3. The Magistrate Judge properly concluded that there was no evidence to support the hearing officer's finding that there deficiencies in the IEP which constituted a denial of FAPE.**

The parents contend in their objection that the Magistrate Judge fails to give deference to the hearing officer's decision that Cranston should have changed the IEP due to the lack of academic progress.

The Magistrate Judge listed the reasons provided by the hearing officer as a justification for finding that the IEP was inadequate. First, the hearing officer noted that the school district had notice of a lack of educational progress in June of 2005, yet took no action to change his IEP for 2005-06. For this proposition, she relied upon the report of the school psychiatrist, Dr. Gregory Stiener, and the admitted lack of academic progress which the school district noted in

February of 2005. The hearing officer then makes a finding which is completely belied by the evidence, i.e., that based upon Dr. Stiener's report, the school district should have added speech and language services, and additional counseling services, in June of 2005. (See Hearing Officer decision at 12-13)

In addition, the hearing officer found that the school district failed to change the student's IEP in response to a report prepared by the parents' neuro-psychologist, Dr. Howard Goldfischer, in June of 2006. Again without any specific citation, the hearing officer found that the district failed to follow the recommendations in the report.

Taking each finding separately, the Magistrate Judge struggled to find support in the record for what the hearing officer was faulting the school district.

First, there is nothing in Dr. Stiener's testimony or report which supports a conclusion that he was recommending any changes to the student's program. In fact, as the Magistrate Judge exhaustively notes, Dr. Stiener's report could only be read as a strong endorsement of the program being provided to the student. R&R at 19-20. To the extent that the hearing officer found that Dr. Stiener's report warranted either a change in the IEP, or in the child's placement, her decision was clearly wrong.

In their objection, the parents suggest that there was evidence in Dr. Stiener's testimony to support the proposition that he acknowledged that changes were warranted to the IEP. But the hearing officer did not rely upon Dr. Stiener's testimony, she relied upon his report in June 2005, in faulting the school district for failing to change the IEP for 2005-06.

The only reference to Dr. Stiener's testimony was in the hearing officer's reference to the doctor's support of Dr. Goldfischer's recommendations, as set forth in his evaluation. She did

not make any factual findings as to which of those recommendations Dr. Stiener agreed. Many of the recommendations that Dr. Stiener agreed with were already being implemented by Cranston. In his testimony, but not in his report, Dr. Goldfischer recommended an immersion model for QD, where he will be educated with other disabled peers in a small class setting, with significant speech and language and occupational therapy services in the classroom, and not in a pull-out model. Dr. Stiener was never asked whether he agreed with these recommendations contained in Dr. Goldfischer's testimony, only his recommendations as contained in his report.[1]

Moreover, in reviewing Dr. Stiener's testimony, the Magistrate Judge notes that he did not agree with all of Dr. Goldfischer's recommendations. He states judiciously:

> "While Dr. Stiener thought that many of Dr. Goldfischer's recommendations were excellent, he also described their number as "a little burdensome." Vol. V. at 14-15. Having read Dr. Goldfischer's report, the Court can only conclude that Dr. Stiener was attempting to be diplomatic in characterizing the number of recommendations as 'a little

---

[1]The parents cite to Dr. Stiener's testimony located at Transcript V, p. 37, ll 5-17, for the proposition that Dr. Stiener agreed with Dr. Goldfischer's recommendations that changes to the program "should have been made." That testimony is as follows:

Q. Given that Jean filled this out honestly and given that it is reliable and valid data, based on some of the answers that she provided in this, should Quinn's program be changed to deal with some of these issues?

A. Yes. I think a program should always be revised to deal with concerns as they come up. Being that that is new data, that should be incorporated and the plan should be modified every year to incorporate the new data. I do definitely agree with that.

This question was never followed up to determine what changes Dr. Stiener thinks should have been made, or whether they should be the changes which Dr. Goldfischer recommended, not in his evaluation, but in his testimony. Certainly, Dr. Stiener's never testified that the student needed to be removed from the public schools, or be provided with speech and language services, or that he needed more counseling.

burdensome.'"

R&R at 29, note 29.

Having found no support for the hearing officer decision in Dr. Stiener's evaluation or testimony, the Magistrate Judge turned to the crux of the parents' evidence: the testimony of Dr. Goldfischer. The simple fact is that Dr. Goldfishcer's report is too thin a reed for any competent hearing officer to rely upon in finding fault with the school district's program. There is no better critique of Dr. Goldfischer's report than that given by the Magistrate Judge in his Report and Recommendation at pp. 21-29.

As an important initial matter, and one completely ignored by the hearing officer, nothing in Dr. Goldfischer's initial report supports a claim that the IEP should have been changed. Nowhere does he suggest in that report that QD is in need of an immersion model, or that there must be significant speech and language and occupational therapy services in the classroom. His only reference to such services is in passing in one small paragraph, and simply states that these services should be considered, without ever stating the manner in which the services should be provided.

