UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CRANSTON SCHOOL DISTRICT,
Plaintiff,

v. C.A. No. 06-538ML

Q.D. through his parents and next friends,
Mr. and Mrs. D,
Defendant.

**MEMORANDUM AND ORDER**

This matter is before the Court on the objections by Defendant Q.D., through his parents ("Parents"), to a Report and Recommendation issued by United States Magistrate Judge Martin on January 24, 2008. In the Report and Recommendation, Magistrate Judge Martin recommended that Cranston School District's (the "School") motion for summary judgment be granted. The School had moved for summary judgment to overturn the Administrative Decision (the "Decision") of the Impartial Due Process Hearing Officer (the "Hearing Officer") ordering the School to reimburse Parents for private school tuition. This Court has reviewed the Report and Recommendation, Parents' objections, and the School's response to Parents' objections. This Court

declines to adopt the Report and Recommendation. The School's motion for summary judgment is DENIED.

The School also objects to Magistrate Judge Martin's order granting Parents' motion to "stay-put" pursuant to 20 U.S.C. § 1415(j). This Court upholds the magistrate judge's order to "stay-put." Further, the School is ordered to reimburse Q.D.'s parents for private school tuition for the full 2007-2008 school year.

## I. Background[1]

Defendant Q.D. ("Q.D.") was born in 1996 and is about twelve years old. (See Plaintiff's Statement of Undisputed Facts ("PSUF") ¶ 1.) From kindergarten through second grade, Q.D. attended Cranston Public Schools in a regular classroom setting. (See PSUF ¶ 4.) His second grade teacher testified that at the end of the second grade Q.D. was about a year behind. (See Hr'g Tr., Vol. II at 10.)[2] In the fall of 2004, Q.D. was placed in a self-contained classroom for third grade taught by a special education teacher, Jean Irving ("Ms. Irving"). (See PSUF ¶ 3; Ex. 24 at 1; II:23, 26.) At an Individualized Education Program ("IEP") meeting held on February 10, 2005, the School and Parents decided to conduct the three year reevaluation which was not due until November of 2006 immediately because of a lack of academic progress. (Defendant's Statement of Undisputed Facts ("DSUF") ¶¶ 5, 6.)

On June 10, 2005, the School had Q.D. evaluated by Gregory Stiener, M.D., ("Dr. Stiener") a child psychiatrist. (See PSUF ¶ 7; Hr'g Tr., V:4-5; Ex. 14.) Dr. Stiener met with Q.D. for approximately an hour, spoke with his mother, reviewed the documentation of Q.D.'s history, and wrote a report. (Hr'g Tr., V:26-27, 31.) He diagnosed Q.D. with

[1] For a more complete statement of the facts, see the Report and Recommendation.
[2] The Hearing Transcript is contained in five volumes. Hereinafter, the Court cites to the transcript by volume and page number (e.g. II:10).

anxiety disorder, ADHD, a nonverbal learning disability, and a sensory integration disorder.[3] (See PSUF ¶ 7; Ex. 14 at 3.) In his recommendations, Dr. Stiener noted that Q.D. had made academic progress over the school year. (Ex. 14 at 5.) He also praised Ms. Irving's classroom, stating: "His teacher has created a wonderful behavioral program that has been very successful." (Id. at 4.)

When school resumed in the fall of 2005, Q.D. entered the fourth grade and returned to Ms. Irving's self-contained classroom at a different elementary school. (See PSUF ¶ 2.) In the class, there were ten students with a variety of disabilities, including some who were emotional disturbed. (See Hr'g Tr., II:26-28.) All the students had individualized education programs, and some students were "pulled out for integrated pieces throughout the day." (Id. at II:28.) Q.D. left Ms. Irving's classroom for art, physical education, library, and music. (Id. at II:33, 35-36.) He also went to the cafeteria for lunch, (id. at II:36), and out for recess, (see id. at III:88). However, Q.D. was often accompanied by an aide when he left Ms. Irving's classroom because he had problems exercising self-control and refraining from inappropriate conversations. (See id. at II:33-37.) Q.D. also received counseling from the School once per week for 30-45 minutes. (PSUF ¶ 31.)

Q.D.'s report cards and progress reports stated he maintained slow academic progress over the year. (Ex. 20.) Ms. Irving also testified that Q.D. made academic progress in many areas, from math to writing to communication skills. (Hr'g Tr., II:63, 68, III:74-79, 84-89.) The School's psychologist noted that Q.D. was making progress commensurate with his abilities. (Id. at IV:16.) His academic grades, however, were

[3] Parents dispute that this diagnosis was correct. (See Response to PSUF ¶ 7.)

almost all C's, (Ex. 20), the lowest grade Ms. Irving tended to award, (Hr'g Tr., II:58, V:50), with no improvement over the year, (see Ex. 20).

Ms. Irving also testified that Q.D. had progressed socially and emotionally. (Hr'g Tr., III:87-89.) He was more willing to participate in group activities and to communicate his feelings. (Id. at III:88.) During recess, he played football with non-disabled children and even made up a hockey-like game. (Id. at III:89.)