The other complaints by Dr. Goldfischer with the IEP are not supported by the evidence. For example, he states that QD should have a case manager; QD does, it is his classroom teacher. Dr. Goldfischer states that the staff should afford QD sensory breaks; QD has a quite extensive sensory diet, with many choices and opportunities to access it. Curiously, he states that the staff should avoid sarcasm and similar uses of language; there is no evidence that QD is subject to such remarks.

Also, Dr. Goldfischer faults the district for affording only a .5 counseling session; the Wolf

School offers none, although they purport to provide it throughout the day in the classroom, with personnel not certified to provide such services. Conversely, the school department has professional guidance counselors, social workers and psychologists available to QD. It is disingenuous to suggest that a certified special education teacher is not as capable of affording QD informal counseling to any less degree that a regular classroom teacher, a speech and language therapist or an occupational therapist.

Having thoroughly reviewed Dr. Goldifscher's report, and comparing it with his testimony, the Magistrate Judge found it poorly organized, contradictory, and lacking in any of the specific criticism raised at the hearing, such as the need for an immersion model program, speech and language services, and more counseling. That little credence should have been given to Dr. Goldfischer's testimony is obvious from the record. In fact, the parents make no real attempt to use Dr. Goldfischer's recommendations as a justification for their case. Instead, the parents claim it was Cranston's responsibility to come up with a different plan. As the Magistrate Judge noted, Cranston believed that its program was working. It was the parents burden to show that some other program was more appropriate.

**C. The Wolf School is not an appropriate placement for QD.**

Since the Magistrate Judge found that Cranston had provided FAPE, he did not address the second prong of the test for awarding tuition reimbursement, i.e whether the Wolf School was an appropriate placement. Even were this Court to consider that FAPE had been denied, it should still rule that tuition reimbursement is not warranted due to the inappropriateness of the Wolf School program.

By comparison with the public school program offered by Cranston, there is no evidence that the Wolf School will provide a program that will improve either QD's academic or social and emotional growth. In fact, the evidence is now that the student has regressed academically. (See Cranston's objection to Magistrate's Order for stay-put.) Simply put, the latest Woodcock Johnson test shows that the child has regressed in all areas of both math and language.

As presented at the hearing, although the Wolf School program includes more in-class speech and language and occupational therapy, it contains no psychological counseling. Such counseling was found to be important by not just Dr. Stiener, but by Dr. Goldfischer as well. Yet the Wolf School has no trained psychologist, social worker or even guidance counselor. Instead, the school relies upon a regular education teacher, and non-teaching certified therapists to provide generalized counseling in the classroom.

Most amazingly, the school does not even prepare IEP's for its students, but relies upon a local sending school district to do so for them.

Finally, one cannot deny that QD will lose out on the very important consideration of the mainstreaming opportunities he receives in the public school. While he does not always participate in integrated environments, he does participate in art, music, and physical education. He has even participated on occasion without the necessity of an aide. He enjoys lunch and recess, and has made friends and participated in collaborative activities with non-disabled peers. These opportunities are simply unavailable in a school with 48 students, all of whom have significant disabilities such as QD's.

Given the mental age and grade equivalency of QD, as testified to by the school psychologist, it is doubtful that QD will ever make the same academic progress as one would

expect to see in other students not similarly situated. But even if one had evidence that the immersion model of teaching could produce some marginally better results in QD's academic performance, that factor alone is not sufficient justification for denying QD the statutorily mandated requirement of an integrated environment in the public school. When addressing a similar situation in the case of Roland M., the Court stated: "As a matter of maximizing [the student's] educational benefit, those special needs were properly considered by the IEP team, notwithstanding the parents' rather single-minded focus on academic results." 910 F.2d at 993.

## VII. CONCLUSION:

In summary, the Magistrate Judge was correct in recommending that the hearing officer's decision be reversed.

Plaintiff,
CRANSTON SCHOOL DISTRICT,
By its Attorney,

/s/ Gregory P. Piccirilli, Esq.
SCIACCA & PICCIRILLI
121 Phenix Avenue
Cranston, Rhode Island 02920
Phone: (401) 946-4900
Fax: (401) 944-3250
gregory@splawri.com

**CERTIFICATION**

I hereby certify that on February 14, 2008, I sent a true copy of the within by electronic filing to the following:

Mary Ann Carroll, Esq.
The Law Offices of Stephen M. Robinson
155 South Main St., Suite 402
Providence, RI 02903
macarroll@smrobinsonlaw.com

Vicki J. Bejma, Esq.
The Law Offices of Stephen M. Robinson
155 South Main St., Suite 402
Providence, RI 02903
vbejma@smrobinsonlaw.com

/s/ Gregory P. Piccirilli