Around February of 2006, Parents contacted Howard M. Goldfischer, Psy.D., ("Dr. Goldfischer") a pediatric neuropsychologist, because they felt that Q.D. was not making progress. (See Hr'g Tr., I:4-6; Ex. 5.) Dr. Goldfischer conducted a neuropsychological evaluation of Q.D., spending about eight or nine hours with him over the course of two days, soliciting information from his parents and teachers, and reviewing his academic record. (See Hr'g Tr., I:6-7.) In soliciting information from Q.D.'s teachers, Dr. Goldfischer did not talk with any of them. (See id. at I:48.) Rather, he sent rating scales to the School which were completed by Ms. Irving during the period February 12-16, 2006. (See Ex. 6; Hr'g Tr., II:40, 87, III:87.) He also administered a Woodcock-Johnson test, a test of academic achievement, to Q.D. (See Ex. 5 at 28; Hr'g Tr., V:32.)

Dr. Goldfischer then wrote a detailed, 33-page report. (Ex. 5.) In the report, he opined that Q.D. had Asperger's Disorder, an autistic spectrum disorder. (Ex. 5 at 10, 16.) The report included more than 60 recommendations, many of which are somewhat contradictory.[4] (See id. at 16-24.) Further, Dr. Goldfischer did not clearly prioritize the

[4] For example, Magistrate Judge Martin observed:

> Despite recommending that Q.D. be required to correct poorly executed class work during recess, see [Ex. 5] at 21, Dr. Goldfischer also advises that "punitive measures" should be avoided, id. at 17, that "his teachers should encourage him to put forth his best work product, rather than focus on

recommendations to indicate which were essential and which might merely be helpful.[5] In giving his recommendations, Dr. Goldfischer made no reference to the School's IEP. (See id.)

Around June 1, 2006, Parents, through their attorney, provided a copy of Dr. Goldfischer's report to the School's Director of Special Education, Ann-Marie Zodda ("Ms. Zodda"). (See Ex. 7 at 1.) An IEP meeting was held in early June 2006, in part to discuss the evaluation. (Id.) According to Parents' attorney, at the meeting, she pointed out that Q.D.'s score on the Woodcock-Johnson test administered by Dr. Goldfischer in April of 2006 had dropped from 3.0 to 2.9 in comparison with the same test administered in March of 2005.[6] (See id.) Parents' attorney asked Ms. Zodda to explain why the plan developed for Q.D. was providing no academic progress. (Ex. 7 at 1.) The parties dispute how Ms. Zodda replied to this question. Parents assert that Ms. Zodda "had no answers." (Id.) Ms. Zodda, however, states in her letter to Parents' attorney dated June 20, 2006:

> I am aware the student has made limited academic progress . . . . I responded quite specifically to your inquiry, I stated changes in current programming were not indicated. The student is making social, emotional, and behavioral progress; as these areas continue to improve, time and attention to academic tasks will increase, and as a result, there will also be academic progress. (Ex. 10 at 1.)

---

> must be made in teacher expectations for volume of written products," id. at 17, and that "[a]dditional time will be needed for all written assignments," id., but he also warns that "Q[.D.] can sometimes be stubborn and therefore needs firm expectations ...," id. at 20, and that "[v]ery firm expectations must be set for the quality of work produced," id.

(Report and Recommendation at 23.)

[5] For more discussion of Dr. Goldfischer's report's lack of organization, see Report and Recommendation at 22.

[6] The parties dispute whether the two Woodcock-Johnson scores are comparable. The School argues that the tests were taken under different conditions. (School's Mot. for Summ. J. at 23). Parents counter that there is no evidence of different conditions. (Parents' Obj. to School's Mot. for Summ J. at 20.)

On June 14, 2006, Parents' attorney advised Ms. Zodda that Parents were requesting that Q.D. be placed at The Wolf School for the 2006-2007 school year at public expense. (See Ex. 7 at 2.) Ms. Zodda responded to Parents' attorney's letter stating: "There is absolutely no basis for a private school program placement at public expense for this student." (Ex. 10 at 2.)

On June 26, 2006, Parents filed a complaint with the Rhode Island Department of Education and requested an impartial due process hearing. (Ex. 1.) Parents summarized their complaint:

> Because Q[.D.] has made limited to no academic progress and because the Cranston School Department does not believe that there is a need to change Q[.D.]'s program the Cranston School Department has failed to and will continue to fail to provide Q[.D.] with a Free and Appropriate Public Education. (Ex. 1 at 3.)

Parents requested that the School be directed to reimburse them for the tuition and costs to place Q.D. at The Wolf School and that the School also transport Q.D. to that facility. (See id.)

The impartial due process hearing (the "Hearing") was conducted on August 21, 22, 30, and September 7 and 8, 2006. (Hr'g Tr.) Dr. Goldfischer, Dr. Stiener, Ms. Irving, Q.D's mother, the Director of Admissions at The Wolf School, Q.D.'s second grade teacher, and the School's psychologist testified at the Hearing. (Id.)

During his testimony, Dr. Goldfischer gave several recommendations and opinions which he had not included in his report. He stated that it would be "bad" for Q.D. to be in a class with children with behavior problems. (Hr'g Tr., I:42.) He also recommended that Q.D. be placed in an immersion program where services would be provided directly in the classroom, rather than a pull-out model. (See id. at I:43-44, 77,

88-90.) He testified not only that The Wolf School would be an appropriate placement for Q.D., but that Q.D. would make progress there. (See id. at I:44-46.) In contrast, Dr. Goldfischer testified that Q.D. would not progress under his IEP at the School. (Id. at I:45-46.) In his testimony, Dr. Goldfischer pointed out inadequacies in the School's IEP, whereas his report merely gave recommendations without reference to the IEP. (See Ex. 5; see, e.g., Hr'g Tr., at I:39-43.) Thus, he testified that the occupational therapy in the IEP was insufficient. (Hr'g Tr., I:41.) In contrast, in his report, he merely stated that the "school is encouraged to evaluate him to determine eligibility to receive school-based Occupational Therapy . . . . " (Ex. 5 at 23.) He also critiqued the IEP for not including speech and language therapy, (Hr'g Tr., I:40-41, 76, III:25), and for providing inadequate counseling, (Id. at I:41). His report, however, not only did not critique the IEP, it did not unambiguously recommend either speech and language therapy or additional counseling.[7] (See Ex. 5.)

Ms. Irving and the School's psychologist testified to Q.D.'s progress in academic, social and emotional areas. Dr. Stiener's testimony reiterated his praise of Ms. Irving's classroom. (Hr'g Tr., V:22.) He stated he agreed with many of the recommendations in Dr. Goldfischer's report, but that he found them too numerous. (Id. at V:14-17.) He also testified that The Wolf School would be an appropriate placement. (Id. at V:41.)

Finally, the Director of Admissions at The Wolf School testified about the program offered there. She stated that The Wolf School offered an immersion program

---

[7] With regard to speech and language therapy, the report included tentative statements such as, "Speech and Language Therapy might also be considered . . . ," (Ex. 5 at 23), and somewhat contradictory statements such as, "Q[.D.]'s language abilities were generally at or just below expected levels," (Id. at 5). With regard to counseling, the report stated that Q.D. "would strongly benefit from individual therapy to address his prominent problems with social skills, anxiety, depression . . . . ," but did not state what level of counseling would be adequate. (Id. at 19.) For a more complete comparison of Dr. Goldfischer's testimony and his report, see the Report and Recommendation at 24-27.

in which services are integrated into the classroom instead of provided on a pull-out model. (See Hr'g Tr., III:67.) Speech and language therapy would be provided in the classroom for six hours a week. (Id. at III:28.) Occupational therapy would be provided for seven hours a week in the same manner. (Id.) Instead of meeting with a counselor in scheduled sessions, she testified that counseling at The Wolf School is offered in the classroom in accordance with the student's needs. (See id. at 67-71.) A social worker is available to deal with crises and a psychologist consults with The Wolf School. (See id.) The Director of Admissions stated that although The Wolf School does not prepare an IEP in accordance with the standards of the public schools, it does formulate a plan for the student's development with the input of the professionals on staff and the parents. (Id. at III:59-66.) She testified that there are no behaviorially disordered students at The Wolf School. (Id. at III:35.)

On November 17, 2006, the Hearing Officer rendered her decision. (Hearing Officer's Administrative Decision ("Decision").) She found that the School had failed to provide Q.D. with a free and appropriate public education and that, as a result, Parents were justified in removing him from Cranston Public Schools and placing him in a private school. (See id. at 15.) The Hearing Officer further found that The Wolf School was an appropriate placement for Q.D. See id. She ordered the School to reimburse Parents for the cost of his enrollment at The Wolf School. (See id.)

## II. Analysis

The underlying issue in this case is whether the Hearing Officer erred in ordering the School to reimburse Parents for the cost of placing Q.D. in a private school. Parents may receive reimbursement for private school tuition under the Individuals with

Disabilities Education Act ("IDEA") in certain circumstances. 20 U.S.C. § 1412(a)(10)(c)(ii). The reimbursement provision is a small piece of the IDEA, a comprehensive scheme of statutes drafted with the general purpose of providing educational opportunities to children with learning disabilities. See § 1400(d). Broadly, the IDEA requires that the states meet minimum standards of educational services for disabled children in exchange for federal funds. See 20 U.S.C. § 1412; Honig v. Doe, 484 U.S. 305, 310-11 (1988). States can set higher standards, but must meet the federal floor to be eligible for federal funding. See 20 U.S.C. § 1412; Town of Burlington v. Dep't of Educ. for Commonwealth of Mass., 736 F.2d 773, 788-89 (1st Cir. 1984). In Rhode Island, the state laws adopt the federal standard for education of disabled children. Scituate Sch. Comm. v. Robert B., 620 F.Supp. 1224, 1234 (D.R.I. 1985). The IDEA's central requirement is that states identify children with disabilities who need special education and prepare an "individualized education program" ("IEP") so that the child receives a "free appropriate public education" ("FAPE"). See 20 U.S.C. § 1412(a); Honig, 484 U.S. at 311.

The IDEA reinforces this goal with several procedural safeguards, one of which is tuition reimbursement for private school. See 20 U.S.C. § 1415. The IDEA provides that "a court or a hearing officer may require the agency to reimburse the parents for the cost of . . . enrollment [in a private school] if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." 20 U.S.C. 1412(a)(10)(c)(ii). The private school must also be "'proper'" for the tuition to be reimbursed. Mr. I. ex rel. L.I. v. Maine School Admin. Dist. No. 55, 480 F.3d 1, 23 (1st Cir. 2007) (quoting Florence County School Dist. Four

v. Carter By and Through Carter, 510 U.S. 7, 15 (1993)); see also R.I. Special Education ("SPED") Regs. 300.148(c).

The statute sets forth a series of due process requirements for both the student (or the student's representatives)[8] and the school to achieve resolution on the matter. See 20 U.S.C. § 1415. Briefly, the parents must provide a due process complaint notice to the state and local educational agencies, to which the local educational agency must respond within 10 days. §§ 1415(b)(7), (c)(2)(B). Within 15 days of receiving the parents' complaint, the local educational agency is required to hold a meeting to attempt a resolution of the complaint. § 1415(f)(1)(B)(i). If the issue is not resolved within 30 days of this meeting, the parents have the opportunity for an impartial due process hearing conducted by the state or local educational agency. §§ 1415(f)(1)(A), (B)(ii). The parties must disclose to each other all the evaluations and recommendations that they intend to use at the hearing at least five days before the hearing begins. § 1415(f)(2). A party aggrieved by a hearing officer's decision has the right to appeal to a federal district court. § 1415(i)(2).

In this case, the parties do not contest that the due process requirements were met. Parents filed a due process complaint alleging that the School had not provided a FAPE and requesting tuition reimbursement and a due process hearing on June 26, 2006. After the Hearing Officer ruled in favor of Parents, the School filed a complaint appealing the Hearing Officer's Decision. The School then moved for summary judgment to overturn the Decision. As the parties have chosen not to submit additional evidence, the motion for summary judgment is a procedural device through which the court decides the case on the basis of the administrative record. See Bristol Warren Reg'l Sch. Comm. v. R.I.

[8] For ease of reference, this Court will refer to the representatives of the student as the parents.

Dep't of Educ. and Secondary Educs., 253 F.Supp.2d 236, 240 (D.R.I. 2003). Rather than considering the facts in the light most favorable to the non-moving party, the School, as the party "challenging the outcome of the administrative decision bears the burden of proof." See id.

This Court referred the matter to Magistrate Judge Martin, who recommended that the Hearing Officer's Decision be reversed. Parents objected to the magistrate judge's Report and Recommendation pursuant to Fed. R. Civ. P. 72(b).

A. Magistrate Judge's Report and Recommendation

A district court determines de novo any part of a magistrate judge's determination of a dispositive motion to which a proper objection has been filed. Fed. R. Civ. P. 72(b)(3). In this case, Parents have objected to Magistrate Judge Martin's recommendation to grant the School's motion for summary judgment. Summary judgment is a dispositive motion, therefore, this Court applies de novo review to the magistrate judge's recommendation. See Fed. R. Civ. P. 72(b)(3); Conetta v. Nat'l Hair Care Ctrs., Inc., 236 F.3d 67, 73 (1st Cir. 2001).

Magistrate Judge Martin conducted a painstaking review of the record and the Hearing Officer's Decision. In doing so, he determined that the deficiencies which the Hearing Officer found in the School's IEP could not "reasonably have been known" to the School at the time Parents requested the due process hearing. (Report and Recommendation at 2.) The magistrate judge found that because the School could not reasonably have known of these deficiencies and had a factual basis for believing that the student was making progress at the time Parents requested a due process hearing, the

School did not deny Q.D. a FAPE. Accordingly, the magistrate judge found that the Hearing Officer erred in ordering the School to reimburse Q.D.'s tuition.

This Court believes that Magistrate Judge Martin applied an incorrect legal standard to the School. The proposition that a school is only responsible for deficiencies in the IEP which it could reasonably know at the time a due process hearing is requested is not supported by statute or case law. As discussed, section 1415 establishes detailed procedural safeguards to protect the due process rights of both the parents and the school. Nowhere does it describe a 'reasonably could have known' standard. On the contrary, the structure of the statute indicates clearly that Congress did not intend such a standard.

Most persuasively, section 1415(f)(2) only requires that the parties disclose to each other all the evaluations and recommendations they intend to use at the due process hearing five days before the hearing takes place. However, the parents must request the due process hearing long before this five-day window, since the local educational agency has 15 days to hold a preliminary meeting with the parents after the parents file their complaint and another 30 days after that to attempt to resolve the complaint before the hearing. §§ 1415(f)(1)(A), (B)(i), (B)(ii). Thus, the law envisions that the school may not receive all the information until long after the parents request a due process hearing.

In this case, Parents gave Dr. Goldfischer's report to the School before they requested a due process hearing. In fact, Parents based their request for a hearing in part on the School's alleged failure to change the IEP in response to Dr. Goldfischer's report. There is no question, therefore, that the School received Parents' expert's report in time as required by section 1415(f)(2).

Arguably, however, the School should have *all* the information that will be presented at the hearing at least five days beforehand. See 20 U.S.C. § 1415(f)(2). The problem that the magistrate judge identified in this case is that information was presented at the hearing which was not in the reports. Specifically, Dr. Goldfischer testified to deficiencies in the IEP during the Hearing which he had not written in his report. The Hearing Officer relied heavily on this new information in rendering her decision.

Nevertheless, the statutes do not support a requirement that the School have all the information which will be presented at the hearing beforehand. As discussed, section 1415(f)(2) requires that all reports and recommendations be disclosed before the hearing. Nowhere does the IDEA require that the substance of all the testimony be disclosed beforehand. The statute goes on to instruct the Hearing Officer to make her decision "on *substantive* grounds based on a determination of whether the child received a free appropriate public education." § 1415(f)(3)(E)(i) (emphasis added). Thus, the language indicates that the hearing officer may consider all the information before her without concern for what the school could reasonably have known. The substantive review requirement is subject to three procedural exceptions, none of which protect the school.[9] § 1415(f)(3)(E)(ii). Moreover, the fact that all three procedural exceptions are enumerated suggests that no other exceptions can be read into the provision. See United States v. Councilman, 418 F.3d 67, 75 (1st Cir. 2005) ("'Where Congress explicitly

---

[9] (ii) Procedural issues
In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies--
(I) impeded the child's right to a free appropriate public education;
(II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
(III) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E).

enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.'").

Finally, this interpretation is supported by the policy that the primary burden of providing a FAPE rests on the school, not the parents. As the First Circuit observed, "'a child's entitlement to special education should not depend upon the vigilance of the parents.'" Maine Sch. Admin. Dist. No. 35 v. Mr. R., 321 F.3d 9, 20 (1st Cir. 2003) (quoting M.C. on Behalf of J.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 397 (3d Cir. 1996)). The structure of the IDEA reflects this policy. The schools are required to identify students with learning disabilities who need a special education and provide them with an IEP. 20 U.S.C. § 1412(a). The parents do not have the responsibility to show the school exactly where they went wrong or to provide a superior IEP. See Maine Sch., 321 F.3d at 20. "In mounting a challenge to a current or proposed IEP, the most that parents can be expected to do is to point out areas in which the IEP is deficient." Id.

For all these reasons, the Court finds that the proper inquiry in this case is simply whether the Hearing Officer correctly determined that the child was denied a FAPE based substantively on the evidence before her.

B. The Hearing Officer's Decision

The standard of review of a hearing officer's decision holds an intermediate position between administrative deference and de novo review. See Lenn v. Portland School Committee, 998 F.2d 1083, 1086 (1st Cir. 1993). This intermediate position might be best characterized as "involved oversight." See Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990). "[T]he judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." Lenn, 998

F.2d at 1087. Rather, the court must consider the findings with care and respond to the hearing officer's resolution of each material issue. Burlington, 736 F.2d at 792. "After such consideration, the court is free to accept or reject the findings in part or in whole," provided that the court "bas[es] its decision on a preponderance of the evidence." See 20 U.S.C. § 1415(i)(2)(C)(iii); Burlington, 736 F.2d at 792. With regard to the hearing officer's rulings of law, the court may "disregard[] any rulings about applicable law that are not in conformity with applicable statutes and precedents." Ross v. Framingham Sch. Comm., 44 F.Supp.2d 104, 112 (D. Mass. 1999) (citing Abrahamson v. Hershman, 701 F.2d 223, 231 (1st Cir. 1983). However, when the issue involves a school district's educational expertise, the courts must give "'due weight'" to the administrative findings because "[j]urists are not trained, practicing educators." Roland M., 910 F.2d at 989.

In this case, the Hearing Officer's Decision is flawed by a number of obvious inconsistencies and mistakes. Most frustrating, the Hearing Officer tends to incorrectly attribute evidence introduced only during testimony at the hearing to reports prepared before the hearing. As the magistrate judge observed, the strongest evidence supporting an inadequate FAPE was first presented at the hearing and was not presented to the School beforehand.

The most egregious example is the analysis of Dr. Stiener's evaluation in June 2005. The Hearing Officer criticized the School for failing to add a speech and language component and additional counseling after receiving Dr. Stiener's report in 2005. Dr. Stiener's report, however, nowhere made either recommendation and, in fact, warmly endorsed Ms. Irving's classroom.

The Hearing Officer's Decision also mischaracterizes Dr. Goldfischer's report as recommending significant changes to the IEP. (Decision at 13.) To the contrary, Dr. Goldfischer's recommendations in his report were often contradictory and did not clearly indicate ways in which the IEP should be changed. In particular, the Hearing Officer relies on Dr. Goldfischer's report for the recommendation that Q.D. not be placed in a classroom with "emotionally disturbed and behavior disordered" children. (Id.) But, Dr. Goldfischer did not make this recommendation in his report.

The problem with the Hearing Officer's Decision, however, is not a lack of evidence suggesting that the IEP was inadequate, but that the Hearing Officer repeatedly misattributed the sources of the evidence. Her findings that Q.D.'s needs were not being met, that the IEP was deficient and that The Wolf School was an appropriate placement do, however, have a great deal of evidentiary support in the record. This Court must analyze the Hearing Officer's findings to determine the extent to which those findings are supported by the evidence and the law. See Burlington, 736 F.2d at 792 ("The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue.").

1. Whether Q.D. was Denied a FAPE

The first prong in determining whether Parents should be reimbursed for Q.D.'s private school placement is whether Q.D. was denied a FAPE. See Florence, 510 U.S. at 15. In Board of Educ. v. Rowley, the Supreme Court rejected the notion that a FAPE must maximize a disabled student's potential, finding instead that a FAPE must provide a reasonable probability of educational benefits with sufficient supportive services at public

expense. See 458 U.S. 176, 203-04 n.26 (1982). The educational benefits an IEP must be "reasonably calculated" to achieve are "'effective results' and 'demonstrable improvement' in the various 'educational and personal skills identified as special needs.'" Lenn, 998 F.2d at 1090. Thus, a FAPE should provide for all of a child's special needs, be they "academic, physical, emotional, or social," not just the purely academic. See id. at 1089. In addition, the IDEA favors mainstreaming, or, as it is termed in the statute, education in the "[l]east restrictive environment." See 20 U.S.C. § 1412(a)(5); Lenn, 998 F.2d at 1086. "To the maximum extent appropriate," a disabled student should be educated "with children who are not disabled . . . . " See 20 U.S.C. § 1412(a)(5).

The Court addresses each of the Hearing Officer's material findings of fact to determine if she correctly found that a FAPE was denied to Q.D. See Burlington, 736 F.2d at 792. The Hearing Officer found that Q.D.'s diagnosis was irrelevant, that Q.D. had not progressed and that the IEP was deficient in failing to provide speech and language therapy, increased counseling services, and placement with children who could "enhance his socialization." (Decision at 12-13.)

First, this Court agrees with the Hearing Officer that the precise diagnosis of the child is irrelevant to the resolution of this case. The essential issue is whether the IEP adequately met the child's educational needs, regardless of the label under which the child's various disabilities fall. This is particularly the case since many of the educational needs associated with the disputed disorders overlap. (Hr'g Tr., I:58.)

The second issue is whether the alleged lack of progress is, as Parents argue, determinative. The Hearing Officer found that Q.D. had not progressed and was, in fact,

regressing. Parents rely on this finding to argue that failure to change the IEP, given the lack of progress, is a denial of a FAPE.[10]

The Hearing Officer found that Q.D. had not progressed based on the "objective" evidence of Q.D.'s scores on the Woodcock-Johnson test. (Decision at 12.) From the spring of 2005 to the spring of 2006, his score dropped from 3.0 to 2.9. In coming to the conclusion that Q.D. did not make academic progress, the Hearing Officer had to weigh a considerable amount of conflicting evidence before deciding to rely on the evidence of the Woodcock-Johnson test. As the fact-finder, her credibility findings from the Hearing should be given deference. Lenn, 998 F.2d at 1087 ("[T]he administrative proceedings must be accorded 'due weight.'"). Nevertheless, even if this Court accepts the finding that Q.D. made no *academic* progress, this finding does not answer the question of whether Q.D. made progress for the purposes of a FAPE. Under the IDEA, academic development is not the sole measure of progress. As the First Circuit stated in Roland M., "purely academic progress – maximizing academic potential – is not the only indicia of educational benefit implicated either by the Act or by state law." 910 F.2d at 992. Rather, the IDEA entitles qualifying children to services that "target '*all* of [their] special needs,' whether they be academic, physical, emotional, or social." Lenn, 998 F.2d at 1089. This fits with the broad purpose of the IDEA that a FAPE prepare children to function independently in the world. See 20 U.S.C. § 1400(d)(1)(A); Mr. I. ex rel. L.I, 480 F.3d at 12.

---

[10] "Of course, if a student had failed to make any progress under an IEP in one year, we would be hard pressed to understand how the subsequent year's IEP, if simply a copy of that which failed to produce any gains in a prior year, could be appropriate." Carlisle Area Sch. v. Scott P. By and Through Bess P., 62 F.3d 520, 534 (3d Cir. 1995).

Here, it is uncontradicted that the child was making some progress with regard to emotional and social skills.[11] Therefore, this Court rejects the Hearing Officer's conclusion that the child was making no progress as contrary to law. Ross, 44 F.Supp.2d at 112 ("A district court reviewing a state administrative officer's rulings of law under the IDEA framework is acting appropriately in disregarding any rulings about applicable law that are not in conformity with applicable statutes and precedents." (citing Abrahamson, 701 F.2d at 231)).

The fact that Q.D. was making some progress refutes Parents' argument that the child was denied a FAPE due to the School's refusal to change the IEP in response to a lack of progress. Nevertheless, a showing of some progress does not in itself prove that the child was receiving a FAPE. See Rowley, 458 U.S. at 203 n.25 ("We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.'" ) The operative question is whether the IEP was reasonably calculated to achieve "'effective results' and 'demonstrable improvement' in the various 'educational and personal skills identified as special needs.'" Lenn, 998 F.2d at 1090. Thus, the Court must continue on to an analysis of whether the Hearing Officer correctly found that Q.D.'s needs were not adequately met by the School's IEP.

This is a close case. On the one hand, the School's IEP appears to have worked in at least some respects. Ms. Irving testified to Q.D.'s social and emotional progress,

[11] In their response to the School's Statement of Undisputed Facts, Parents contest the School's assertion that Q.D. made social and emotional progress. (Def.'s Response to PSUF ¶ 20.) However, Parents' response is unsupported. Parents rely on a letter from the School to show that the School's officials themselves noted regression. (Id.) In fact, this letter only states that the child would regress socially and emotionally over the upcoming summer while out of regular school, not that he had regressed in the previous year. (Ex. 9.) In addition, Ms. Irving's responses to the rating scales may have indicated serious social and emotional impairment, but, as snapshots in time, the rating scales do not show either progress or regression. (Ex. 6; Hearing Tr., V:42.)

particularly his increased willingness to participate with his peers and communicate his feelings. The School's psychologist, Ms. Irving, and Dr. Stiener all found that Q.D. had made some academic progress. Of the two experts who testified at trial, one, Dr. Stiener, rendered a highly favorable opinion of Ms. Irving's classroom. (See Hr'g Tr., V:22-23 ("I thought she developed a nice behavioral plan. . . . To be honest, there are not a lot of teachers willing to put that much effort into it.").)

On the other hand, it is uncontested that Q.D. had significant special needs and there is evidence that some of those needs were not being met. Despite Ms. Irving's testimony and progress reports describing Q.D.'s gains, she consistently gave him grades of C, the lowest grade she tended to give students. In filling out the rating scales, Ms. Irving described most of the problematic behaviors as "frequently observed," "often," or "almost always true."[12] More importantly, the other expert at the hearing, Dr. Goldfischer, pointed out a number of specific areas in which the IEP did not meet Q.D.'s needs. He stated that Q.D. needed an immersion model, in which he received constant reinforcement for his needs in the classroom, rather than the pull-out model which the School was providing. He found the IEP deficient in that it did not have a component designed to target Q.D.'s speech and language needs. Dr. Goldfischer further found that the IEP failed to provide adequate occupational therapy and counseling. Finally, he opined that placing Q.D. in a classroom with children exhibiting behavior problems would undermine Q.D.'s progress by setting the wrong behavioral models. Several of the students in Ms. Irving's classroom were emotionally disturbed.

[12] These behaviors include: "expresses feelings of frustration and anger inappropriately," "demonstrates eccentric forms of behavior," "fails to predict probable consequences in social events," etc. (Ex. 6 at 3, 4, 6.)

One of the challenges in weighing this evidence is that the opinions of the two experts, Dr. Goldfischer and Dr. Stiener, conflict. Unlike Dr. Goldfischer, Dr. Stiener did not find serious deficiencies in the IEP.[13] The Hearing Officer, however, clearly relied on Dr. Goldfischer's opinion at the expense of Dr. Stiener's favorable assessment of Ms. Irving's classroom. This Court finds that the Hearing Officer's decision to rely on Dr. Goldfischer is supported by the preponderance of the evidence. See 20 U.S.C. § 1415(i)(2)(C)(iii). Dr. Goldfischer saw Q.D. more recently and conducted a more extensive evaluation. Dr. Goldfischer's critiques of the IEP as stated in his testimony may be discounted to some extent because he did not include them in his report. Nevertheless, his testimony can be explained at least in part by the fact that he was asked directly at the Hearing about ways in which the IEP was deficient. In his report, he merely gave general recommendations.

This Court also accepts the Hearing Officer's finding that there were deficiencies in the School's IEP. Firstly, Q.D. clearly had considerable problems which did not appear to be improving significantly, if at all. The Hearing Officer may have focused too narrowly on the evidence of academic regression from the Woodcock-Johnson tests, despite testimony to the contrary from the School's psychologist, Ms. Irving, and Dr. Stiener. However, Q.D.'s consistently low grades also belie evidence of significant progress. At the minimum, academic progress was "limited," as even the School admits. (See Ex. 10.) Moreover, although Q.D. made social and emotional gains, the record is full of evidence of continuing social and emotional problems.

---

[13] Dr. Stiener testified that "for the most part [he] agreed with [Dr. Goldfischer's] recommendations." (Hr'g Tr., V:15.) However, he was referring to Dr. Goldfischer's recommendations in his report, not the more pointed deficiencies that Dr. Goldfischer stated in his testimony. (See id.)

Secondly, Dr. Goldfischer gave credible and concrete testimony on deficiencies in the IEP. He found that the IEP was inadequate in that it failed to offer immersive services, speech and language therapy, sufficient occupational therapy, adequate counseling, and placement with children who offered a good example. Again, the Hearing Officer confused these deficiencies in the "Discussion and Conclusion" section of her Decision. (Decision at 12.) Nevertheless, she identified them all in her "Review of Evidence and Findings of Fact" section. (Id. at 3-11.) Despite the confusion in her analysis, the Hearing Officer clearly relied on this evidence in making her finding that the IEP was deficient. This Court finds that the Hearing Officer had a sufficient evidentiary basis from which she concluded that the IEP was deficient given Dr. Goldfischer's testimony and the evidence of Q.D.'s persistent problems.

The final question is whether these deficiencies were severe enough to deny Q.D. a FAPE. As explained above, this is a close case. Although, the School appears to have made an effort to provide the appropriate services to Q.D., there is also strong evidence of continuing deficiencies despite those efforts. In such a case, the Court hesitates to second-guess the Hearing Officer's finding that a FAPE was denied. As the First Circuit observed, "[j]urists are not trained, practicing educators." Roland M., 910 F.2d at 989. "[T]he alchemy of 'reasonable calculation' necessarily involves choices among educational policies and theories – choices which courts, relatively speaking, are poorly equipped to make." Id. at 992. Here, Q.D.'s needs were significant and clearly inhibited his progress toward the IDEA's goals of self-sufficiency and a meaningful education. Moreover, Dr. Goldfischer credibly identified specific areas in which the IEP failed to

meet Q.D.'s needs. This Court, therefore, gives "due weight" to the Hearing Officer's analysis and finds that Q.D. was denied a FAPE by the School. See id. at 989.

2. Whether The Wolf School was a Proper Placement

After finding that a FAPE has been denied, the second step in deciding whether to award tuition reimbursement for a private school is the determination of whether the private school is a "proper" placement.[14] Mr. I. ex rel. L.I., 480 F.3d at 23; R.I. SPED Regs. 300.148(c). Like the standard for a FAPE, to be "proper," a private school placement must be "'reasonably calculated to enable the child to receive educational benefits.'" See Florence, 510 U.S. at 11. However, the private school need not meet all state standards to be proper. R.I. SPED Regs. 300.148(c). As the Supreme Court stated in Florence, "'it hardly seems consistent with the Act's goals to forbid parents from educating their child at a school that provides an appropriate education simply because that school lacks the stamp of approval of the same public school system that failed to meet the child's needs in the first place.'" 510 U.S. at 14. Thus, for example, the private school need not be included on the state's list of approved schools to be a proper placement. Id. The court must focus instead on the substance of the private school's teaching and services. See Florence, 510 U.S. at 11, 14.

[14] First Circuit case law requires that the private school placement be "proper," whereas the Rhode Island Special Education Regulations require that it be "appropriate." Mr. I. ex rel. L.I., 480 F.3d at 23; R.I. SPED Regs. 300.148(c). This Court finds the standard to be the same. Firstly, Rhode Island's laws and regulations on education for disabled children adopt the federal standard in general. Scituate Sch. Comm., 620 F.Supp. at 1234. Secondly, the federal standard for a private school is essentially the same as the standard for a FAPE: services "'reasonably calculated to enable the child to receive educational benefit.'" See Florence, 510 U.S. at 11. The fact that the Rhode Island Special Education Regulations use the term "appropriate," the same term as is used in "free and appropriate public education," suggests that these standards are the same in Rhode Island too. R.I. SPED Regs. 300.148(c).

The School argues that The Wolf School is inappropriate because it is not the "least restrictive environment" and because it does not even provide the services, such as counseling, the lack of which Parents use to justify Q.D.'s removal from public school.

The School is correct in that the IDEA favors mainstreaming. See 20 U.S.C. § 1412(a)(5). Nevertheless, this Court must balance the IDEA's emphasis on mainstreaming against the "Act's mandate for educational improvement." Roland M., 910 F.2d at 993. The School cannot boast that it provided much interaction for Q.D. with his non-disabled peers. His primary placement was a self-contained classroom with other disabled students. Although Q.D. did join mainstream classes for art, music, and physical education, he was often accompanied by an aide.

Moreover, the modest level of mainstreaming available at the School must be balanced against The Wolf School's provision of services in which the School's IEP was deficient. At The Wolf School, Q.D. would be provided speech and language therapy, counseling, and occupational therapy in an all-day, immersive setting. He would not be exposed to children with behavior disorders. Thus, the Hearing Officer correctly found that the benefits offered by The Wolf School would outweigh any loss of mainstreaming opportunities. See Roland M., 910 F.2d at 993.

The School argues that The Wolf School does not provide the psychological counseling which Dr. Goldfischer found deficient in the IEP. However, counseling would be provided in the classroom in consultation with The Wolf School's psychologist. Therefore, this Court concurs with the Hearing Officer's finding that The Wolf School provides adequate counseling.

The School also argues that The Wolf School is improper because it is not accredited as a special education school by the State of Rhode Island and does not even formulate its own IEPs. As the Supreme Court held in Florence, however, the failure to meet state standards for a public school does not make a private school an improper placement as long as the private school substantively offers a proper education. See 510 U.S. at 14. Here, state accreditation is comparable to the inclusion on a state-approved list which the Supreme Court found unnecessary in Florence. See id. With regard to the formulation of IEPs, the Director of Admissions at The Wolf School testified that The Wolf School creates a plan for the student, but that it cannot be termed an IEP by state standards because the appropriate personnel do not draft it. This Court finds that these deficiencies do not render The Wolf School improper.

In sum, the evidence showed that The Wolf School would meet Q.D.'s needs and provide him with teaching and services "reasonably calculated" to achieve a meaningful "educational benefit." See Florence, 510 U.S. at 11. This Court agrees with the Hearing Officer's finding that The Wolf School was a proper placement.

III. Stay-Put Motion

The School objects to Magistrate Judge Martin's order granting Parents' motion to "stay-put" pursuant to 20 U.S.C. § 1415(j). Because a "stay-put" motion is a nondispositive matter, this Court considers the magistrate judge's ruling under the "clearly erroneous or . . . contrary to law" standard of review. Fed. R. Civ. P. 72(a).

Parents moved that the School pay the tuition for Q.D.'s private school placement during the pendency of the School's appeal of the Hearing Officer's decision. Under Federal Regulations, the hearing officer's order that the public school pay the student's

private tuition is considered an "agreement" between the school and the parents until an appeal is completed. 34 C.F.R. §§ 300.518(a), (d); see also 20 U.S.C. § 1415(j).

The School objected to the magistrate judge's order in Parents' favor on the grounds that Parents must exhaust their administrative remedies for *each* academic year in which an IEP is challenged.[15] Thus, the School concedes that, due to the Hearing Officer's Decision that the IEP for the 2006-2007 school year was inadequate, it is bound to pay Q.D.'s private school tuition for that year. The School contends, however, that it is not required to pay the 2007-2008 school year tuition unless Parents again challenge the IEP, request a due process hearing, and obtain a judgment in their favor from a hearing officer.

Relying on Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., Magistrate Judge Martin found that the requirement that the parents exhaust administrative remedies does not apply to the "stay-put" provision. 297 F.3d 195, 199 (2d Cir. 2002). The School, however, argues that Murphy is distinguishable from the case at hand because, in Murphy, the parents sought a due process hearing for the succeeding academic year. See id. at 198. This distinction, however, does not affect the applicability of Murphy to this case. See id. The Second Circuit's holding in Murphy was that the parents need not exhaust their administrative remedies, not that the parents must reach a certain point in the administrative proceedings. See id. at 199. As the magistrate judge found, the case law supports Parents' position that, once the hearing officer has ordered tuition

[15] The School relies on MM ex rel. DM v. School Dist. of Greenville County, for this proposition. 303 F.3d 523, 536 (4th Cir. 2002) ("When parents of a disabled child challenge multiple IEPs in court, they must have exhausted their administrative remedies for *each academic year* in which an IEP is challenged.").

reimbursement, the School must reimburse tuition until the appeals process has been completed.

Accordingly, this Court finds that the magistrate judge's disposition is not contrary to law. Further, Magistrate Judge Martin only ordered reimbursement for half of the 2007-2008 school year. Because the appeal has continued past the end of the school year, the School must reimburse Parents for the full 2007-2008 school year tuition.

IV. Conclusion

For the reasons set forth above, the School's motion for summary judgment is denied. The decision of the Hearing Officer is affirmed. This Court also upholds the magistrate judge's order to "stay-put." The School is hereby ordered to reimburse Parents for private school tuition for the full 2007-2008 school year.

SO ORDERED

Mary M. Lisi

Mary M. Lisi
United States District Judge
September 8, 2008